**KING & SPALDING**

King & Spalding LLP
1290 Avenue of the Americas
14th Floor
New York, NY 10104

Tel: +1 212 556 2100
Fax: +1 212 556 2222
www.kslaw.com

Kenneth Fowler
Partner
Direct Dial: +1 212 556 2227
kfowler@kslaw.com

July 14, 2026

**VIA ECF**
Honorable Ramon E. Reyes, Jr.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *Bernardo, et al. v. Delta Air Lines, Inc.*, No. 1:25-cv-04608-RER-SDE

Your Honor:

Defendant Delta Air Lines, Inc. ("Delta") respectfully submits this letter in response to Plaintiffs' Notice of Supplemental Authority (ECF 42), which relies on *Brenman v. United Airlines, Inc.*, No. 25-cv-06995-JD, 2026 WL 1950456 (N.D. Cal. July 6, 2026). *Brenman* does not support denial of Delta's pending motion to dismiss. The decision rests on materially different allegations, did not address the contractual disclaimers central to Delta's motion, applied California rather than Georgia law, and should not alter this Court's analysis.

First, the allegations in *Brenman* were materially different. There, the named plaintiffs alleged specific representations about "windows" and "window seats" on their tickets, and the amended complaint included images of the alleged representations on which the plaintiffs claimed to have relied. *Brenman*, No. 3:25-cv-06995, ECF 24, Am. Compl. ¶ 58 (Oct. 15, 2025) (attached hereto as Exhibit A). The *Brenman* plaintiffs alleged, for example, that "the word 'window' was printed on [one plaintiff's] ticket" (*id.* ¶ 10), that another plaintiff's "ticket states that the seat was a 'window seat'" (*id.* ¶ 11), and that a third plaintiff's seats "were labeled with the word 'window' during the seat selection process" and that "her ticket . . . included the phrase 'Window Seat.'" (*Id.* ¶ 14). The *Brenman* plaintiffs also alleged that the terms printed on their boarding passes, including the term "window", were terms included in the United contract. (*Id.* ¶¶ 58-62). The *Brenman* Court relied on these allegations when it found, "[t]he ticket that entitles the passenger to fly on United is a boarding pass that expressly states a window seat was purchased." *Brenman*, 2026 WL 1950456, at *2.

July 14, 2026
Page 2

Plaintiffs' Amended Complaint here contains no comparable allegations. It identifies no contractual language and no specific representation allegedly made by Delta. Nor have Plaintiffs identified any such representation in discovery. Instead, each Plaintiff offers only conclusory assertions that they expected a window, without identifying any language from Delta's contract that promised one. ECF 16 (First Amended Complaint) ¶ 8 (Bernardo alleges "the seat he selected for his wife did not have a 'window,' as Delta represented," without specifying the alleged representation); *id.* ¶ 10 (Roberts alleges she understood her seats to have a window "based on Delta's representations during the booking process," without identifying those "representations"); *id.* ¶ 11 (Valentine alleges he "understood, based on information provided in his booking confirmation and ticket information, that he specifically booked seats with windows"). A material factual distinction explains why Plaintiffs cannot make allegations like those in *Brenman*: Delta's boarding passes do not include the term "window."

Second, *Brenman* did not address contractual language expressly stating that seat assignments are not part of the parties' contract. That issue is central here. As Delta explained in its motion papers, Delta's Contract of Carriage states that "seat assignments, and similar details reflected in the ticket . . . form no part of this contract," which bars Plaintiffs' breach-of-contract claim. *See* ECF 26 (Delta Mot. to Dismiss), at 11–15; ECF 29 (Delta Reply), at 1–5. Because the *Brenman* court did not expressly consider any comparable disclaimer in United's contract, its decision cannot be read as a holding—much less persuasive authority—on the contractual issue presented here.

Third, the *Brenman* court's analysis of United's alternative claims is limited and unpersuasive. The court cited *Hickcox-Huffman v. U.S. Airways, Inc.,* 855 F.3d 1057 (9th Cir. 2017) for the premise that implied contract claims are not preempted. *Brenman*, 2026 WL 1950456, at *1. But *Hickox-Huffman* did not reach such a conclusion.[1] To the contrary, the Ninth Circuit explained that it "did not reach any of [Hickox-Huffman's] alternative claims because we have determined that she has pleaded an express breach of contract. These alternative claims are all reformulations in the event that her breach of contract claim was deemed preempted." *Hickcox-Huffman*, 855 F.3d at 1066. Nor did *Brenman* address any argument that United's contract expressly precludes implied covenants. *Brenman*, 2026 WL 1950456, at *1–3. Here, Delta's contract similarly expressly disclaims implied promises, which defeats Plaintiffs' implied-covenant claim. ECF 26, at 21; ECF 29, at 8–10.[2]

---

[1] Nor did *Brenman* call into doubt the Supreme Court's holding that the ADA permits only a narrow exception for plaintiffs "seeking recovery solely for [an] airline's breach of its own, self-imposed undertakings," *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 228 (1995), or its holding that a "[s]tate's implied covenant rules will escape pre-emption only if the law of the relevant State permits an airline to contract around those rules[.]" *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 288, (2014).

[2] In addition, unlike Delta, United did not contend that the ADA barred the promissory estoppel claims against it. *Brenman*, No. 3:25-cv-06995, ECF 32 (United Motion to Dismiss), at 19 (attached hereto as Exhibit B). *Brenman* thus cites no cases applying the ADA to promissory estoppel claims. *See Brenman*, 2026 WL 1950456, at *1–3.

July 14, 2026
Page 3

Fourth, *Brenman* applied California law, not Georgia law. *See generally Brenman*, 2026 WL 1950456, at **2–3. Delta's Contract of Carriage is governed by Georgia law. ECF 16 ¶ 79; ECF 26 at 11; *see generally* ECF 28 (Plaintiffs' Opposition). Under Georgia law, Plaintiffs must identify the contractual provision that Delta allegedly breached. *Estate of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358–59 (11th Cir. 2020); *see also Harrington v. Delta Air Lines, Inc.*, 2006 WL 1581752, at *4-5 (D. Mass. Feb. 21, 2006) (dismissing contract claim because "[a]irline tickets and contracts of carriage are not difficult to come by," but plaintiff did not submit or identify a specific breached provision). Plaintiffs have not identified any such provision here. Their contract claim should therefore be dismissed regardless of *Brenman*.

Plaintiffs' reliance on *Brenman* also does not salvage their alternative theories. Even if *Brenman* allowed the claims there to proceed on materially different allegations and contractual language, Delta's Contract of Carriage expressly excludes seat assignments from the contract and disclaims implied promises of the kind Plaintiffs seek to enforce. Under *Wolens* and *Ginsberg*, the ADA preempts claims that would impose obligations beyond the parties' voluntary undertaking. Plaintiffs' claims, therefore, remain preempted to the extent they depend on implied covenants, implied promises, or state-law duties not found in Delta's Contract of Carriage.

Respectfully submitted,

/s/ Kenneth Fowler

Kenneth Fowler
*Counsel for Delta Air Lines, Inc.*
(NY Bar No. 5272109)

cc:     All counsel of record via ECF

# EXHIBIT A

Carter E. Greenbaum (SBN 344692)
**GREENBAUM OLBRANTZ LLP**
160 Newport Center Drive, Suite 110
Newport Beach, CA 92660
Tel: (332) 222-9119
Email: carter@greenbaumolbrantz.com

**GREENBAUM OLBRANTZ LLP**
Casey Olbrantz (*pro hac vice*)
244 Fifth Avenue, Suite C221
New York, NY 10001
Email: casey@greenbaumolbrantz.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARC BRENMAN, AVIVA COPAKEN, SEAN MINYARD, ROBERT MONROE, and CINDY PAWLOWSKI, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED AIRLINES, INC, <br><br> Defendant. | **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> Case No. 3:25-cv-06995-JD <br><br> JURY TRIAL DEMANDED |

Plaintiffs MARC BRENNAN, AVIVA COPAKEN, SEAN MINYARD, ROBERT MONROE, and CINDY PAWLOWSKI ("**Plaintiffs**"), individually and on behalf of all others similarly situated, bring this class action against Defendant UNITED AIRLINES, INC. ("**United**") and allege upon personal knowledge and information and belief as to all other matters:

- 1 -

FIRST AMENDED CLASS ACTION COMPLAINT

## INTRODUCTION

1.      This class action seeks redress for United's unlawful practice of charging passengers upgrade fees to buy seats that United represents have a "window," but that are actually next to a blank wall. Plaintiffs and the proposed class members paid valuable consideration to obtain a window to improve their flying experiences. United specifically represented to Plaintiffs and class members that the particular seats they selected for purchase had a "window," even though United knew full well they did not. United even generated boarding passes and ticket records—which United concedes are enforceable components of its passenger contracts—that expressly confirmed that Plaintiffs purchased, and were entitled to obtain, seats with a "window." Notwithstanding that United knew that Plaintiffs' chosen seats were actually next to a blank wall, it proceeded to enter contracts that promised windows, as memorialized in Plaintiffs' ticket records, and accepted extra consideration for them. By selling "window" seats only to provide windowless ones, United breached its contracts with Plaintiffs and the putative class members, who are entitled to damages for United's misconduct.

2.      The majority of planes in United's fleet have one or more exterior-row seats that are adjacent to a blank wall, or have severely misaligned windows that are not reasonably usable ("**Windowless Window Seat(s)**"). These seats exist for various reasons unique to each plane's design. For instance, certain models of United's Boeing 737 and Airbus A321 aircraft have air conditioning ducts that run through a side panel and prevent the installation of windows in certain rows.

3.      For many years, United has knowingly and routinely sold Windowless Window Seats to passengers while representing that the seats have a window. United operates hundreds of these aircraft, which each make several flights every day. As a result, during the class period, United has likely sold over a million Windowless Window Seats. For example, seat 11A in United Boeing 737-900 planes is a Windowless Window Seat, yet United specifically informed passengers during the booking process that seat 11A has a "window," as shown in the screenshots below.

FIRST AMENDED CLASS ACTION COMPLAINT



4.      When passengers book an airplane seat adjacent to the wall, they expect it to have a window. United gives passengers no reason to doubt that expectation, but has long confirmed the same, and entered contracts with passengers that promise the same. United's website and passenger interfaces exclusively refer to "window," "middle," and "aisle" seats. Until after this litigation was filed, United maintained pre-booking and post-booking electronic seat selection interfaces that described *every* wall-adjacent seat as having a "window"—including for Windowless Window Seats. Moreover, United even issued tickets to every passenger who purchased Windowless Window Seats that prominently displayed the phrase "Window Seat," which confirmed United's contractual obligation, while also inducing passengers to abstain from changing their seats prior to boarding.

FIRST AMENDED CLASS ACTION COMPLAINT

**5.** A large proportion of passengers are willing to pay extra for windows. Many passengers have a fear of flying or experience anxiety, claustrophobia, or motion sickness, and windows provide greater comfort in an otherwise distressing environment. Parents purchase them with the hope they will captivate or distract antsy children. For many others, it is a special experience to see the world from 30,000 feet, or to watch a descent into SFO, LGA, or O'Hare. Whatever the motivation for buying a window, had Plaintiffs and the putative class members known that they were buying Windowless Window Seats, they would not have selected them at all, much less paid extra for them.

**6.** United's practice is deliberate. It has long been on notice of passenger complaints that this practice is misleading and unfair, but United has deliberately continued it for many years. United has received countless complaints from passengers who experienced disappointment, anxiety, claustrophobia, dizziness, and severe distress due to their unwitting purchase of a Windowless Window Seat "upgrade." In response to such complaints, United's own customer service representatives have referred to the practice as "misleading." In 2017, in response to a tweet by a dissatisfied passenger, United tacitly admitted it sells Windowless Window Seats as providing a window by responding, "Sorry," and misleadingly claiming that "We never guaranteed you will get a window." In response to a more recent complaint, United admitted that "[w]hile some seats may be labeled as 'window' based on the aircraft layout, there are instances where the actual window placement doesn't fully align."

**7.** United's booking software has long had the capacity to affirmatively disclose Windowless Window Seats to passengers. Several of United's competitors, such as American Airlines and Alaska Airlines, use the same software features to specifically alert passengers to Windowless Window Seats. By contrast, United misleadingly sells Windowless Window Seats as having a window and accepts substantial premiums for them, only to breach its contractual promises and disappoint

FIRST AMENDED CLASS ACTION COMPLAINT

unwitting passengers when they arrive at their seats. Tellingly, after this lawsuit was filed, United changed its practices, in part, by replacing its seat map's former descriptor "Window" with "No Window" for certain (but not all) of its Windowless Window Seats.

8.    In short, United has routinely and systematically entered contracts to provide passengers with "window" seats in exchange for additional consideration, only to breach its obligations upon providing Windowless Window Seats. Through this action, Plaintiffs, on behalf of themselves and the class they seek to represent, seek compensatory damages for United's serial wrongdoing.

**PARTY BACKGROUND AND EXPERIENCE**

9.    Plaintiff Marc Brenman is a resident of San Francisco, California. Brenman is a lifelong civil servant, who served as a Senior Policy Advisor for Civil Rights at the United States Department of Transportation and the Executive Director of the Washington State Human Rights Commission. He is a professor and scholar, who has written numerous books on public participation, the first amendment, and antisemitism. He regularly purchases flights between Washington D.C. and San Francisco. He routinely purchases a window seat so that he can watch the view as he crosses the country. He often uses benefits conferred from annual fees he pays for his United credit card to select such seats. Sometimes, he cannot use such credit card benefits to select the seat of his choice. In those cases, he pays more to select the window seat of his choice. On at least one occasion in the past year, Brenman purchased a window seat, only to discover that his "window" seat did not have a window at all. Brenman paid extra money or utilized United credit card benefits to purchase that window seat because United represented that the seat had a "window." Brenman provided United with notice of his complaint and they refunded him 7,500 miles, which is insufficient to compensate him for the extra consideration he remitted to buy a window.

FIRST AMENDED CLASS ACTION COMPLAINT

10.     Plaintiff Robert Monroe is a resident of Honolulu, Hawaii. Monroe is a United States Army veteran who achieved the Chief Warrant Officer 4 rank. He served this country through multiple tours of duty in Afghanistan. On his last tour of duty during Operation Enduring Freedom, he suffered a debilitating injury to his left ulna, resulting in complex regional pain, hypersensitivity, nerve damage, and long-term disabilities. As a result of the injury, he (or his wife on his behalf) books a seat on the left window-side of the plane so that he can rest his arm on the windowsill, where he is most comfortable. In 2025, he purchased a round-trip flight between Honolulu, Hawaii and Hartford, Connecticut. He asked his wife to book him a window seat, which she did through the United website, using a credit card that Monroe jointly holds and pays for. Monroe confirmed that the seat was described as a "window" during the booking process, and the word "window" was printed on Monroe's ticket. He paid extra for that "window" seat. Nevertheless, the seat Monroe purchased was a Windowless Window Seat. As a result, Monroe experienced significant pain and discomfort because he could not position his elbow on the windowsill he believed he purchased. He complained on numerous occasions to a flight attendant, who refused to take any action or move him. The flight attendant told him to "look out someone else's window" if he wanted a window. Monroe provided United with notice of his complaint, but they refused to refund any of the fees he paid to buy a seat with a window. Instead, United gave Monroe 5,000 airline miles.

11.     Plaintiff Sean Minyard is a resident of Marin County, California. In 2025, he purchased a flight from SFO to Kona International Airport in Hawaii. He paid an extra fee to upgrade from Basic Economy to Regular Economy so that he could select his seat. He selected a window seat because he suffers from claustrophobia on flights. He also wanted to see the aerial view of the Big Island of Hawaii as he descended, which his friends described to him as "stunning" from an airplane. Due to aircraft changes, however, Minyard's seat was moved from a window seat to a non-window seat. As a result, he paid an additional $52.99 to move to a preferred section of the plane with a

FIRST AMENDED CLASS ACTION COMPLAINT

window. United represented to Minyard that his seat was a "window" seat. It was described as a window seat in the seat selection process. And Minyard's ticket states that the seat was a "window seat" as shown in the below screenshot.

UA 1721 | SFO to KOA

MINYARD/SEANMICHAEL
Confirmation: LWTRY0

Sequence: 94

GATE                          EST. BOARDING BEGINS
F22                           8:20 AM
Terminal 3, Concourse F       Est. Boarding ends 8:55am

Boarding Group 3        Window Seat 29A

United Economy
Bag drop shortcut

Last refreshed 9:30am, Sun. Jun 1. Pull down to refresh.

12.    Nevertheless, unbeknownst to Minyard, his seat was a Windowless Window Seat, as shown in the below picture Minyard took of his alleged "Window" seat. As a result, Minyard suffered from claustrophobia throughout his flight and he was unable to watch the once-in-a-lifetime descent alongside the nation's largest volcano.



- 7 -

FIRST AMENDED CLASS ACTION COMPLAINT

13. Minyard complained to United, and they refunded his $52.99 preferred seat fee, but refused to refund his seat selection upgrade fee from Basic Economy to regular economy, which he also needed to pay to unwittingly select his Windowless Window Seat.

14. Plaintiff Cindy Pawlowski is a resident of Bluff City, Tennessee. In 2023 and 2024, she purchased and flew on several flights on United between Syracuse, New York, and Phoenix, Arizona, with stops in Chicago, Illinois. She purchased seats 21A and 21B, 31A, and 31B, and 29F, and 29E for herself and her husband on those flights, in part, using benefits from her United credit card. She purchased those seats because the A and F seats were labeled with the word "window" during the seat selection process and she specifically wanted to sit in the window seat and see the Phoenix skyline as she landed and took off. She paid extra to choose those window seats. Upon information and belief, her ticket, which she can no longer access, included the phrase "Window Seat" to describe her or her husband's seat. Nevertheless, on two of those flights, her window seats were actually Windowless Window Seats. She was disappointed and complained to United, while demanding a refund. In response, a United representative told her "I understand how disappointing it can be to not sit in the seat you requested"—even though she did, in fact, obtain the seat she selected—but United did not issue any refund.

15. Plaintiff Aviva Copaken is a resident of Los Angeles. Over the past year or more, she purchased several United flights for which she paid extra to obtain seats with a "window." Copaken prefers a window seat because she experiences claustrophobia on flights and enjoys a view while looking out the window of the airplane. On multiple flights, she was disappointed to discover that she had been led to purchase Windowless Window Seats, for which she paid United additional upgrade fees between $45.99 and $169.99. Copaken demanded refunds from United for her experiences with Windowless Window Seats, but only obtained partial refunds for certain flights.

FIRST AMENDED CLASS ACTION COMPLAINT

**16.** Defendant United is a major commercial airline headquartered in Chicago, Illinois. United is a wholly owned subsidiary of United Airlines Holdings, Inc., a publicly traded company listed on the Nasdaq Stock Market (ticker symbol: UAL). United engages in substantial activities in San Francisco, including by maintaining the San Francisco Airport as one of its "hubs" for significant operations and travel. United operates one of the largest airline networks in the world, with more than 800 mainline and regional aircraft serving hundreds of destinations across six continents. United operates at least 4,500 flights per day and transports many millions of passengers annually.

### JURISDICTION AND VENUE

**17.** Divisional Assignment**:** In accordance with Civil L.R. 3-2(c) and 3-5(b), this matter should be assigned to the San Francisco division because Plaintiffs Marc Brenman is a resident of San Francisco, United engaged in substantial activities giving rise to the complaint in San Francisco, and several plaintiffs took flights at issue in this case from San Francisco's International Airport, SFO, where United engages in substantial operations.

**18.** This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than United, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

**19.** This Court has personal jurisdiction over United because it conducts substantial business in this District, and engaged in the conduct at issue herein from and within this District, including by advertising and selling airline tickets to certain Plaintiffs and passengers in this District, and operating aircraft that depart from and arrive in this District.

**20.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because this District is where a substantial part of the acts, omissions, and events giving rise to certain Plaintiffs' claims occurred.

FIRST AMENDED CLASS ACTION COMPLAINT

## FACTUAL ALLEGATIONS

**A.     UNITED CHARGES PASSENGERS ADDITIONAL FEES TO ENSURE THEY OBTAIN SEATS WITH A WINDOW**

21.     Around 2017, United began charging extra fees for airfare services, such as seat selections, that were traditionally included in the standard cost of a ticket. At that time, United introduced "Basic Economy" fares, which prohibit passengers from selecting a seat assignment in advance unless they pay extra. Basic Economy passengers are randomly assigned a seat—and often a less desirable one—after the passenger has concluded his or her check-in on the day of travel.

22.     As a result, United passengers wishing to select *any* seat must first pay an upgrade fee from the Basic Economy fare to the Economy fare. The additional fee is often significant. For example, while the fee to upgrade from Basic Economy to Economy (and thus select any seat) starts at just $15 on small regional flights ($30 for a round trip), it can reach up to $200 for a trip to Europe. Passengers who upgrade to Economy may select from a small selection of seats in the back of the Economy cabin for no additional cost.

23.     On top of the fees to upgrade to Economy, United also charges passengers to select "preferred" and "economy plus" seats, which United indicates are more desirable than the "standard" Economy seats. Once again, those fees can be hundreds of dollars depending on the aircraft, route, and demand, on top of the upgrade from Basic Economy. The seat selection fees vary based on the seat's perceived desirability, with "window" and "aisle" seats generally priced higher than middle seats. In addition, United charges hundreds—sometimes thousands of dollars—for seats in premium cabins.

24.     These additional fees to select a particular seat are charged in addition to the base fare, taxes, and other fees. United collects these upgrade fees as separate line items at the time of booking, and presents them as necessary for passengers to choose their seat locations in advance. Furthermore,

after a non-Basic Economy passenger has booked travel, they can enter standalone transactions with United to similarly upgrade or change their seat selection.

25.     United generates significant fees from these seat selection fees. A congressional investigation of "junk fees" charged by airlines, including United, found that airlines, including United "have generated billions of dollars in revenue from ancillary fees" and that such fees "have become vital stream[s] of revenue for the airlines." According to the Senate report, United alone collected $1.3 billion in revenue from seat fees in 2023.

26.     United does not just collect these fees in cash. United also uses its loyalty program, known as the United Mileage Plus Program, to attract repeat passengers by offering rewards and benefits in the form of points or miles. Those points can be redeemed for benefits, including the ability to choose seats or upgrade to a higher class. Some United Mileage Plus members may be able to select seats for free because they have expended significant sums of money in order to fly with United.

27.     United also collects seat selection fees through its co-branded credit cards. In 2009, United launched its first airline branded credit card with JP Morgan Chase. United passengers pay significant annual fees ranging from $150 for the United Explorer card to $695 for the United Club card in order to obtain the benefits from those cards, including the ability to select seats without paying certain of (but not all) of United's seat selection fees. United's co-branded card with JP Morgan is a significant source of revenue for United. United reported that its co-branded card agreement was the main driver behind its "other operating revenue" increasing by $424 million from 2022 to 2023, an increase of 15.4%.

28.     United also routinely charges a premium for "window" seats as compared to middle seats. In short, of its own volition, United undertook to create a seat selection fee for seats with a window, set the amount of the fee, and required its passengers to pay the fee. Upon acceptance of the

FIRST AMENDED CLASS ACTION COMPLAINT

seat selection fee for "window" seats, United incurred an obligation to provide a seat with an actual window.

**B.    A LARGE PROPORTION OF UNITED PASSENGERS ROUTINELY PAY EXTRA FOR WINDOW SEATS**

29.    Both during and after the flight booking process, United represents to passengers that its planes have three horizontal seat types, irrespective of the class: window, middle, and aisle seats.

30.    Passengers often have strong preferences against middle seats, and strong preferences between windows and aisles. For example, a 2013 *Harris Interactive* study found that the obtainment of a window or aisle seat is far and away the most important airline amenity for American flyers.

31.    Of the large proportion of airline passengers who pay to select seats, a strong majority prefer window seats. For instance, per a recent study conducted by the popular travel website *Upgraded Points*, two-thirds of passengers prefer window seats, and eight of the top ten seats that passengers most desire on a standard plane configuration have a window.

32.    Windows entail obvious benefits for airline passengers. Simply, it is a stunning experience to watch the world go by from 30,000 feet. For even the most jaded frequent flyer, watching a descent into a treasured place or exotic new destination can trigger visceral emotions, or build core memories of a trip that are well worth the upgrade fee.

33.    Windows also provide benefits that are less obvious, but important, for several subsets of passengers. For instance:

- Numerous passengers have conditions like generalized anxiety disorder or PTSD, and many others experience claustrophobia in confined spaces. Windows are often extremely important to such passengers, as they feel that the ability to look outside alleviates the often serious distress that may be triggered by confined environments, and mitigates against the prospect that they will experience panic attacks or other adverse effects.

- 12 -

FIRST AMENDED CLASS ACTION COMPLAINT

- Passengers who experience motion sickness buy seats with windows because they find that looking outside at fixed positions mitigates their symptoms.

- Many passengers who have a fear of flying purchase seats with windows because the ability to see outside gives them a greater sense of knowledge about, or "control" over, their flights.

- Windows can captivate, distract, or calm antsy children. Indeed, United publishes marketing materials that advise parents to buy children window seats.

- Passengers with seasonal affective disorder or depressive conditions buy seats with windows to get a burst of sunlight that is otherwise unavailable or unpleasant during certain seasons.

34.    Whatever the motivation, wide swaths of airline passengers intentionally purchase seats for the purpose of obtaining a window.

**C.    THE MAJORITY OF UNITED'S PLANES HAVE WINDOWLESS WINDOW SEATS**

35.    United Airlines operates a fleet of over 1,000 aircraft, including hundreds of Boeing 737-series and Airbus A321-series planes serving domestic and international routes. United is one of the largest operators of Boeing 737s globally, with around 500 737s in its fleet as of mid-2025.

36.    Most of these planes, as well as others in United's fleet, have at least one Windowless Window Seat. Some of them have four such seats. One of United's competitors, Alaska Airlines, explains on its website that some Windowless Window Seats occur at "the spot where Boeing places the air conditioning riser ducts from the belly" and the "vertical ducts [] located behind the passenger compartment sidewall panels … prevent the installation of a window…."

37.    Until this lawsuit, United did not disclose where any of its Windowless Window Seats were located on its flights, and made it impossible for passengers to determine that information, including because the Windowless Window Seats on a particular aircraft vary. For example, on some

FIRST AMENDED CLASS ACTION COMPLAINT

Boeing 737-900s, the Windowless Window Seat is 11A, while on others, it is 10A or 12A. On other United aircraft, the Windowless Window Seat, like Minyard's, is 29A. On others, it is 11F, 29F, 8A, or others.

38.    The Windowless Seat generally looks like this:



39.    Upon information and belief, the following models of planes in United's fleet have Windowless Window Seats: Airbus A319, Airbus A320, Airbus A321, Airbus A330-300, Boeing 717-200, Boeing 737-700, Boeing 737-800, Boeing 737-900, Boeing 757-200, Boeing 757-300, Boeing 767-300ER, Boeing 767-300ER, Boeing 767-400ER, Boeing 777-200ER/LR, Boeing 787-10, Boeing 787-8, Boeing 787-9, Bombardier CRJ-700, Bombardier CRJ-900, Embraer EMB-120, Embraer EMB 170, and Embraer EMB-175.

40.    Windowless Window Seats are often found in United's Economy Plus Seats, in the preferred seats in the economy cabin, and in the back of the economy cabin. On certain models of United's planes, Windowless Window Seats are also found in United's premium class cabins.

**D.    UNITED SELLS WINDOWLESS WINDOW SEATS TO PASSENGERS WHILE PROMISING TO PROVIDE A WINDOW**

41.    Passengers can purchase tickets for United flights through the United mobile application ("**App**"), online via the United website, by calling United or visiting an airport ticketing counter, or through third-party ticketing agents.

42.     Regardless of the medium, all passengers who purchase Windowless Window Seats are expressly told, whether through the pre-booking reservation process or the pre-flight ticketing process, that their seat includes a "window."

43.     During the booking process on the App, for instance, the App explicitly identifies every Windowless Window Seat as having a "window." After selecting a flight itinerary and entering passenger information, the App prompts passengers to select seats for each flight segment. The seat map presented within the App visually distinguishes seat types—such as window, middle, and aisle— and assigns prices for seat selection accordingly.

44.     United's App labels seats as "window" or "aisle" through visual placement on the seat map and accompanying textual labels, but (until this litigation was filed) it did not provide any disclaimer or indication that certain seats labeled as "window" may not have a window. For example, a Boeing 737-800 has a Windowless Window Seat at seat 10A or 11A, depending on the configuration. Nevertheless, as shown in the screenshots below, the App affirmatively describes both as "Window" seats during the booking process, and charges between $44.99 and $159.99 for them.

 

FIRST AMENDED CLASS ACTION COMPLAINT

45.     On information and belief, United makes the same representations when passengers book flights through other mediums, such as through airport ticket windows, customer service telephone lines, and through third-party booking sites.

46.     Passengers who purchase airline tickets on United's website face similar issues. The website's booking interface includes a seating chart that indicates that a seat will have a window based on its proximity to the side of the aircraft. Passengers are led to believe by United, and by their previous experiences with Untied, that they are booking seats with a window, and are not made aware that they may be selecting Windowless Window Seats.

47.     Indeed, United's website leaves no room for doubt that Windowless Window Seat passengers have in fact purchased seats with an actual window. United posts detailed configurations of every aircraft model in its fleet on its website, but those webpages do not disclose Windowless Window Seats, and United otherwise does not publish information about aircraft configurations. Passengers looking for more detail on the website about United's "seat options" will find a webpage that suggests they use the App to make their seat selections, which states: "Go to the seat map in our app to tell us your seat preference at any time between booking and check-in. If your preferred seat is available, we'll assign it to you." United's marketing materials and other webpages similarly refer only to "window," "middle," and "aisle" seats, without disclosing the potential for Windowless Window Seats. Its "boarding process" webpage explains that "Group 3" is for "Economy Plus® or United Economy® travelers in window seats or exit row seats." Other pages on its website recommend, for example, that "Children in car seats should sit in a window seat," or suggest that "no matter how many miles you've logged," passengers should "paus[e] to look out the window and watch the world go by from high above."

48.     Whatever the medium, until this litigation was filed, at no point during the seat selection process did United provide an option to verify whether the selected "window" seat actually

includes a window, nor did it allow passengers to preview or confirm the physical configuration of the aircraft before completing the transaction. Instead, United simply sold Windowless Window Seats as if they were typical "window seats" with actual windows, and accepted premiums for them.

49.     Ultimately, in selecting a seat with a window and choosing to pay additional fees for it, passengers reasonably rely on United's representations during the booking process that when they purchase a "window" seat, the seat will include a physical window and its associated benefits. United necessarily leads passengers to conclude that the "window" seats they are buying will include a usable window. And after passengers unwittingly purchase Windowless Window Seats, they can review their tickets on United's booking interfaces or on their boarding passes and receive express confirmation that they did purchase a seat with a "window." Or they can receive the same "confirmation" when they call United's customer service agents, who, on information and belief, provide the same faulty information.

E.      **UNITED'S SALES PRACTICE FOR WINDOWLESS WINDOW SEATS IS INTENTIONAL**

50.     United deliberately sells Windowless Window Seats to passengers while promising that the seats have actual windows, as evidenced by the facts that United has long been on notice of passenger complaints about this practice, offers compensation to certain passengers who complain, and chose (until this litigation was filed) not to update its booking system to disclose the presence of Windowless Window Seats.

51.     For many years, travel bloggers and dissatisfied passengers have publicly posted their complaints about United's Windowless Window Seats. For example, on the popular social media website Reddit, the United page is chock full of complaints from passengers who felt duped into buying Windowless Window Seats. A few examples are reflected in the below screenshots.

FIRST AMENDED CLASS ACTION COMPLAINT











FIRST AMENDED CLASS ACTION COMPLAINT

52.     United representatives, moreover, acknowledge in communications with dissatisfied passengers that its practice of selling Windowless Window Seats is a "misrepresentation." For example, in response to one putative class member's complaint to United and demand for a refund, on August 25, 2022, United stated:

> [W]e sincerely apologize for the inconvenience caused by the misrepresentation of seat 11A as a window seat. We understand how important seating preferences are, especially when traveling with family. As requested, we have processed a full refund of the $159.99 upgrade fee as a goodwill gesture…We recognize the importance of transparency in our booking system. Your feedback regarding windowless seats has been noted, and we are actively evaluating enhancements to our seat selection interface to better inform passengers during booking.

53.     Moreover, United's provision of refunds or compensation to Windowless Window Seat passengers also tacitly confirms United has contractual obligations to provide a window, as detailed below. United, however, also regularly and inconsistently denies refund requests, and frequently does so on the irrelevant basis that United does not guarantee seat selections in its terms and conditions.

54.     While United has affirmatively represented to prospective passengers that its Windowless Window Seats have a "window," several of its competitors disclose that their Windowless Window Seats do not. For example, both American Airlines and Alaska Airlines also operate Boeing 737-800 aircraft that have Windowless Window Seats. However, when a passenger attempts to purchase those seats, both American Airlines and Alaska Airlines disclose that the seat has "no window view," as shown in the screenshots below (with emphasis).

- 19 -

FIRST AMENDED CLASS ACTION COMPLAINT



55.      American Airlines and Alaska Airlines are not alone. For instance, Ryanair, a large low-cost carrier that primarily operates in Europe, also alerts passengers about the nature of its Windowless Seats. As a result, and in recognition that the Windowless Seats are less desirable, Ryanair charges less for them.

FIRST AMENDED CLASS ACTION COMPLAINT

**F.      UNITED ENTERS EXPRESS CONTRACTS THAT REQUIRE IT TO PROVIDE THE PROMISED "WINDOW" SEAT**

56.      United's practice is not merely "misleading," but results in United's systemic breach of its express contracts with passengers who purchase Windowless Window Seats.

57.      The express contracts between United and its passengers are formed when United provides confirmation that passengers successfully completed the booking process. The terms that become part of those contracts appear on the "checkout" pages of United's electronic booking interfaces, which itemize the prices for the selected itinerary, identify any purchased add-ons, and list passenger seat assignments along with a seat map popup link. Passengers who select an exterior-row seat during checkout reasonably understand they are purchasing a seat with a "window" based on, among other things, United's pre-booking representations and passengers' prior experiences with United. Indeed, at the checkout stage, United's App explicitly confirms that passengers who have selected a Windowless Window Seat are buying a seat with a "window."

58.      United uses that same checkout information to generate post-purchase electronic ticket records, which United concedes are enforceable components of its passenger contracts, as detailed below. Those electronic ticket records contain terms memorializing United's promise to provide a "window." That is confirmed by the facts that: (i) the portions of United's electronic ticket records that it makes accessible to passengers post-purchase include express confirmation that Windowless Window Seat passengers purchased seats with a "window," and (ii) United uses its electronic ticket records to generate boarding passes that also expressly confirm Windowless Window Seat passengers obtained a "window" or "window seat," as shown in the below pictures:

FIRST AMENDED CLASS ACTION COMPLAINT





59.     United's own terms and conditions for its passenger contracts confirm that United undertakes contractual obligations to provide seats with a "window." When passengers purchase travel, United claims that the resulting contracts include "all terms and conditions associated with any additional offer/product purchases made, United's dangerous good policy, and the terms and

FIRST AMENDED CLASS ACTION COMPLAINT

conditions of United's Contract of Carriage."[1] The Contract of Carriage states that it is not a complete contract, but provides that the parties' overall contract also includes "any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt."

60.     The Contract of Carriage defines "Ticket" as "the record of agreement, including electronic tickets, e.g., 'United Electronic Tickets' or 'eTickets." It does not define "ticket jacket," but based on the plain meaning of that term, the phrase "on or in" the "ticket jacket" is necessarily inclusive of, at least, the terms listed on United's boarding passes. The Contract of Carriage also defines "eTicket" as:

> [T]he record of the ticket agreement maintained and processed within the carrier's electronic reservation system. A receipt is provided to the purchaser of the ticket that contains a reference for retrieving the record within the carrier's reservation system and summary of the ticket information."

61.     Even using United's unspecific representations of what its "ticket, ticket jacket or eticket receipt" are and what they encompass, those items confirm that United undertook contractual obligations to provide a "window" to Windowless Window Seat passengers. This is so in multiple ways.

62.     First, the "ticket" necessarily contains terms confirming the purchase of a "window." As provided in the Contract of Carriage, passengers can review the terms of the "electronic ticket" by retrieving the ticket number listed in the "receipt" United sends upon flight confirmation, and by entering that number into United's reservation system on the App. Upon doing so, the "Ticket" page to which passengers are directed is a dynamic page substantially similar to United's booking "checkout" page. That page provides Windowless Window Seat passengers with express confirmation

---

[1]    United's language and attempts to incorporate these extraneous documents are, at best, confusing, and do not readily provide passengers with all terms of the resultant agreement. United does not provide links to the "additional offer/product" terms, and leaves passengers without means to ascertain the "terms and conditions associated with any additional offer/product" or the "dangerous good policy." United also does not provide a link to the Contract of Carriage, but instead links passengers to a page that purports to summarize the Contract of Carriage and includes only a few terms.

that their assigned seats have a "window." Similarly, United issues boarding passes to all Windowless Window Seat passengers that expressly confirm they purchased a seat with a "window." Consistent with United's unspecific definitions of "ticket" in the Contract of Carriage, the terms found in United's post-booking electronic reservation system and boarding passes must either: (i) constitute components of the contractual "ticket, ticket jacket, or eticket,"[2] or (ii) be generated from, and reflect, the terms found in United's internal record of the "ticket, ticket jacket or eticket."

63.    Second, per the Contract of Carriage, the ticket contains the "record of agreement" maintained with United's "electronic reservation system," which also contains terms confirming the purchase of, and entitlement to, seats with a "window." The record of agreement must reflect and incorporate the representations United made at the time of booking, including the representations made through its "electronic reservation system" that the Windowless Window Seats have a "window." Those representations reflect United's "offer," which Windowless Window Seat passengers accepted by purchasing the seats and itineraries United described. There is no other information that the "record of agreement" could refer to. Passengers would not have accepted United's "offer" and paid consideration for Windowless Window Seats but for United's undertaking. And the contents of the "record of agreement" are confirmed by the fact that United's boarding passes for Windowless Window Seat passengers state that seats with a "window" were purchased.

64.    Consequently, United's passenger contracts contain terms reflecting that passengers who booked Windowless Window Seats did book, and were entitled to, seats with a "window." The Contract of Carriage recognizes that those terms are enforceable by passengers. And no provision in

---

[2]    The "window" term on United's boarding passes is an enforceable component of passenger contracts for the additional reasons that: (i) the Contract of Carriage indicates that the boarding passes are the "tickets," or are part of the tickets, including because it provides that: "No person will be entitled to transportation except upon presentation of a valid Ticket"; and (ii) the boarding passes are encompassed by the Contract of Carriage's reference to terms appearing "in" the "ticket jacket."

FIRST AMENDED CLASS ACTION COMPLAINT

the Contract of Carriage covers circumstances where a passenger uses her assigned seat, but is not provided with the window that United promised was associated with that seat.

65.     United thus contracted to provide windows to purchasers of Windowless Window Seats in exchange for valuable consideration. United breached those contractual promises when it failed to provide a window, and Plaintiffs and the putative class members are entitled to damages in amounts to be determined at trial.

**G.     UNITED CHANGES ITS PRACTICE IN RESPONSE TO THIS LITIGATION**

66.     This lawsuit ignited a firestorm of media and criticism surrounding United's practices in selling Windowless Window Seats. Virtually every mainstream news outlet that covers the United States published critical coverage of United's practice, including the New York Times, Washington Post, NBC, CBS, ABC, Reuters, the Associated Press, the New York Post, CNN, the BBC, and the Guardian. George Stephanopoulos criticized United's practice on Good Morning America. Public message boards, TikTok, and Instagram were inundated with tens of thousands of critical comments. Several travel sites and bloggers published similar critiques. As *Frommers' Travel Guide* stated, for example:

> As longtime flyers ourselves, we think it should be reasonable to expect a window if you pay for a window. If we weren't being charged extra fees by the airlines for window seating—and for many decades we weren't—we might be more flexible on that expectation. But now that [] corporations have chosen to extract funds from us for the privilege of sitting in so-named window seats, airlines have created an expectation of the delivery of a specific type of seating.

67.     Following this suit and the public backlash, United apparently changed its practices and now alerts prospective passengers to the location of certain (but not all) Windowless Window Seats. For example, as shown in the below screenshot from the App taken after this litigation was filed, United alerts customers that there is "No window" at many Windowless Window Seats.

FIRST AMENDED CLASS ACTION COMPLAINT



**68.** After United made this change to its electronic reservation system, a United spokesperson stated to a reporter, dubiously, that the change was supposedly "part of our regular review of united.com and the United App to enhance the customer experience."

<u>CLASS ALLEGATIONS</u>

**69.** Plaintiffs incorporate the above allegations as if fully set forth below.

**70.** Plaintiffs bring this class action individually and on behalf of all members of the following classes of similarly situated persons pursuant to Federal Rule of Civil Procedure 23(b)(3), and 23(c)(4):

<u>Nationwide Class</u>

All persons and entities in the United States that purchased airfare from United and remitted additional consideration to obtain a window seat, but received a Windowless Window Seat ("**Nationwide Class Members**").

<u>California Subclass</u>

All persons and entities in California or who traveled to or through

California that purchased airfare from United and remitted additional consideration to obtain a window seat but received a Windowless Window Seat ("**California Subclass Members**") (together with the Nationwide Class Members, "**Class Members**").

71. Excluded from the classes are United and its subsidiaries, affiliates, officers, directors, and any entity in which United has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

72. Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

73. <u>Numerosity:</u> The Class Members are so numerous that joinder of all Class Members in a single proceeding would be impracticable. While the exact number of Class Members is unknown at this time and can only be determined by appropriate discovery, Plaintiffs are informed and believe that the classes are likely to include thousands of members. As set forth above, United has likely sold more than 1 million Windowless Seats during the class period. Therefore, the classes are sufficiently numerous that joinder of all members in a single action is impracticable under Rule 23(a)(a), and the resolution of claims through the procedure of a class action will benefit the parties and the Court. Adequate notice can be given to Class Members directly using information maintained by United.

74. <u>Commonality and Predominance:</u> Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individuals. Such common questions of law or fact include, among other things, whether United breached a self-imposed contractual obligation or enforceable promise to provide Class Members with a seat with a "window" when it provided them with Windowless Window Seats. United engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

FIRST AMENDED CLASS ACTION COMPLAINT

**75.** <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs, like all proposed Class Members, selected window seats on United flights, but were placed in Windowless Window Seats. Plaintiffs and Class Members were injured by the same wrongful acts, practices, and omissions committed by United, as described above. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

**76.** <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs are adequate representatives of the classes and have no interests adverse to, or in conflict with, the classes they seek to represent. Plaintiffs have retained counsel with substantial experience and success in complex civil litigation and class actions.

**77.** Furthermore, Plaintiffs have not waived the ability to seek relief against United on a class basis. United's Contract of Carriage includes a provision that states: "By purchasing a ticket or accepting transportation under this Contract of Carriage, Passenger agrees that any lawsuit brought by Passenger against UA and Carriers doing business as United Express will be brought only in Passenger's individual capacity, and may not be brought in or asserted as part of a class action proceeding." Contract of Carriage Rule 3(P) ("**COC Class Waiver**"). The COC Class Waiver, however, is unenforceable. Initially, the provision appears in a contract of adhesion presented to passengers on a take-it-or-leave-it basis, with no opportunity for negotiation, meaningful consent, or ability to opt out. United does not require passengers to confirm that they have read the COC Class Waiver; instead, United does not even fairly alert passengers to that provision. It is buried deep in United's contract of adhesion under sub-part "P" of Rule 3, which is inappositely titled "Application of Contract." Moreover, when passengers purchase travel from United, they are not even presented with the Contract of Carriage, but are given a hyperlink to a "summary" of the Contract of Carriage that never references nor even alludes to the COC Class Waiver. The provision is also not included nor referenced in any materials United sends to passengers upon or after their purchases. In substance, the

- 28 -

FIRST AMENDED CLASS ACTION COMPLAINT

waiver is one-sided and oppressive. It prevents individual passengers from pursuing claims that are economically impractical to litigate alone, and it effectively insulates United from meaningful liability for its flagrant and systemic misconduct. Such a provision defeats the remedial purpose of Rule 23 and lacks legitimate commercial justification.

78.     Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.

## COUNT I: BREACH OF CONTRACT ("TICKET BREACH")

79.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

80.     Plaintiffs and Class Members entered contracts with United that required United to provide seats that had a "window," and required Plaintiffs and Class Members to remit consideration to obtain those seats.

81.     When Plaintiffs and Class Members purchased travel from United, they entered contracts that include and reflect the details selected on United's flight booking interface. United claims that these contracts also include "all terms and conditions associated with any additional offer/product purchases made, United's dangerous good policy, and the terms and conditions of United's Contract of Carriage." The Contract of Carriage confirms the parties' contracts also include "any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt." It defines "Ticket" as "the record of agreement, including electronic tickets, e.g., 'United Electronic Tickets' or 'eTickets," and defines "eTicket," in turn, as "the record of the ticket agreement maintained and processed within the carrier's electronic reservation system."

82.     The "ticket, ticket jacket or eticket" necessarily contain terms confirming that Plaintiffs and Class Members purchased, and were entitled to, seats with a "window." This is shown

by the fact that, post-purchase and pre-flight, United's electronic reservation system and boarding passes expressly confirm that Windowless Window Seat passengers have purchased a seat with a "window." The terms found in United's post-booking electronic reservation system and boarding passes must either: (i) constitute components of the contractual "ticket, ticket jacket, or eticket," or (ii) be generated from, and reflect, the terms found in United's internal record of the "ticket, ticket jacket or eticket." Plaintiffs and Class Members performed all relevant obligations owed to United under their contracts, including by paying United the additional consideration it solicited and retained in exchange for the selected seats.

83.     United breached its contractual obligations to Plaintiffs and Class Members by providing them with Windowless Window Seats.

84.     As a direct and proximate result of United's breaches, Plaintiffs and Class Members have been damaged in an amount to be determined at trial.

## COUNT II: BREACH OF CONTRACT ("RECORD OF AGREEMENT BREACH")

85.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

86.     Plaintiffs and Class Members entered contracts with United that required United to provide seats that had a "window," and required Plaintiffs and Class Members to remit consideration to obtain those seats.

87.     When Plaintiffs and Class Members purchased travel from United, they entered contracts that include and reflect the details selected on United's flight booking interface. United claims that these contracts also include "all terms and conditions associated with any additional offer/product purchases made, United's dangerous good policy, and the terms and conditions of United's Contract of Carriage." The Contract of Carriage confirms the parties' contracts also include "any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt." It defines

FIRST AMENDED CLASS ACTION COMPLAINT

"Ticket" as "the record of agreement, including electronic tickets, e.g., 'United Electronic Tickets' or 'eTickets,'" and defines "eTicket," in turn, as "the record of the ticket agreement maintained and processed within the carrier's electronic reservation system."

88.     The "record of agreement" necessarily contains terms confirming that Plaintiffs and Class Members purchased, and were entitled to, seats with a "window." Simply, the record of agreement must reflect and incorporate the representations United made at the time of booking through its "electronic reservation system," including that the Windowless Window Seats have a "window." Those representations reflect United's "offer," which Plaintiffs and Class Members accepted by purchasing the seats and itinerary that United described. There is no other information that the "record of agreement" could refer to. The contents of the record of agreement are further confirmed by the fact that United's post-booking and pre-flight reservation information and boarding passes for all Plaintiffs and Class Members expressly state that seats with a "window" were purchased.

89.     Plaintiffs and Class Members performed all relevant obligations owed to United under their contracts, including by paying United the additional consideration it solicited and retained in exchange for the selected seats.

90.     United breached its contractual obligations to Plaintiffs and Class Members by providing them with Windowless Window Seats.

91.     As a direct and proximate result of United's breaches, Plaintiffs and Class Members have been damaged in an amount to be determined at trial.

### COUNT III: BREACH OF IMPLIED CONTRACT

### (ALTERNATIVE CLAIM)

92.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

FIRST AMENDED CLASS ACTION COMPLAINT

**93.**    In the event the Court finds that United did not undertake express contractual commitments to provide Plaintiffs with actual windows at the seats they purchased, United is alternatively liable for undertaking an implied-in-fact contractual obligation, which was otherwise extraneous or subsequent to the underlying express contracts, to provide seats with a "window."

**94.**    When Plaintiffs and Class Members booked their flights, United purported to bind them to "all terms and conditions associated with any additional offer/product purchases made, United's dangerous good policy, and the terms and conditions of United's Contract of Carriage." None of those terms or conditions cover whether the seats Plaintiffs purchased included a window.

**95.**    As detailed above, during both the pre-purchase booking process and the post-purchase pre-flight ticketing process, United represented and confirmed that the particular seats Plaintiffs and Class Members purchased would have a "window." In so doing, United undertook an implied-in-fact contractual obligation to provide Plaintiffs and Class Members with a window at their respective seats.

**96.**    Plaintiffs and Class Members performed all relevant obligations owed to United, including by paying United the additional consideration it solicited and retained in exchange for the selected seats.

**97.**    United breached its contractual obligations to Plaintiffs and Class Members by providing them with Windowless Window Seats.

**98.**    As a direct and proximate result of United's breaches, Plaintiffs and Class Members have been damaged in an amount to be determined at trial.

**COUNT IV: PROMISSORY ESTOPPEL**

**(ALTERNATIVE CLAIM)**

**99.**    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

FIRST AMENDED CLASS ACTION COMPLAINT

**100.** In the event the Court finds that United did not undertake contractual commitments to provide Plaintiffs with actual windows at their seats, United is alternatively liable for making promises, which were otherwise extraneous or subsequent to the underlying contracts, to provide seats with a "window."

**101.** United made unambiguous promises, both during the pre-purchase booking process and the post-purchase pre-flight ticketing process—including through United's issuance of changeable boarding passes within the day before flight—that the particular seats Plaintiffs and Class Members purchased would have a "window." United expected that Plaintiffs and Class Members would rely on those promises. And Plaintiffs and Class Members reasonably relied on United's promises to their detriment, including by: (1) expending additional consideration to obtain seats that they would not have originally purchased, and/or (2) abstaining from changing their seats post-purchase and before their flights. Plaintiffs and Class Members would not have undertaken either set of detrimental actions in the absence of United's false promises.

**102.** As a direct and proximate result of United's misconduct, Plaintiffs have suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other Class Members, respectfully request that the Court enter judgment in their favor and against United as follows:

A.     Certifying the classes as requested herein, designating Plaintiffs as class representatives, and appointing Plaintiffs' counsel as class counsel;

B.     Awarding Plaintiffs and the Class Members all appropriate monetary relief, including compensatory damages in amounts to be determined at trial, or such other monetary remedies the Court deems are available and appropriate;

FIRST AMENDED CLASS ACTION COMPLAINT

C.      Awarding Plaintiffs and the Class Members pre-judgment and post-judgment interest to the maximum extent allowable;

D.      Awarding Plaintiffs and the Class Members reasonable attorneys' fees, costs, and expenses, as allowable under Rule 23; and

E.      Awarding Plaintiffs and the Class Members such other favorable relief as allowable under law.

<u>**JURY TRIAL DEMANDED**</u>

103.     Plaintiffs demand a trial by jury of all claims so triable.


Dated:  October 15, 2025                         Respectfully Submitted,

<u>/s/ *Carter E. Greenbaum*</u>

Carter E. Greenbaum (SBN 344692)
**GREENBAUM OLBRANTZ LLP**
160 Newport Center Drive, Suite 110
Newport Beach, CA 92660
Tel: (332) 222-9119
Email: carter@greenbaumolbrantz.com

Casey Olbrantz (*pro hac vice*)
**GREENBAUM OLBRANTZ LLP**
244 Fifth Avenue, Suite C221
New York, NY 10001
Tel: (332) 222-9119
Email: casey@greenbaumolbrantz.com

*Attorneys for Plaintiffs*

- 34 -

# EXHIBIT B

**RILEY SAFER HOLMES & CANCILA LLP**
SONDRA A. HEMERYCK (*pro hac vice*)
shemeryck@rshc-law.com
ELI LITOFF (*pro hac vice*)
elitoff@rshc-law.com
STEVEN E. VOGEL (*pro hac vice*)
svogel@rshc-law.com
1 S. Dearborn Street, Suite 2200
Chicago, IL 60603
Telephone:    (312) 471-8700
Facsimile:    (312) 471-8701
JEFFREY R. WILLIAMS (CSB No. 084156)
jwilliams@rshc-law.com
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Telephone:    (415) 275-8550
Facsimile:    (415) 275-8551

*Attorneys for Defendant*
UNITED AIRLINES, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC BRENMAN, AVIVA COPAKEN, SEAN MINYARD, ROBERT MONROE, and CINDY PAWLOWSKI, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED AIRLINES, INC., <br><br> Defendant. | **Case No. 3:25-cv-06995-JD** <br><br> **DEFENDANT UNITED AIRLINES, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT, AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> **DATE:  January 22, 2026** <br> **TIME:  10:00 a.m.** <br> **COURTROOM: 11** <br><br> Complaint Filed: August 19, 2025 |

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS
ACTION COMPLAINT, AND SUPPORTING MEM. OF AUTHORITIES – 3:25-cv-06995-JD

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

I.      PRELIMINARY STATEMENT AND ISSUES TO BE DECIDED ................................. 1

II.     SUMMARY OF RELEVANT FACTUAL ALLEGATIONS ............................................ 2

        A.      Plaintiffs' Alleged Purchases ............................................................................. 2

        B.      Plaintiffs' Allegations Regarding United's Supposed "Promise" .......................... 2

        C.      United's Contract of Carriage ............................................................................. 3

III.    LEGAL STANDARD ................................................................................................... 4

IV.     ARGUMENT ............................................................................................................... 5

        A.      The ADA Preempts Plaintiffs' Claims. ............................................................... 5

                1.      Plaintiffs' Claims Relate to United's Prices and Services. ........................ 6

                2.      The ADA Preempts the Claims Asserted in Counts I and II of the
                        Complaint. ............................................................................................. 7

                3.      The ADA Preempts Plaintiffs' Other Claims (Counts III and IV). ............ 13

                4.      The ADA Preempts Plaintiffs' Request for Attorneys' Fees and
                        Expenses. .............................................................................................. 13

        B.      Plaintiffs' Claims Fail on Their Merits. .............................................................. 14

                1.      Counts I and II Fail Because Plaintiffs Do Not Plausibly Allege That
                        United Breached Any Contract with Them. .............................................. 14

                2.      Count III Fails Because the CoC Precludes Implied Agreements. ........... 14

                3.      Count IV Fails Because Plaintiffs Do Not Plausibly Allege the
                        Elements of a Promissory Estoppel Claim and There Is a Valid
                        Contract Between the Parties. ................................................................ 15

CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

**CASES**

*Am. Airlines, Inc. v. Wolens*,
513 U.S. 219 (1995) .................................................................................................... 6, 7, 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................................. 5

*Bajra v. Delta Air Lines, Inc.*,
No. 1:24-CV-3477-MHC, 2025 WL 1527076 (N.D. Ga. May 6, 2025)................................. 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................................................... 4, 5

*Boon Rawd Trading Int'l Co., Ltd. v. Paleewong Trading Co., Inc.*,
688 F. Supp. 2d 940 (N.D. Cal. 2010) ............................................................................... 15

*Doe I v. Google, LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024) ............................................................................... 14

*Fernald v. Sw. Airlines Co.*,
No. 11CV0453 AJB (POR), 2011 WL 13254382 (S.D. Cal. Sept. 28, 2011) ..................... 6, 7

*Horne v. Harley-Davidson, Inc.*,
660 F. Supp. 2d 1152 (N.D. Cal. 2009) ............................................................................. 15

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005)............................................................................................. 5

*Mend Health, Inc. v. Carbon Health Techs., Inc.*,
588 F. Supp. 3d 1049 (C.D. Cal. 2022)............................................................................... 15

*MGIC Indem. Corp. v. Weisman*,
803 F.2d 500 (9th Cir. 1986)............................................................................................... 5

*Neft v. United Cont'l Holdings, Inc.*,
299 F.Supp.3d 965 (N.D. Ill. 2018) ..................................................................................... 6

*Netbula, LLC v. BindView Dev. Corp.*,
516 F. Supp. 2d 1137 (N.D. Cal. 2007) ........................................................................ 10, 14

*Northwest, Inc. v. Ginsberg*,
572 U.S. 273 (2014) ................................................................................................... 5, 7, 13

*Onoh v. Nw. Airlines, Inc.*,
613 F.3d 596 (5th Cir. 2010)............................................................................................... 6

*Quick Dispense, Inc. v. Vitality Food Serv., Inc.*,
No. 8:23-cv-02322-FWS-ADS, 2025 WL 576589 (C.D. Cal. Feb. 5, 2025)................... 10, 14

*Scarlett v. Air Methods Corp.*,
    922 F.3d 1053 (10th Cir. 2019)..................................................................................... 13

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003)......................................................................................... 5

*Villarroel v. Recology, Inc.*,
    775 F. Supp. 3d 1050 (N.D. Cal. 2025) ..................................................................... 14

*Watson v. United Airlines, Inc.*,
    Civil 16-00400 LEK-KJM, 2017 WL 6060173 (D. Haw. 2017) ............................... 6

*Weber v. USAirways, Inc.*,
    11 F. App'x 56 (4th Cir. 2001)..................................................................................... 7

*Witty v. Delta Air Lines, Inc.*,
    366 F.3d 380 (5th Cir. 2004)........................................................................................ 7

**STATUTES**

49 U.S.C. § 40101(a)(6) ....................................................................................................5

49 U.S.C. § 40101(a)(12) ..................................................................................................5

49 U.S.C. § 41713(b)(1) ....................................................................................................5

**RULES**

Fed. R. Civ. P. 12(b)(6)..................................................................................................1, 4

Fed. R. Civ. P. 23 .............................................................................................................13

Fed. R. Civ. P. 23(h)........................................................................................................13

**OTHER AUTHORITIES**

*Black's Law Dictionary* (12th ed. 2024) .....................................................................9, 10

PLEASE TAKE NOTICE that on January 8, 2026, at 10:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 11 of the above-entitled court, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant United Airlines, Inc. ("United"), will move to dismiss Plaintiffs' First Amended Class Action Complaint (ECF No. 24, hereafter "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6).

Plaintiffs' Complaint should be dismissed with prejudice because Plaintiffs have not pleaded, and cannot plead, a claim on which relief can be granted.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    PRELIMINARY STATEMENT AND ISSUES TO BE DECIDED

Plaintiffs Marc Brenman ("Brenman"), Aviva Copaken ("Copaken"), Sean Minyard ("Minyard"), Robert Monroe ("Monroe") and Cindy Pawlowski ("Pawlowski") (collectively, "Plaintiffs") allege that they purchased flights on United and "paid extra" or used "United credit card benefits" to purchase window seats. Compl. ¶¶ 9–11, 14–15. Plaintiffs further allege they were "disappointed" (*id.* ¶¶ 14–15) to discover that their seats on these flights "did not have a window at all" (*id.* ¶ 9). *See also id.* ¶¶ 10, 12 (similar). Based on these allegations, Plaintiffs purport to bring claims against United for Breach of Contract ("Ticket Breach") (Count I) and Breach of Contract ("Record of Agreement Breach") (Count II), as well as "alternative" claims for Breach of Implied Contract (Count III) and Promissory Estoppel (Count IV).

Plaintiffs' Complaint should be dismissed in its entirety and with prejudice because Plaintiffs have not pleaded, and cannot plead, a claim on which relief can be granted. Plaintiffs' claims are preempted by the Airline Deregulation Act of 1978, 49 U.S.C. § 40101, *et seq.* (the "ADA"), because they relate to United's prices and services, and do not seek merely to enforce a contractual obligation that United undertook. In addition, Plaintiffs' claims would fail on their merits even if they were not preempted. Counts I through III fail because Plaintiffs do not plausibly allege a contractual promise by United (either express or implied) that their seats would have an exterior window view. Count III also fails because there was an express agreement between United and the Plaintiffs—United's Contract of Carriage ("CoC")—that constituted "the conditions of

carriage" upon which United agreed to provide transportation to Plaintiffs.[1] The CoC also expressly states that "no covenants at law or in equity shall be implied or incorporated." Kelley Decl. Ex. 1, at 1. Finally, Count IV fails because Plaintiffs do not plausibly allege the elements of a promissory estoppel claim, and there is a valid contract (the CoC) that governs the subject matter.

## II.     SUMMARY OF RELEVANT FACTUAL ALLEGATIONS

### A.     Plaintiffs' Alleged Purchases

Plaintiffs provide relatively few details regarding their own purchases of window seats that they claim did not have an exterior window view. Plaintiff Brenman alleges that, at some point in the past year, he "paid extra money or utilized United credit card benefits" to purchase a window seat "because United represented that the seat had a 'window.'" Compl. ¶ 9. Brenman does not allege *how* United purportedly represented that the seat had a "window," or whether he made the purchase through United's website or its mobile application ("App"). Plaintiff Monroe alleges that his wife "book[ed] him a window seat" through the United website, that the seat "was described as a 'window' during the booking process, and the word 'window' was printed on Monroe's ticket," and that he "paid extra" for that seat. *Id.* ¶ 10. Plaintiff Minyard alleges that, due to aircraft changes after his original booking, he paid $52.99 "to move to a preferred section of the plane with a window" and that his seat "was described as a window seat in the seat selection process." *Id.* ¶ 11. The Complaint also includes an image of a boarding pass for Minyard—mistakenly described as a "ticket"—that includes the words "window seat." *Id.* Plaintiff Pawlowski alleges that, in 2023 and 2024, she "paid extra" to purchase seats "on several flights" that "were labeled with the word 'window' during the seat selection process." *Id.* ¶ 14. Pawlowski also alleges upon information and belief that her ticket "included the phrase 'Window Seat' to describe her or her husband's seat." *Id.* Finally, Plaintiff Copaken alleges that she purchased "several" United flights for which she paid extra "to obtain seats with a 'window.'" *Id.* ¶ 15.

### B.     Plaintiffs' Allegations Regarding United's Supposed "Promise"

Plaintiffs allege that "all passengers who purchase Windowless Window Seats are

---

[1] Declaration of Noemi Kelley ("Kelley Decl.") Ex. 1, Rule 3.A. The Court may consider the CoC because it is central to Plaintiffs' claims and its authenticity is unquestioned. *See infra* at 5 and United's Request for Judicial Notice and Incorporation by Reference (ECF No. 32-1).

expressly told, whether through the pre-booking reservation process or the pre-flight ticketing process, that their seat includes" an exterior window view. *Id.* ¶ 42; *see also id.* ¶ 49 (alleging that passengers rely on "United's representations during the booking process that when they purchase a 'window' seat, the seat will include a physical window"). This supposed promise is allegedly communicated to passengers who book through United's App by a seat map that "visually distinguishes seat types—such as window, middle, and aisle—and assigns prices for seat selection accordingly." *Id.* ¶ 43. Plaintiffs further allege that the App "labels seats as 'window' or 'aisle' through visual placement on the seat map and accompanying textual cues." *Id.* ¶ 44. Plaintiffs similarly allege that the booking interface on United's website "includes a seating chart that indicates that a seat will have a window based on its proximity to the side of the aircraft." *Id.* ¶ 46. And Plaintiffs allege that the "promise to provide a 'window'" is memorialized by the electronic ticket record that United provides to passengers after purchase, and boarding passes that label the passenger's assigned seat as "window" or "window seat." *Id.* ¶¶ 57–58.

## C. United's Contract of Carriage

When Plaintiffs purchased their tickets, they agreed to be bound by the CoC. Kelley Decl. Ex. 1, at 1. The CoC states that "[t]hese rules constitute the conditions of carriage" upon which United agreed "to provide … Carriage" to Plaintiffs. *Id.*, Rule 3.A. Although Plaintiffs' Complaint repeatedly references the CoC (*see, e.g.*, Compl. ¶¶ 59–65, 77, 79–83, 86–90), they do not attach it to their Complaint. United therefore provides in support of its Motion a true and correct copy of the CoC that has been in effect since January 22, 2025. *See* Kelley Decl. ¶ 3 and Ex. 1.[2]

The CoC provides:

> Transportation of Passengers … provided by United … [is] subject to the following terms and conditions, in addition to any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt. To the extent there is a conflict between this Contract of Carriage and any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt, this Contract governs.

---

[2] The CoC states that "transportation is subject to the Contract of Carriage … in effect on the date on which the Ticket is issued." *Id.*, Ex. 1, Rule 3.E. The Complaint does not allege the specific dates of purchase by any Plaintiff, but the January 22, 2025 CoC likely applied to the purchases of Monroe and Minyard "[i]n 2025," and possibly to Brenman's purchase "in the past year." Compl. ¶¶ 9–11. United cannot determine the relevant CoC for Pawlowski's alleged purchases "in 2023 and 2024" or Copaken's alleged purchases "over the past year or more." *Id.* ¶¶ 14–15.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT, AND SUPPORTING MEM. OF AUTHORITIES – 3:25-cv-06995-JD

- 3 -

*Id.*, Ex. 1, at 1. The CoC also expressly states that "no covenants at law or in equity shall be implied or incorporated." *Id.*

The CoC does not contain any promise that seats in the window position of any aircraft will have exterior window vies. Rule 4.D of the CoC, which concerns seat assignments, states:

> Seat assignments, regardless of class of service, are not guaranteed and are subject to change without notice. UA reserves the right to reseat a Passenger for any reason, including but not limited to from a United First or Business class seat, United Polaris® seat, United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which the applicable fee, miles, or other compensation has been paid, and if a Passenger is improperly or erroneously upgraded to a different class of service. If a Passenger is removed from a United First or Business class seat, United Polaris® seat, United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which a fee, miles, or other compensation has been paid, and the Passenger is not re-accommodated in a seat of equal or greater value, or if a Passenger is downgraded from a class of service and is not re-accommodated in a seat in an equal or greater class of service for which a fee, miles, or other compensation has been paid, the Passenger may be eligible for a refund in accordance with Rule 27.

*Id.*, Rule 4.D. The relevant provision of Rule 27 states:

> If a Passenger is removed from a United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which a fee has been paid, and the Passenger is not re-accommodated in a seat of equal or greater value, or if a Passenger is downgraded from a class of service and is not re-accommodated in a seat in an equal or greater class of service for which a fee has been paid, the Passenger is eligible for a refund of this fee upon request.

*Id.*, Rule 27.C.5.

Lastly, Rule 24.I of the CoC addresses United's liability for any failure to provide any "amenity," for any reason. That Rule states, in relevant part, that United

> shall have no liability for, and shall owe no refund with respect to any failure to provide that amenity …. <u>EXCEPTION</u>: If a Passenger has paid for a specific … amenity … as a separate fee … and that … amenity is not provided, the Passenger is eligible for a refund of the amount paid if a refund request is made within 90 days of the date the fee was originally paid or the flight date, whichever is later.

*Id.*, Rule 24.I.

## III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard

requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss, courts may consider not only the allegations in the complaint and documents attached thereto, but any matter subject to judicial notice. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986). In addition, the incorporation-by-reference doctrine allows a court ruling on a motion to dismiss to consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached" to the pleading. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (internal quotation marks and citation omitted); *see also United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (a document is incorporated by reference into a complaint if the plaintiff refers extensively to the document or it forms the basis of his claim). Here, United has asked the Court to take judicial notice of an official publication of the Federal Aviation Administration, and to consider under the incorporation-by-reference doctrine both United's CoC and its "boarding procedures" webpage. *See* ECF No. 32-1.

## IV.   ARGUMENT

### A.   The ADA Preempts Plaintiffs' Claims.

Congress enacted the ADA to promote "efficiency, innovation, and low prices" in the airline industry through "maximum reliance on competitive market forces and on actual and potential competition" rather than regulation. 49 U.S.C. § 40101(a)(6), (a)(12). To "prevent the states from undoing what the [ADA] was meant to accomplish," Congress included a broad preemption provision. *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 283 (2014). Under the ADA's preemption provision, a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). The ADA thus preempts state laws that are "related to"—*i.e.*, have "a connection with, or reference to"—an airline's prices, routes or services. *Ginsberg*, 572 U.S. at 280–84.

The Supreme Court has recognized only a single, narrow exception to the ADA's broad

preemption provision. Claims that relate to an airline's prices, routes or services escape preemption only in "routine" breach of contract actions that seek to enforce the terms of the parties' bargain, but nothing more:

> The ADA's preemption clause ... stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated. This distinction between what the State dictates and what the airline itself undertakes **confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement**.

*Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 232–33 (1995) (emphasis added).

Merely styling a claim as one for breach-of-contract does not bring it within the *Wolens* exception. To the contrary, courts have repeatedly found so-called breach-of-contract claims preempted when they seek to impose obligations that exceed the scope of the parties' bargain. *See, e.g.*, *Onoh v. Nw. Airlines, Inc.*, 613 F.3d 596, 600 (5th Cir. 2010) (ADA preempted breach-of-contract claim that "d[id] not involve the airline's 'self-imposed' undertaking"); *Neft v. United Cont'l Holdings, Inc.*, 299 F.Supp.3d 965, 975–76 (N.D. Ill. 2018) (ADA preempted plaintiff's demand for a remedy that was outside the terms of plaintiff's contract with United); *Watson v. United Airlines, Inc.*, Civil 16-00400 LEK-KJM, 2017 WL 6060173, at *5–7 (D. Haw. 2017) (finding claim for breach-of-contract preempted because it sought "to enlarge Plaintiffs' contractual rights" beyond those provided in the CoC), *aff'd* 709 Fed. App'x 500 (9th Cir. 2018).

The claims asserted by Plaintiffs here plainly relate to both United's prices and its services. Consequently, the claims are preempted unless they fit within the narrow *Wolens* exception. They do not, and the Complaint must therefore be dismissed.

### 1. Plaintiffs' Claims Relate to United's Prices and Services.

All of Plaintiffs' asserted claims relate to what they describe as United's alleged "unlawful practice of charging passengers upgrade fees to buy seats that United represents have a 'window,' but that are actually next to a blank wall." Compl. ¶ 1. Courts repeatedly have held that claims concerning airline fees and surcharges, as well as claims that concern seat selection, seat restrictions, and upgrades, relate to "price" for purposes of ADA preemption. *See Wolens*, 513 U.S. at 226 (mileage credits for upgrades related to price); *Fernald v. Sw. Airlines Co.*, No.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT, AND SUPPORTING MEM. OF AUTHORITIES – 3:25-cv-06995-JD

- 6 -

11CV0453 AJB (POR), 2011 WL 13254382, at \*2–3 (S.D. Cal. Sept. 28, 2011) (collecting cases and holding that ADA preemption applies to "claims involving fees, taxes, and other charges," including mileage credits and upgrades); *Weber v. USAirways, Inc.*, 11 F. App'x 56, 56–58 (4th Cir. 2001) (flight voucher's seat restrictions fell under "price"); *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 383 (5th Cir. 2004) (increasing seat legroom indirectly acts as a "forbidden significant effect" on prices). Plaintiffs' claims are unquestionably related to United's prices.

Claims relating to seat selection and upgrades also relate to airline "services." *See, e.g.*, *Fernald*, 2011 WL 13254382, at \*3 ("[T]he EBCI program is a ***service*** that provides passengers with an opportunity to upgrade their seat selection.") (emphasis added); *see also Wolens*, 513 U.S. at 227 (airline "services" include class-of-service upgrades). Indeed, the Complaint *itself* categorizes seat selection as a "service[]." Compl. ¶ 21.

### 2. The ADA Preempts the Claims Asserted in Counts I and II of the Complaint.

The Supreme Court's *Wolens* decision recognized an exception to ADA preemption for "state-law-based adjudication of *routine breach of contract claims*." 513 U.S. at 233 (emphasis added). In doing so, the *Wolens* Court reasoned that such claims "seek[] recovery solely for the airline's breach of its own, self-imposed undertakings," and that "[a] remedy *confined to a contract's terms* simply holds parties to their agreements." *Id.* at 228–29 (emphasis added). Regardless of how Plaintiffs have styled their claims, those claims escape preemption only if they seek to enforce a contractual obligation that United undertook. *See Ginsberg*, 572 U.S. at 276 (a claim is preempted "if it seeks to enlarge the *contractual obligations* that the parties voluntarily adopt") (emphasis added).

The only valid and enforceable contract between United and Plaintiffs is the CoC. As the CoC expressly provides: "By purchasing a ticket …, the Passenger agrees to be bound by ***these controlling terms*** of this Contract of Carriage." Kelley Decl. Ex. 1, at 1 (emphasis added). The CoC also states: "These rules constitute ***the*** conditions of carriage" upon which United "agrees to provide … Carriage." *Id.* Rule 3.A. (emphasis added). The CoC incorporates "any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt," but only if they do not

conflict with the terms of the CoC. *Id.* at 1. "To the extent there is a conflict between" the CoC any such terms and conditions, the CoC governs. *Id.*

The CoC does not contain any promise that seats in the "window" position of any aircraft will have exterior window views. Plaintiffs' claims thus attempt to enlarge United's obligations beyond those it undertook in the CoC, and are consequently preempted.

Plaintiffs attempt to avoid this conclusion by alleging that the "terms and conditions printed on or in any ticket, ticket jacket or eticket receipt" include both "the terms listed on United's boarding passes" and "the representations United made at the time of booking." Compl. ¶¶ 57–63. Plaintiffs' theory is belied by the plain language of the CoC, which makes clear that a boarding pass is *not* a "ticket, ticket jacket or eticket receipt" and that a "ticket" does not incorporate the seat selection screens that are displayed during the booking process. Moreover, even if that were not the case, the use of the word "window" in reference to a particular seat cannot reasonably be interpreted as a promise that the seat will have an exterior window view. Rather, the word "window" identifies the *position* of the seat—*i.e.*, next to the wall of the main body of the aircraft. Finally, the CoC expressly provides that United has no liability for failure to provide any amenity, regardless of the circumstance that results in the amenity being unavailable, subject to a limited exception that does not apply here.

### a. *Boarding Passes and Seat Selection Screens Are Not Tickets, Ticket Jackets or ETicket Receipts.*

The CoC defines "ticket" as "the record of agreement, including electronic tickets, … for Passenger air transportation provided by [United] under certain terms and conditions to the Passenger named on the Ticket." Kelly Decl., Ex. 1, Rule 1. The CoC defines "eTicket" as "the record of the ticket agreement maintained and processed within the carrier's electronic reservation system." *Id.*[3] The CoC makes clear that a "ticket" must be "issued" to a passenger, and that it has specific attributes, including a ticket number and a "fare construction box." *See, e.g.*, *id.*, Rule 1 (definitions of "Other Charges" and "Related Charges" that must be shown in "the fare

---

[3] The CoC does not define "ticket jacket," but it is common knowledge that the term refers to folders that historically were used to hold paper tickets and boarding passes. *See, e.g.*, https://www.ebay.com/itm/275972648896.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT, AND SUPPORTING MEM. OF AUTHORITIES – 3:25-cv-06995-JD

- 8 -

construction box of the ticket"; definition of "UA Ticket Stock" referencing the "ticket serial number"); Rule 3.E. (transportation is subject to the CoC in effect "on the date the Ticket is issued"); Rule 6.A (referencing tickets being "issued" and "Ticket numbers"). The boarding pass images that Plaintiffs include in their Complaint (Compl. ¶¶ 11, 58) do not have ticket numbers—indeed, the image of a paper boarding pass (*id.* ¶ 58) has an empty space where the ticket number could be referenced, further confirming that the "ticket" is distinct from the boarding pass. In addition, neither boarding pass shows what the passenger paid for the airfare, how the passenger paid, the date of purchase, the fare class, or the taxes and fees the passenger paid, all of which would be included in a ticket. *Id.* ¶¶ 11, 58. The seat selection screens that Plaintiffs include in their Complaint (*id.* ¶ 44) likewise do not include a ticket number, fare information or purchase information, and they are plainly not "issued" by United.

Numerous other provisions of the CoC further refute Plaintiffs' interpretation of "ticket." For example, Rule 5.D.1.a states that for domestic flights, "Passenger must complete the purchase of the ticket(s), check-in, check baggage, *and obtain a boarding pass* at least 60 minutes prior to scheduled departure." Kelly Decl., Ex. 1, Rule 5.D.1.a (emphasis added). Rule 6.L states that United "will assess a 50.00 USD fee for issuance of a paper *ticket*," but there is no fee for a passenger to print a paper *boarding pass* (which passengers can do on their home computers or at an airport kiosk). *Id.*, Rule 6.L (emphasis added). Various other Rules would simply make no sense if "ticket" meant what Plaintiffs contend. *See, e.g.*, Rule 1 (defining "Flight Coupon" as "a portion of the Ticket that indicates travel points between which the coupon is good for carriage"); Rule 7.E (providing that, for purposes of determining the ticket validity period, a "ticket" is "issued" on the date when payment is made); Rule 24.A.1 and 2 (recognizing that "a Ticket" and "a confirmed reservation" are different); Rule 27.B.3 (referencing the "expiration date" of a "Ticket").

In addition, the seat selection screens shown during the booking process are plainly not a "record of agreement." A "record of agreement" describes a *completed* purchase. Kelley Decl. Ex. 1, Rule 1; s*ee also* "record" definition, *Black's Law Dictionary* (12th ed. 2024) ("A documentary account of *past* events, usu. designed to memorialize those events." (emphasis added)). The term "eticket *receipt*" likewise indicates a past-facing acknowledgement. *See* "receipt" definition,

*Black's Law Dictionary* (12th ed. 2024) ("A written acknowledgment that something *has been received*; esp., a piece of paper or an electronic notification that one *has paid* for something."). But the seat selection screens on which Plaintiffs rely are not a record of a transaction that has already occurred; rather, they show the *seat selection process*, before any seat selection is finalized. Compl. ¶ 44.

In short, the boarding passes and seat selection screens on which Plaintiffs rely are not "ticket[s], ticket jacket[s] or eticket receipt[s]." They are not incorporated into the CoC, and Plaintiffs' tortured attempt to show that they are should be rejected.

### b. The Word "Window" Is Not a Promise That a Seat Will Have an Exterior Window View.

Plaintiffs' claims rest on the premise that the mere labeling of a seat with the word "window" on a boarding pass or seat selection screen constitutes an affirmative promise that the seat will have an exterior window view. To be enforceable, however, "a promise must be definite enough that a court can determine the scope of the duty and the limits of performance." *Quick Dispense, Inc. v. Vitality Food Serv., Inc.*, No. 8:23-cv-02322-FWS-ADS, 2025 WL 576589, at *4 (C.D. Cal. Feb. 5, 2025) (internal quotation marks and citation omitted); *see also Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007) (contract formation "requires that the parties reach mutual assent or consent on definite or complete terms. … Terms of a contract must also be sufficiently definite in all particulars essential to its enforcement."). Plaintiffs' Complaint does not plausibly allege that United's seat selection process, as reflected in the screenshots on which Plaintiffs rely, promises that any seat labelled "window" will have an exterior window view. As a result, Plaintiffs' claims would fail even if the seat selection process were incorporated into the CoC.[4]

The seat selection process as depicted in Plaintiffs' screenshots is just that—a way for the passenger to select the *location* in which the passenger will sit. *See* Compl. ¶¶ 44–46. Plaintiffs allege that "United's App labels seats as 'window' or 'aisle' through visual placement on the seat

---

[4] Boarding passes, as the Court undoubtedly knows, are not issued until shortly before a flight, well after the formation of the contract between United and the passenger, so nothing contained in the boarding pass could constitute the purported "promise" of an exterior window.

map and accompanying textual label." *Id.* ¶ 44. As evidenced by Plaintiffs' screenshots, however, there are no exterior windows depicted next to any of the "window" seats—unlike the exit rows, which *are* depicted. *Id.* Nothing in the screenshots indicates that the labeling of a seat as "window" signifies anything other than the position of the seat on the aircraft. *Id.* In fact, Plaintiffs *themselves* describe the seat selection process in geospatial terms, referencing the "window" seats on United's website in terms of their "proximity to the side of the aircraft." *Id.* ¶ 46.

Further, the appearance of the word "window" just above (and in a smaller font than) the words "Preferred Seat"—which offers a "Favorable location in Economy"—or "Economy Plus"—which provides "Extra legroom"—reinforces that the seat selection screens concern seat *location.* *Id.* ¶ 44. This conclusion is confirmed by the CoC, which provides:

> If a Passenger is removed from … [an] **Economy Plus seat**, or from **Preferred Seating** for which a fee, miles, or other compensation has been paid, and the Passenger is not re-accommodated in a seat of equal or greater value, or if a Passenger is downgraded from a class of service and is not re-accommodated in a seat in an equal or greater class of service for which a fee, miles, or other compensation has been paid, the Passenger may be eligible for a refund in accordance with Rule 27.

Kelley Decl., Ex. 1 Rule 4.D (emphasis added). In other words, what the Passenger purchases when she pays "a fee, miles, or other compensation" to select an Economy Plus seat or a Preferred Seat is "extra legroom" or a "favorable location in Economy." Compl. ¶ 44. If *those* benefits are not provided, she may be eligible for a refund upon request. But nothing in Rule 4.D states that a customer who purchases and sits in an Economy Plus seat or a Preferred Seat in the window location on the aircraft is eligible for a refund if the seat does not have an exterior window view.

Plaintiffs' attempt to buttress their theory by referencing statements found elsewhere on United's website (Compl. ¶ 47) undermines their position. Boarding Groups 3, 4 and 5 on United's "boarding process" webpage clearly relate to the *position* of the passenger's seat, such that passengers with "window seats"—*i.e.*, the seats in closest proximity to the external wall of the aircraft—board before passengers with middle or aisle seats, to minimize passengers in the same row having to squeeze past each other to get to their seats.[5] The *position* of a seat is relevant to the boarding of the aircraft; whether the seat has an exterior window view is not. Likewise, United

---

[5] *See* https://www.united.com/en/us/fly/travel/airport/boarding-process.html

advises that "Children in car seats should sit in a window seat" (Compl. ¶ 47) to avoid "block[ing] the egress of any passenger … to the aisle used to evacuate the aircraft," per Federal Aviation Administration guidance.[6] Again, "window seat" is used to identify the *position* of the seat, not to indicate that the seat has an exterior window view.

### c. Rule 24.I of the CoC Provides the Exclusive Remedy for Failure to Provide an Amenity.

There are no provisions in the CoC—and Plaintiffs have identified none—by which United promises that every seat in the "window" position of an aircraft will have an exterior window view. But there is a Rule that expressly addresses—and provides the exclusive remedy for—any failure by United to provide any "amenity." *See* Kelley Decl., Ex. 1, Rule 24.I. Rule 24.I. states that United "shall have *no liability*" for any failure to provide any amenity, regardless of the circumstance that results in the amenity not being available on a flight. *Id.* (emphasis). There is one exception, which provides: "If a Passenger has paid for a specific … amenity in advance of the flight as a separate fee specifically designated for such … amenity and that … amenity is not provided, the Passenger is eligible for a refund of the amount paid if a refund request is made within 90 days" of the flight date. *Id.*

Plaintiffs' Complaint does not reference Rule 24.I, and there is no suggestion that Plaintiffs intend to allege a breach of that Rule by United. Nor could they do so. Although Plaintiffs claim that they "paid extra" for window seats, *see supra* at 2, the Complaint alleges no facts plausibly suggesting any of them paid a fee that was "specifically designated for" the amenity of having an exterior window view, rather than for a seat in a particular location on the aircraft or a seat with additional legroom. There also are no allegations that any Plaintiff made a request for a refund of any such fee "within 90 days" of their flight date, which is a condition precedent that Rule 24.I requires.

In sum, while Counts I and II of Plaintiffs' Complaint are styled as claims for "breach of contract," they do not ask the Court to enforce a contractual obligation that United actually undertook (because no such contractual obligation arises), but instead seek to "enlarge the

---

[6] https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC_120-87C.pdf; ECF 32-1, Ex. 1.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT, AND SUPPORTING MEM. OF AUTHORITIES – 3:25-cv-06995-JD

- 12 -

contractual obligations" that United voluntarily adopted. *See Ginsberg*, 572 U.S. at 276. They are therefore preempted and must be dismissed.

### 3. The ADA Preempts Plaintiffs' Other Claims (Counts III and IV).

Count III of the Complaint purports to assert a claim for "breach of implied contract." Plaintiffs allege that, if the Court finds United "did not undertake express contractual commitments to provide Plaintiffs with actual windows at the seats they purchased," then United "is alternatively liable for undertaking an implied-in-fact contractual obligation." Compl. ¶ 93. But the CoC expressly states that, "[b]y purchas[ing] a ticket or accepting transportation, the passenger agrees to be bound ***by these controlling terms*** of this Contract of Carriage, and ***no covenants at law or in equity shall be implied***." Kelley Decl. Ex. 1, at 1 (emphasis added). Plainly, then, Plaintiffs' Count III does *not* seek only to enforce a contractual obligation that United undertook; it instead asks the Court, based on state law external to the agreement, to *imply* certain terms *despite* the express prohibition in the CoC. Plaintiffs' claim for breach of implied contract is therefore preempted. *See, e.g.*, *Scarlett v. Air Methods Corp.*, 922 F.3d 1053, 1065 (10th Cir. 2019) (finding implied contract claim preempted); *Bajra v. Delta Air Lines, Inc.*, No. 1:24-CV-3477-MHC, 2025 WL 1527076, at *15 (N.D. Ga. May 6, 2025) (same). Finally, Plaintiffs' alternative claim for promissory estoppel (Count IV) is preempted for reasons similar to those discussed with respect to Counts I and II—*i.e.*, because Plaintiffs do not plausibly allege any promise by United that every window seat will have an exterior window view, the claim does not seek to enforce any obligation that United actually undertook. *See Wolens*, 513 U.S. at 232–33.

### 4. The ADA Preempts Plaintiffs' Request for Attorneys' Fees and Expenses.

Plaintiffs' prayer for relief requests attorney's fees and expenses "as allowable under Rule 23." Compl. at 34. But Rule 23 does not provide any independent basis for such an award. *See* Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are *authorized by law or by the parties' agreement*.") (emphasis added). The CoC does not authorize any such award, so even if there were a basis for one under state law (and United is aware of none), it would constitute precisely the type of "enlargement or enhancement" of the parties' bargain that the ADA prohibits. *See Wolens,* 513 U.S. at 232–33.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT, AND SUPPORTING MEM. OF AUTHORITIES – 3:25-cv-06995-JD

- 13 -

Plaintiffs' request for attorney's fees and expenses is therefore preempted.

### B. Plaintiffs' Claims Fail on Their Merits.

#### 1. Counts I and II Fail Because Plaintiffs Do Not Plausibly Allege That United Breached Any Contract with Them.

To state a claim for breach of contract, a plaintiff must allege: (1) the existence of a contract; (2) plaintiff's performance or excuse for non-performance; (3) defendant's breach; and (4) resulting damage to the plaintiff. *Villarroel v. Recology, Inc.*, 775 F. Supp. 3d 1050, 1064 (N.D. Cal. 2025). The formation of a contract "requires that the parties reach mutual assent or consent on definite or complete terms." *Netbula, LLC*, 516 F. Supp. 2d at 1155. Consent is not mutual "unless the parties all agree on the same thing in the same sense." *Quick Dispense, Inc.*, 2025 WL 576589, at *3 (internal quotations and citation omitted). Further, the terms of an alleged contract must be "sufficiently definite in all particulars essential to its enforcement." *Netbula, LLC*, 516 F. Supp. 2d at 1155; *see also Quick Dispense, Inc.*, 2025 WL 576589, at *4 ("[A] promise must be definite enough that a court can determine the scope of the duty and the limits of performance.")

As discussed in Section IV.A.2, *supra*, Plaintiffs' Complaint fails plausibly to allege the existence of any contract between any Plaintiff and United whereby United promised that the seats Plaintiffs selected would have an exterior window view. And while there is no dispute that by purchasing their tickets Plaintiffs "agree[d] to be bound by" the CoC, they also fail plausibly to allege that United breached that contract. Counts I and II should therefore be dismissed.

#### 2. Count III Fails Because the CoC Precludes Implied Agreements.

"An implied breach of contract claim has the same elements as an express breach of contract claim except its existence and terms are manifested by conduct, not words." *Doe I v. Google, LLC*, 741 F. Supp. 3d 828, 848 (N.D. Cal. 2024). In this case, Plaintiffs do not allege any specific conduct by United that purportedly created an implied contract between United and any Plaintiff, and the conduct that the Complaint generally alleges (the location of a seat on a seat map or labeling of a seat as "window") is no more sufficient to allege an implied contract than an express one.

In any event, "an implied contract cannot exist when there is an express contract between the parties governing the same subject." *Id*. Here, not only is there an express contract—the CoC—

that "constitute[s] the conditions of carriage" upon which United agreed to provide transportation to Plaintiffs, but that contract expressly *precludes* any implied covenants. Kelley Decl. Ex. 1, at 1 and Rule 3.A. Count III should therefore be dismissed.

### 3. Count IV Fails Because Plaintiffs Do Not Plausibly Allege the Elements of a Promissory Estoppel Claim and There Is a Valid Contract Between the Parties.

In California, the elements of promissory estoppel are: "(1) a promise that is clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) the reliance must be reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his or her reliance." *Boon Rawd Trading Int'l Co., Ltd. v. Paleewong Trading Co., Inc.*, 688 F. Supp. 2d 940, 953 (N.D. Cal. 2010). Plaintiffs here have not alleged a "clear and unambiguous" promise by United that the seats they selected would have exterior window views, *see supra* Section IV.A.2, nor have they sufficiently alleged that their supposed reliance on the word "window" as a promise that their seats would have exterior window views was either reasonable or foreseeable. In addition, their allegations that they relied to their detriment "by (1) expending additional *consideration* to obtain seats that they would not have originally purchased, and/or (2) abstaining from changing their seats post-purchase" (Compl. ¶ 101, emphasis added) are insufficient to satisfy that element of the claim. *See, e.g.*, *Boon Rawd Trading*, 688 F. Supp. 2d at 953–54 ("The doctrine of promissory estoppel is only applicable when an alleged promise lacks adequate consideration."); *Mend Health, Inc. v. Carbon Health Techs., Inc.*, 588 F. Supp. 3d 1049, 1057 (C.D. Cal. 2022) (finding plaintiff's allegations "that it forwent alternative options to expand its business" insufficient to support promissory estoppel claim).

Even if Plaintiffs had adequately pleaded those elements, however, their promissory estoppel claim would still fail because a valid contract—the CoC—"governs the same subject matter"—transportation of Plaintiffs by United—as the alleged promise. *See Horne v. Harley-Davidson, Inc.*, 660 F. Supp. 2d 1152, 1163 (N.D. Cal. 2009) (dismissing promissory estoppel claim without leave to amend). Count IV should accordingly be dismissed.

### CONCLUSION

For the foregoing reasons Plaintiffs' Complaint should be dismissed with prejudice.

Dated: November 10, 2025

Respectfully Submitted:

**RILEY SAFER HOLMES & CANCILA LLP**

By: /s/ Sondra A. Hemeryck

Sondra A. Hemeryck (*pro hac vice*)
Eli Litoff (*pro hac vice*)
Steven E. Vogel (*pro hac vice*)
RILEY SAFER HOLMES & CANCILA LLP
1 S. Dearborn Street, Suite 2200
Chicago, IL 60603
Telephone: (312) 471-8700
Facsimile:  (312) 471-8701
shemeryck@rshc-law.com
elitoff@rshc-law.com
svogel@rshc-law.com

Jeffrey R. Williams (CSB No. 084156)
RILEY SAFER HOLMES & CANCILA LLP
jwilliams@rshc-law.com
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Telephone:(415) 275-8550
Facsimile: (415) 275-8551

*Attorneys for Defendant*
UNITED AIRLINES, INC.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT, AND SUPPORTING MEM. OF AUTHORITIES – 3:25-cv-06995-JD

- 16 -

**PROOF OF SERVICE**

I hereby certify that I caused the above document to be electronically filed with the Clerk of Court using CM/ECF system, which will send notification of such filing to all counsel of record in the above-captioned matter.

Dated: November 10, 2025                By: /s/ Sondra A. Hemeryck
                                            Sondra A. Hemeryck (*pro hac vice*)

**RILEY SAFER HOLMES & CANCILA LLP**
SONDRA A. HEMERYCK (*pro hac vice*)
shemeryck@rshc-law.com
ELI LITOFF (*pro hac vice*)
elitoff@rshc-law.com
STEVEN E. VOGEL (*pro hac vice*)
svogel@rshc-law.com
1 S. Dearborn Street, Suite 2200
Chicago, IL 60603
Telephone:    (312) 471-8700
Facsimile:    (312) 471-8701
JEFFREY R. WILLIAMS (CSB No. 084156)
jwilliams@rshc-law.com
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Telephone:    (415) 275-8550
Facsimile:    (415) 275-8551

*Attorneys for Defendant*
UNITED AIRLINES, INC.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARC BRENMAN, AVIVA COPAKEN, SEAN MINYARD, ROBERT MONROE, and CINDY PAWLOWSKI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED AIRLINES, INC.,<br><br>Defendant. | **Case No. 3:25-cv-06995-JD**<br><br>**DEFENDANT UNITED AIRLINES, INC.'S REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE IN SUPPORT OF MOTION TO DISMISS**<br><br>**DATE:** January 22, 2026<br>**TIME:** 10:00 a.m.<br>**COURTROOM:** 11<br>Judge: Honorable James Donato<br><br>Complaint Filed: August 19, 2025 |

Pursuant to Federal Rule of Evidence 201 of the Federal Rules of Evidence, Defendant United Airlines, Inc. ("United") respectfully requests that the Court take judicial notice of an official government publication issued by the Federal Aviation Administration. In addition, United respectfully requests that the Court consider United's Contract of Carriage and United's boarding process webpage, both of which are referenced in the First Amended Complaint, under the incorporation-by-reference doctrine.

3:25-cv-06995-JD

REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE
IN SUPPORT OF MOTION TO DISMISS

**LEGAL STANDARD**

When considering a motion to dismiss, courts may consider not only the allegations in the complaint and documents attached thereto, but any matter subject to judicial notice. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *Love v. Wildcats Owner LLC*, 532 F. Supp. 3d 872, 876 (N.D. Cal. 2021) ("The court need not accept as true allegations that contradict facts which may be judicially noticed."). Judicial notice is appropriate for facts "not subject to reasonable dispute" that are capable of accurate and ready determination by resort to sources whose "accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). In particular, courts often take judicial notice of government documents, including public government websites. *See Nat'l Urb. League v. Ross*, 489 F. Supp. 3d 939, 957 n.2 (N.D. Cal.), *order clarified*, 491 F. Supp. 3d 572 (N.D. Cal. 2020) ("Courts take judicial notice of information … found on government agency websites."); *Gonzalez v. City of Mountain View*, No. 24-CV-00296-PCP, 2025 WL 2482238, at *4 (N.D. Cal. Aug. 27, 2025) (granting "judicial notice of three documents currently available on the City's website").

In addition, the incorporation-by-reference doctrine allows a court ruling on a motion to dismiss to consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached" to the pleading. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (internal quotation marks and citation omitted). A document is incorporated by reference into a complaint if the plaintiff refers extensively to the document or it forms the basis of his claim. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "The incorporation-by-reference doctrine applies with equal force to internet pages as it does to printed material." *Browning v. Am. Honda Motor Co.*, 549 F. Supp. 3d 996, 1004 (N.D. Cal. 2021)(quoting *Knievel v. ESPN*, 393 F.3d 1068, 1076–77 (9th Cir. 2005)). Where only a portion of a webpage is referenced or included in the complaint, courts routinely consider the full webpage in ruling on a motion to dismiss. *Browning*, 549 F. Supp. 3d at 1004; *see also Knievel*, 393 F.3d at 1076–77 (considering entire webpages in motion to dismiss through incorporation by reference of specific webpage elements).

**REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE**

Here, United seeks (1) judicial notice of an official government publication issued by the United States Federal Aviation Administration ("FAA"), and (2) incorporation by reference of United's Contract of Carriage effective as of January 22, 2025, and United's boarding process webpage.

Plaintiffs allege that they purchased flights on United and "paid extra" or used "United credit card benefits" to purchase window seats. First Am. Compl. (ECF 24, hereafter "Complaint") ¶¶ 9–11, 14–15. When Plaintiffs purchased their tickets, they agreed to be bound by United's Contract of Carriage. *See* Declaration of Noemi Kelley, Ex. 1 (Contract of Carriage, hereafter "CoC"), at 1. Although Plaintiffs do not attach the CoC to their pleading, they reference it extensively, and it is central to their claims. *See,e.g*, Compl. ¶¶ 59–65, 77, 79–83, 86–90.

Plaintiffs' theory in this case is that the labeling of a seat with the word "window" on an seat map or boarding pass constitutes an affirmative promise that the seat will have an exterior window view. In attempting to support that theory, Plaintiffs' pleading references United's "boarding process" webpage (Compl. ¶ 47), as well a statement on United's website recommending that "Children in care seats should sit in a window seat" (*id.*).

United asks the Court to take judicial notice of an FAA Advisory Circular entitled "Use of Child Restraint Systems on Aircraft," issued by the FAA on September 24, 2015 and available on the FAA's website at: https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC_120-87C.pdf. A copy of that Advisory Circular is also attached to this Request as Exhibit 1. This official publication, available on a government website, is properly subject to judicial notice. *See supra*.

In addition, United asks the Court to consider its January 22, 2025 CoC, attached as Exhibit 1 to the Declaration of Noemi Kelley, under the incorporation-by-reference doctrine. Plaintiffs' Complaint repeatedly references and relies on the CoC, which constituted "the conditions of carriage" upon which United agreed to provide transportation to Plaintiffs. *See,e.g.*, Compl. ¶¶ 59–65, 77, 79–83, 86–90. It is therefore appropriately considered in support of United's motion to

REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE
IN SUPPORT OF MOTION TO DISMISS

dismiss. *Ritchie*, 342 F.3d at 908 (a document is incorporated by reference into a complaint if the plaintiff refers extensively to the document or it forms the basis of his claim).

Finally, United asks the Court to consider its full "boarding procedures" webpage under the incorporation-by-reference doctrine. In their allegations regarding United's boarding groups, Plaintiffs selectively quote from United's "boarding process" webpage, *see* Compl. ¶ 47; the Court accordingly should consider the entire webpage for appropriate context. The complete boarding process webpage is available here: https://www.united.com/en/us/fly/travel/airport/boarding-process.html.

Dated:  November 10, 2025

RILEY SAFER HOLMES & CANCILA LLP

By: */s/ Sondra A. Hemeryck*

Sondra A. Hemeryck (*pro hac vice*)
Eli Litoff (*pro hac vice*)
Steven E. Vogel (*pro hac vice*)
RILEY SAFER HOLMES & CANCILA LLP
1 S. Dearborn Street, Suite 2200
Chicago, IL 60603
Telephone: (312) 471-8700
Facsimile:  (312) 471-8701
shemeryck@rshc-law.com
elitoff@rshc-law.com
svogel@rshc-law.com

Jeffrey R. Williams (CSB No. 084156)
RILEY SAFER HOLMES & CANCILA LLP
jwilliams@rshc-law.com
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Telephone:(415) 275-8550
Facsimile: (415) 275-8551

*Attorneys for Defendant*,
UNITED AIRLINES, INC.

-4-            3:25-cv-06995-JD

# EXHIBIT 1



**U.S. Department
of Transportation**
Federal Aviation
Administration

# Advisory Circular

| | | |
|---|---|---|
| **Subject:** Use of Child Restraint Systems on Aircraft | **Date:** 9/24/15 | **AC No:** 120-87C |
| | **Initiated by:** AFS-200 | **Change:** |

**1. PURPOSE.** This advisory circular (AC) provides information and practices regarding the use of child restraint systems (CRS) on aircraft. The Federal Aviation Administration (FAA) intends for operators to use this as a resource during the development, implementation, and revision of an air carrier's standard operating procedures (SOP), Web sites and training programs regarding the use of CRSs.

    **a. FAA Initiatives.** This AC is one of several FAA initiatives designed to address safety concerns of the National Transportation Safety Board (NTSB). It is a part of the FAA's ongoing commitment to educate and inform aircraft operators, crewmembers, and airline passengers regarding the use of CRSs on aircraft in order to encourage and increase the use of approved CRSs. For more information, refer to the following FAA Web site: http://www.faa.gov/passengers/fly_children/.

    **b. Regulatory Requirements.** In addition, this AC provides information to air carriers conducting Title 14 of the Code of Federal Regulations (14 CFR) part 121 operations about the requirement to make available on their Web sites the width of the narrowest and widest passenger seats in each class of service for each make, model, and series (M/M/S) of airplane used in passenger-carrying operations. If an air carrier does not have a Web site, the air carrier is not required to establish a Web site in order to comply with this regulation.

**2. CANCELLATION.** AC 120-87B, Use of Child Restraint Systems on Aircraft, dated September 17, 2010, is cancelled.

**3. RELATED REGULATIONS.** Title 14 CFR part 21, § 21.8; part 91, §§ 91.107 and 91.1035; part 121, §§ 121.311 and 121.583; part 125, § 125.211; and part 135, § 135.128.

**4. RELATED FAA GUIDANCE (CURRENT EDITIONS).** This AC provides information and suggested practices regarding the use of CRSs on aircraft. This AC also supplements and contains information previously published in the documents listed below.

- AC 91-62A, Use of Child Seats in Aircraft;
- Information for Operators (InFO) 11007, Regulatory Requirements Regarding Accommodation of Child Restraint Systems – Update;
- FAA Office of Aerospace Medicine Technical Report FAA-AM-78-12, Children Restraint Systems for Civil Aircraft;

- FAA Office of Aerospace Medicine Technical Report FAA-AM-94-19, The Performance of Child Restraint Devices in Transport Airplane Passenger Seats; and
- Order 8900.1 Volume 3, Chapter 33, Section 6, Operations—Cabin Safety.

**5.  AUDIENCE.** Air carrier personnel involved in the development of aircraft SOP and training programs, as well as crewmembers, engineers, Web site designers, and others involved in flight operations under part 121, should be familiar with the contents of this AC. This AC may also be valuable to others associated with operations under parts 91, 125, and 135.

**6.  HISTORY OF CRS REQUIREMENTS AND APPROVAL STANDARDS.**

   **a.  Civil Air Regulation (CAR) Section 40.174.** The permissive language that does not require children under the age of 2 to be restrained can be found in the 1964 CAR, § 40.174, which stated in part that "A seat and an individual safety belt are required for each passenger and crew member excluding infants, who are in other than a recumbent position."

   **b.  Federal Motor Vehicle Safety Standard (FMVSS) No. 213.** In 1982, the Department of Transportation (DOT) had two standards for CRSs. CRSs for use in motor vehicles were required to be certified as complying with the requirements of FMVSS No. 213. CRS for use in aircraft were required to be certified as complying with the requirements of FAA's Technical Standard Order (TSO)-C100c, Aviation Child Safety Device (ACSD). In early 1983, the NTSB considered the safety problems posed for young children traveling in motor vehicles and aircraft and urged that a variety of actions be taken to promote increased use of CRSs. One of those recommendations was that DOT simplify its two different standards and set forth requirements for CRSs by combining the standards. The FAA and the National Highway Traffic Safety Administration (NHTSA) agreed upon a single government performance standard that would satisfy both aviation and highway safety requirements for CRSs. The agencies proposed NHTSA as the sole agency responsible for administering the new FMVSS No. 213, which would be applicable to CRSs designed for use in motor vehicles and CRSs designed for use in aircraft (Title 49 of the Code of Federal Regulations (49 CFR) part 571, § 571.213).

   **c.  United Nations (UN) Standards or Approval by a Foreign Government.** On October 15, 1992, the FAA broadened the categories of CRSs allowed to be used on aircraft to include CRSs meeting the standards of the UN or approved by a foreign government (57 Federal Register (FR) 42662).

   **d.  FAA Approval Through a Type Certificate (TC), Supplemental Type Certificate (STC) or TSO.** On August 26, 2005, the FAA once again broadened the categories of CRSs that aircraft operators may furnish for use on aircraft to include CRSs approved by the FAA through TC, STC, or TSO (70 FR 50902).

   **e.  FAA Approval Through § 21.305(d) (2010 ed.) (i.e., AmSafe Child Aviation Restraint System (CARES), Part No. 4082), 14 CFR § 21.8(d), or TSO-C100b, or a Later Version.** On July 14, 2006, the FAA further broadened the categories of CRSs that both passengers and aircraft operators may furnish and use on aircraft to include CRSs approved under § 21.305(d) or TSO-C100b, Child Restraint System (CRS), or a later version (71 FR 40003). On October 16, 2009, the FAA published a final rule entitled, Production and

Airworthiness Approvals, Part Marking, and Miscellaneous Amendments (74 FR 53368). In this final rule, the FAA amended its certification procedures and identification requirements for aeronautical products and articles. As a result of this amendment, § 21.305 was redesignated as § 21.8, effective April 14, 2010. On May 20, 2014, the FAA amended the provision in § 121.311 relating to the label required for FAA-approved CRSs onboard aircraft to reflect this redesignation of § 21.305 to § 21.8 (refer to 79 FR 28811). The May 20, 2014 amendment also corrected minor technical errors in the codified regulations. The technical amendment ensures that CRSs previously approved under § 21.305(d) (2010 ed.) (i.e., CARES, Part No. 4082) can continue to be used and CRSs approved under § 21.8(d) may also be used.

   **f.   TSO-C100c.** Additionally, the FAA published TSO-C100c, effective April 6, 2012. Therefore, approvals under § 21.8(d) would use TSO-C100c as the basis for approval.

**7.   FAA APPROVAL PROCESSES USED FOR APPROVED CRSs ON AIRCRAFT.** The TC, STC, TSO, § 21.305(d) (2010 ed.), and § 21.8(d) approval processes address differences in CRS design and performance as follows:

   **a.   TC Process.** A TC is an FAA design approval in which an applicant applies for, and if approved, receives a TC for a product or a major design change to a product. A product is defined as an aircraft, an aircraft engine, or an aircraft propeller. The TC process is appropriate if a CRS is incorporated into the original design of the aircraft.

   **b.   STC Process.** The STC process allows a specific CRS meeting FAA-established testing and evaluation criteria to be used on a specific type of aircraft.

   **(1)** Under the STC process, a CRS manufacturer would submit an application for his or her product to be used on specific type of aircraft. This allows the FAA to deal with novel and unusual design features associated with any new type of CRS not addressed by current regulations and safety standards. The STC process is appropriate for a CRS not meeting FMVSS No. 213.

   **(2)** When the FAA considers granting an STC for a CRS, it may publish proposed special conditions in the FR for notice and comment. These proposed special conditions discuss the additional safety standards the FAA deems necessary for the CRS to comply with existing regulations. It also discusses the required performance of the CRS and the capability of the CRS to be installed and used without creating safety concerns. Refer to 70 FR 18271, for an example of special conditions that were part of an STC which the FAA granted to a manufacturer for a CRS.

   **c.   TSO Process.**

   **(1)** A TSO is a minimum performance standard issued by the FAA for specified materials, parts, processes, and appliances used on aircraft. These minimum performance standards must be used for an applicant to receive TSO authorization or a letter of design approval (LODA) in the case of manufacturers located outside the United States. TSO-C100c contains minimum performance standards for the testing and evaluation of CRS. The minimum performance standard references Society of Automotive Engineers (SAE) Aerospace Standard (AS) 5276/1. It also requires the manufacturer to provide operating instructions, equipment

limitations, installation procedures and limitations, as well as instructions for continued airworthiness (ICA) and maintenance of the CRS.

**(2)** A TSO is a minimum performance standard similar to FMVSS No. 213. However, TSO-C100c provides more realistic CRS testing regarding performance in an aviation environment. The TSO process is appropriate if a CRS is similar in design to a CRS meeting FMVSS No. 213 requirements, as well as designed to meet the specific aviation performance standards contained in TSO-C100c.

**d.  Section 21.8(d) Process.**

**(1)** Under the FAA's certification rules, § 21.8(d) allows a material, part, process, or appliance to be approved in any manner approved by the Administrator. One of the reasons that the FAA included this provision in § 21.8 was to address the unique challenges presented by certain types of equipment for use on aircraft.

**(2)** When approving a CRS under the provisions of § 21.8(d), the FAA must ensure the CRS meets an equivalent level of safety (ELOS) to other approval processes. For a CRS, the FAA's technical experts look at the benchmark (current edition of TSO-C100, Child Restraint Systems) and identify safety-critical features. The technical experts ensure that each of these features meets an ELOS adequately. This ensures a CRS approved by the FAA under § 21.8(d) will meet a high level of safety regarding testing, quality, and performance standards.

**8.  AVIATION CHILD SAFETY DEVICE (ACSD).**

**a.  Avoiding Consumer Confusion.** The FAA recognizes that the term "child restraint system" was originally used to refer to child restraints meeting the requirements of FMVSS No. 213 and designed to perform effectively in motor vehicles. However, in recent rulemakings, the FAA uses the term "child restraint system" to describe any approved seat or device used to restrain children on aircraft regardless of whether or not it complies with the requirements of FMVSS No. 213. To reduce consumer confusion between a CRS meeting the requirements of FMVSS No. 213 (safe for use in motor vehicles) and a CRS designed only for use in aircraft (not safe for use in motor vehicles), the FAA has introduced a new term referring to a CRS only approved for aviation use. The FAA will call these aviation-only restraints an ACSD. Regulations regarding the use of a CRS in aircraft also apply to an ACSD. Figure 1 is an example of an ACSD (also shown in paragraph 13).

**FIGURE 1. EXAMPLE OF A CRS (ACSD)**



**b.  Warning Label.** An ACSD only meeting the aviation performance standards contained in TSO-C100c previously approved under § 21.305(d) (2010 ed.), or meeting the aviation performance standards contained in TSO-C100c and approved under § 21.8(d) is not safe for use in a motor vehicle. The FAA worked closely with NHTSA to ensure that labeling on an ACSD clearly illustrates that an ACSD is not safe for use in motor vehicles. The FAA also plans to require a similar warning label on ACSDs approved by the FAA through the STC process.

**FIGURE 2. REQUIRED WARNING LABEL FOR AVIATION CHILD SAFETY DEVICES WITHOUT FMVSS NO. 213 APPROVAL**



**c.  Consumer Education.** The FAA is taking steps to educate consumers regarding the difference between devices safe for use in both motor vehicles and aircraft versus those safe only for use in aircraft. The FAA revised the information on its Web site for passengers traveling with children (http://www.faa.gov/passengers/fly_children/), and put additional educational material on the site to remind people that ACSDs are not safe for use in motor vehicles. The FAA also encourages airline personnel, especially flight attendants (F/A), to take advantage of opportunities to educate parents and guardians who use ACSDs on aircraft regarding the differences between those "aviation only" ACSDs and devices that can be used safely in both aircraft and motor vehicles.

> NOTE:  Unless indicated otherwise, any information regarding CRSs and pertinent regulations also apply to ACSDs.

**9. LABELING ON A CRS APPROVED FOR USE DURING GROUND MOVEMENT, TAKEOFF, AND LANDING.** Current operating rules in parts 91, 121, 125, and 135 require that a CRS used on aircraft during ground movement, takeoff, and landing meet one of the following labeling or marking requirements:

    **a. Required Labels.** The CRS must bear two labels. However, typically the text for these two required labels is merged onto one label. The labeling must include the text "This child restraint system conforms to all applicable Federal Motor Vehicle Safety Standards" and "This Restraint is Certified for Use in Motor Vehicles and Aircraft," in red lettering. Figure 3 is an example of this required labeling.

**FIGURE 3. EXAMPLE OF REQUIRED LABELING**



    **b. Approval Labels.** The CRS must bear either a label showing approval of a foreign government or a label showing that the CRS was manufactured under the standards of the UN. Figure 4 is an example of the required labeling for a CRS manufactured under the standards of the UN (the "E" is consistently used in the label, but the number to the right of the "E" can change because it is the distinguishing number of the country that has granted approval).

**FIGURE 4. EXAMPLE OF THE REQUIRED LABELING FOR A CRS MANUFACTURED UNDER UNITED NATIONS (UN) STANDARDS**



    **c. FAA Approval Label.** The CRS must bear a label or markings showing FAA approval through an STC. Figure 5 is an example of this required labeling.

**FIGURE 5. EXAMPLE OF REQUIRED LABELING FOR
CRS APPROVED UNDER AN STC**

```
Conforms To:
  PAT NO.
  STC STO10781LA


APPROVED FOR AIRCRAFT
      USE ONLY
```

**d.  TSO Label.** A CRS approved under the current version of TSO-C100 must be permanently and legibly marked "TSO-C100" and must include the TSO version under which it was approved. For instance, a CRS approved under TSO-C100c must be permanently and legibly marked "TSO-C100c."

**e.  Label Indicating Approval Under § 21.305(d) (2010 ed.).** The CRS must be clearly marked showing FAA approval under § 21.305(d) and bear the label "FAA Approved in Accordance with 14 CFR § 21.305(d)."

**FIGURE 6. EXAMPLE OF REQUIRED LABELING FOR CRS APPROVED UNDER
14 CFR PART 21, § 21.305(d)**

```
FAA APPROVED IN
ACCORDANCE WITH
 14 CFR 21.305 (d)
  APPROVED FOR
AIRCRAFT USE ONLY
```

**f.  Label Indicating Approval Under § 21.8(d).** The child restraint device manufactured by AmSafe, Inc. (CARES, Part No. 4082) and approved by the FAA in accordance with § 21.8 is the only device that may bear a label or markings showing FAA approval in accordance with § 21.8. Figure 7 is an example of an appropriate label for this device.

**FIGURE 7. EXAMPLE OF REQUIRED LABELING FOR CRS APPROVED UNDER
14 CFR PART 21, § 21.8(d)**

```
FAA APPROVED IN
ACCORDANCE WITH
  14 CFR 21.8(d)
  APPROVED FOR
AIRCRAFT USE ONLY
```

**10. REGULATORY REQUIREMENTS REGARDING THE USE OF CRSs ON AIRCRAFT.**

**a. Children Under the Age of Two.** Under the provisions in parts 121, 125, and 135, during takeoff, landing, and movement on the surface, each person on board shall occupy an approved seat or berth with a separate seatbelt properly secured about him/her. However, a person who has not reached his/her second birthday may be held by an adult occupying a seat or berth. During takeoff, landing, and movement on the surface, a child under the age of two may be held in an adult's lap or be placed in a regular passenger seat and use a standard seatbelt.

**b. Proper Use of CRS.** If a child occupies a CRS, a parent/guardian must accompany the child, and the aircraft operator must comply with the requirements that the child is properly secured in the CRS, the CRS is properly secured in a forward-facing seat, the child does not exceed the weight limits of the CRS, and the CRS is approved and has the proper labels or markings.

**c. CRS Restrictions.** No aircraft operator may permit a child to occupy a booster-type, vest-type, harness-type, or lap-held CRS during takeoff, landing, and movement on the surface, except when the CRS has been approved by the FAA through a TC, STC, TSO, under § 21.305(d) (2010 ed.), or under § 21.8(d). Booster-type, vest-type, and harness-type CRSs approved by the FAA through a TC, STC, TSO, under § 21.305(d) (2010 ed.), or under § 21.8(d), may be used during all phases of flight.

**d. Regulations.** Under the provisions in parts 121, 125, and 135, no certificate holder may prohibit a child from using an approved CRS when the parent/guardian purchases a ticket for the child. Certificate holders are encouraged to allow the use of empty seats to accommodate CRS; however, they are not required to allow non-ticketed children to occupy empty passenger seats, even if the child uses a CRS.

**e. Approved CRSs.** The regulations allow aircraft operators to provide approved CRSs for use.

**f. Operators Prohibiting CRS Use.** No aircraft operator may prohibit a child from using an approved CRS when the parent/guardian purchases a seat for the child. If an approved CRS, for which a ticket has been purchased, does not fit in a particular seat on the aircraft, the aircraft operator has the responsibility to accommodate the CRS in another seat in the same class of service. The regulations also permit an aircraft operator to use its discretion in identifying the most appropriate forward-facing passenger seat location, considering safe operating practices. For example:

**(1)** A CRS with a base that is too wide to fit properly in a seat with rigid armrests can be moved to a seat with moveable armrests that can be raised to accommodate the CRS in the same class of service.

**(2)** An aft-facing CRS that cannot be installed properly, because of minimal pitch (distance between seats) between rows, can be moved to a bulkhead seat or a seat in a row with additional pitch in the same class of service.

    **(3)** A harness type CRS (approved under § 21.305(d) (2010 ed.) (i.e., CARES, Part No. 4082) or under § 21.8(d)) with an upper strap unable to encircle some sleeper seats or very large first-class seats, can be moved to another seat that can accommodate the strap in the same class of service.

> **NOTE:  An aircraft operator may have policies, based on safe operating practices, that establish certain seat locations for passengers who use a CRS on a specific aircraft. However, prohibiting the use of a CRS (if a ticket has been purchased), when there are seats on the aircraft in the same class of service where the CRS could be used safely, is not consistent with the requirements in parts 121, 125, and 135.**

**11.  SEAT DIMENSION DISCLOSURE.** Consistent with the FAA Modernization and Reform Act of 2012, § 121.311(k) requires air carriers conducting part 121 operations to make available on their Web sites the width of the narrowest and the widest passenger seats in each class of service for each airplane used in passenger-carrying operations. This rule facilitates the use of a CRS onboard an airplane and provides greater information to assist a caregiver to determine whether a particular CRS will fit in an airplane seat.

    **a.  Class of Service.** "Class of service" is the most relevant break point for information disclosure as it remains the prevailing terminology used to distinguish seat products, including the seat size variations and amenities that are associated with those products. The DOT defines "class of service" to mean seating in the same cabin class such as First, Business, or Economy class, or in the same seating zone if the carrier has more than one seating product in the same cabin (e.g., Economy and Premium Economy class); or seats that are wider or have more legroom that are available at a higher cost to passengers. Because no certificate holder may prohibit a child from occupying a CRS if the child holds a ticket for an approved seat, the agency has stated that the aircraft operator need only accommodate the CRS in another seat in the same class of service.

    **b.  Measurement of Seat Width.** Section 121.311 includes a definition of seat width applicable to seat dimension disclosure requirements. The definition specifies that seat width is the distance between the inside of the seat armrests.

    **c.  Accommodation of a CRS.** An operator may have policies, based on safe operating practices that establish certain seat locations for a passenger who uses a CRS on a specific aircraft. Even if a certain seat can accommodate an approved CRS, an operator does not have to permit the CRS in that location if the operator's policies disallow the CRS in that seat. However, prohibiting the use of a CRS (if a ticket has been purchased) when there are seats on the aircraft, in the same class of service, where the CRS could be used safely is not consistent with the requirements stated in part 121. As an operator determines how best to meet the requirement of § 121.311(k), it would be beneficial to the air carrier and would help facilitate the use of a CRS onboard an airplane, if the air carrier only provides seat widths for seats that an air carrier allows for CRS use.

    **d.  Effective Practices Regarding Air Carrier Information.** In addition to the seat width information required by § 121.311, the FAA encourages air carriers to include information on

their Web sites about their operational policies and limitations regarding the placement of CRS in specific seats or locations on their aircraft. For example, if an air carrier prohibits a CRS in aisle seats, it would be beneficial to list this on the air carrier's Web site because it would provide greater information to a caretaker when choosing assigned seats and determining whether a particular CRS will fit in an airplane seat.

**12.   WORN OR UNREADABLE LABELS.**

   **a.   Regulatory Requirement.** When an approved CRS is labeled or marked by the manufacturer, it certifies the CRS meets a set of safety standards (FMVSS No. 213, the standards of a foreign government, the standards of the UN, or approval by the FAA through a TC, STC, TSO, or under § 21.305(d) (2010 ed.) or § 21.8(d)). Current operating rules require the CRS used on an aircraft during ground movement, takeoff, and landing bear labels or markings to indicate to the aircraft operator that the CRS meets safety standards.

   **b.   CRS with a Worn or Unreadable Labels.** When a parent/guardian presents an approved CRS for use on aircraft with a worn off or unreadable label, the CRS must be furnished with a letter or document from the manufacturer that specifically ties the CRS (through a detailed description or specific make and model number) to approval for use on aircraft. An owner's manual is also acceptable as proof of safety standards, as these booklets contain pictures or illustrations of the CRS and information that the CRS meets FMVSS No. 213.

**13.   TYPES OF CRSs MEETING THE CRITERIA OF FMVSS NO. 213, STANDARDS OF A FOREIGN GOVERNMENT, OR STANDARDS OF THE UN.** Basic design features for the majority of approved CRSs for use on aircraft have remained fairly constant, although some changes and innovations in the design of CRSs have occurred as a result of FAA approval of CRSs through a TC, STC, TSO, or under § 21.305(d) (2010 ed.) or § 21.8(d). An aircraft operator's personnel, specifically F/As, should be aware of the following items pertaining to a CRS meeting the criteria of FMVSS No. 213, the standards of a foreign government, or the UN. The criteria include:

- The CRS should have a solid back and seat,
- The CRS should have internal restraint straps installed to securely hold the child in the CRS, and
- The CRS must have a label showing approval for aviation use.

**FIGURE 8. EXAMPLE OF A FORWARD-FACING CRS WITH INTERNAL HARNESS**



**FIGURE 9. EXAMPLE OF AN AFT-FACING CRS WITH INTERNAL HARNESS**



**14. TYPES OF CRSs APPROVED BY A TC, STC, TSO, UNDER SECTION 21.305(d) (2010 ed.) OR § 21.8(d).** Typically, a CRS approved by the FAA through the TSO process will be similar in design to a CRS meeting the requirements of FMVSS No. 213. However, a CRS approved by the FAA through a TC, STC, TSO, or under § 21.305(d) (2010 ed.) or § 21.8(d), may contain novel and unusual design features. In addition, the regulations allow the use of a booster-type or vest- and harness-type CRS, if the FAA has approved it through a TC, STC, TSO, under § 21.305(d) (2010 ed.) or § 21.8(d) (§§ 121.311(b)(2)(ii)(C)(3), 121.311(b)(2)(ii)(C)(4), and 121.311(c)(1)). The aircraft operator is responsible for ensuring that crewmembers have proper training and information regarding the use of a CRS approved for use on aircraft through a TC, STC, TSO, under § 21.305(d) (2010 ed.) or § 21.8(d). Figure 10 is an example of a CRS that has been approved by the FAA through an STC, as well as under § 21.305(d) (2010 ed.).

**FIGURE 10. EXAMPLE OF A CRS (ACSD) APPROVED THROUGH STC AND UNDER § 21.305(d) (2010 ed.)**



**15.   CRSs NOT APPROVED FOR USE DURING GROUND MOVEMENT, TAKEOFF, AND LANDING.** In 1994, the FAA issued a study entitled, The Performance of Child Restraint Devices in Transport Airplane Passenger Seats. The research for the study conducted by the FAA Civil Aerospace Medical Institute (CAMI) involved dynamic impact tests with a variety of CRSs installed in transport category aircraft passenger seats. The results of this study were used as the basis for prohibiting the use of the following devices during ground movement, takeoff, and landing. The FAA Office of Aerospace Medicine (AAM) Technical Report, The Performance of Child Restraint Devices in Transport Airplane Passenger Seats (FAA-AM-94-19), may be found at: http://www.faa.gov/data_research/research/med_humanfacs/oamtechreports/1990s/media/AM94-19.pdf. The CAMI study revealed:

   a.   **Belly Belts.** These devices attach the child to the accompanying adult. The child is restrained by an abdominal belt attached to the adult's seatbelt. During dynamic testing, the forward flailing of the adult and the child resulted in severe body impacts against the forward seat. The child Anthropomorphic Test Dummy (ATD) moved forward to impact the forward row seat back, followed by the adult ATD torso striking the child ATD. Then, the adult ATD torso continued to move forward after contact with the child ATD, crushing the child ATD against the seat back.

   b.   **Harness Restraints.** The devices tested consisted of a torso harness for the child ATD placed in its own seat with the airplane seatbelt routed through a loop of webbing attached to the back of the harness. During dynamic testing, the devices allowed excessive forward body excursion, resulting in the test dummy sliding off the front of the seat with a high likelihood of the child's entire body impacting the seat back of the seat directly in front of it. Then, elasticity in the webbing of the harness and seatbelts pulled the ATD rearward and this rebound acceleration presented further risk of injury.

   c.   **Booster Seats.** A key concern for backless booster seats used in airplane seats is the combined effect of seat back breakover and impact of an adult seated behind the child. Booster

seats may expose the child occupant to potential abdominal injury due to the combined effects of these forces.

**d.   Prohibition.** Except for ACSDs approved by the FAA through a TC, STC, TSO, under § 21.305(d) (2010 ed.), or § 21.8(d), the following CRSs continue to be prohibited for use during ground movement, takeoff, and landing:

- Lap-held child restraint (commonly referred to as a belly belt);
- Vest- and harness-type devices that attach the child to the parent, the parent's restraint system, or to the aircraft seatbelt; and
- Booster-type child restraints (even though they may bear appropriate labels showing that they meet applicable UN standards or are approved by a foreign government).

**16.   FAA BOOSTER SEAT DEFINITION.** The FAA defines booster seats as those that are a raised platform base on which the child sits. A front shield, over which the lap belts are routed, covers the abdominal area of the child. Booster seats do not have a back or side shell. There are no integral belts to restrain the child. The use of such automotive booster seats is prohibited by the FAA's operating rules during ground movement, takeoff, and landing. A child large enough for a booster seat can also be properly restrained in the normal passenger seat lap belts.

**FIGURE 11. EXAMPLE OF A BACKLESS BOOSTER SEAT**



**17.   CRS MANUFACTURERS' BOOSTER SEAT DEFINITION.**

**a.   Overview.** Some manufacturers choose to market and label their approved CRSs with backs as "booster seats." These "booster seats" do not meet the FAA definition of a booster seat. However, these "booster seats" fall into two categories, those with and without internal restraints. As per FMVSS No. 213, the manufacturer's labeling will specify that a CRS without internal restraints is not certified for use in aircraft. However, with internal restraints, solid backs, and the proper labeling, these CRSs marketed as "booster seats" will be labeled as certified for use in motor vehicles and aircraft and may be used for all phases of flight.

**b.   Approved "Booster Seat."** The CRSs in the following image (Figure 12, CRS with Internal Restraint Marketed as a "Booster Seat") would be approved for use during all phases of flight.

9/24/15                                                        AC 120-87C

**FIGURE 12. CRS WITH INTERNAL RESTRAINT MARKETED
AS A "BOOSTER SEAT"**



c.  **Non-Approved "Booster Seat."** The CRS in the following image (Figure 13, CRS without Internal Restraint Marketed as a "Booster Seat") would not be approved for use during all phases of flight.

**FIGURE 13. CRS WITHOUT INTERNAL RESTRAINT MARKETED
AS A "BOOSTER SEAT"**



**18.  PASSENGER USE OF NON-APPROVED CRSs ON AN AIRCRAFT.**

a.  **Regulations.** The regulations contained in § 121.311 prohibit the use of certain types of CRSs during ground movement, takeoff, and landing. However, during the cruise portion of the flight, there is no regulatory prohibition regarding the use of any type of child restraint, including those prohibited from use during ground movement, takeoff, and landing.

b.  **Operational Flexibility.** Also, there is no regulatory requirement that an aircraft operator must permit the use of a "non-approved" CRS during the cruise portion of the flight. If an aircraft operator decides to implement a policy to prohibit the use of a non-approved CRS in-flight, the operator has the operational flexibility to do so.

**19.  PLACEMENT OF CRS ON THE AIRCRAFT.** A CRS must be installed in a forward-facing aircraft seat, in accordance with instructions on the label. This includes placing the CRS in the appropriate forward- or aft-facing direction as indicated on the label for the size

of the child. A window seat is the preferred location; however, other locations may be acceptable, provided the CRS does not block the egress of any passenger, including the child's parent or guardian, to the aisle used to evacuate the aircraft. The regulations contained in §§ 91.107, 121.311, 125.211, and 135.128 allow aircraft operators to determine the most appropriate passenger seat location for a CRS based on safe operating practices. In making this determination, an aircraft operator should consider the following:

a.  **Aisle Seats.** CRSs should not be placed in an aisle seat because this placement has the highest risk of slowing down the passenger flow rate during an evacuation. For example, a parent or guardian traveling with the child in a CRS may step out into the aisle to release the child from the CRS, or the CRS may impede F/As who may need to climb over the top of aisle seats to get past passengers in the aisle to reach an emergency exit.

b.  **Rows Forward and Aft of Emergency Exit Rows.** Each aircraft operator's specific evacuation procedures should be considered during the development of procedures regarding the placement of a CRS on aircraft.

(1)  In an evacuation, space has to be rapidly cleared forward or aft of the exit row so that no one would be hurt or trapped if the exit hatch was thrown in this area. A delay may occur as a parent/guardian removes a child from a CRS. If the aircraft operator's crewmember evacuation procedures or instructions to passengers demonstrate the removal and placement of Type III exit hatches (as defined in 14 CFR part 23, § 23.807, part 25, § 25.807, and part 29, § 29.807) in the row forward or aft of the emergency exit row, the aircraft operator should restrict the placement of CRSs accordingly.

(2)  Installation of a CRS in the row forward of an exit keeps a seat back from breaking over. Aircraft seats are not required to break over, but if an aircraft operates with this feature and evacuation procedures include breaking over seat backs forward of an exit to create space for a crewmember or to create a wider evacuation path for passengers, the aircraft operator should restrict the placement of CRSs accordingly.

c.  **Proper Installation.**

(1)  Some CRSs will not fit into certain aircraft seats. In this instance, the CRS may not be used on those seats. Examples of this include:

- When the base of a CRS with a solid back and seat is wider than an aircraft seat with rigid armrests or
- When the strap encircling the seat back on a harness-type CRS approved under the provisions of § 21.305(d) (2010 ed.) or § 21.8(d) does not fit around some sleeper seats or very large first-class seats.

(2)  Certain aircraft seat models have a recessed tray table cavity with rigid sides into which the tray table fits when closed. If the strap encircling the seat back on a harness-type ACSD is installed underneath the tray table, then this seat back design will not allow the tray table to be properly secured during ground movement, takeoff, and landing. In this case, the strap

must be placed completely over both the seat back and stowed tray table during these phases of aircraft operation.

**(3)** Some seats are equipped with inflatable seat belts. A seat belt extender must always be used with a CRS installed in a seat equipped with an inflatable seat belt. The seat belt extender will deactivate the inflation component of the seat belt installed in that seat. Not using a seat belt extender with a CRS in a seat equipped with an inflatable seat belt can result in death or serious injury.

**20. TRAVELING WITH MORE THAN ONE CHILD.** In the event a parent/guardian is traveling with more than one child in a CRS or is traveling with several small children, only one of whom is occupying a CRS, good judgment should be used regarding placement of the CRS. As long as these conditions below are met, the CRS could be placed in a seat other than a window seat. At a minimum:

- The CRS should be placed so it does not block any passenger's (including the parent's/guardian's) egress to the aisle used to evacuate the aircraft and
- The CRS should be placed so the parent/guardian can reach the child in the CRS to release and evacuate with the child, should an emergency evacuation be necessary.

**21. RESPONSIBILITY FOR ENSURING THE PROPER USE OF CRS.** If the CRS is supplied by the parent or guardian, typically he or she will check to ensure that the CRS is approved and that the child is the right size and weight for the CRS. In addition, the parent will usually ensure that the CRS is properly installed in a forward-facing passenger seat. However, aircraft operators still have overall responsibility to ensure that the CRS is properly secured to a forward-facing seat, the child is properly secured in the CRS and does not exceed the weight limit for the CRS, and that the CRS bears appropriate labels or markings (§ 121.311(b)(2)(iii)).

**22. EFFECTIVE PRACTICES FOR CONSIDERATION.** Effective practices may include:

- The aircraft operator's training program and crewmember operating manuals should contain information, policy, and procedures regarding CRS use;
- The CRS should be secured to a regular passenger seat at all times or, if not in use, stowed as carry-on baggage; and
- The child should always be properly secured in the CRS whenever other passengers are required to fasten their seatbelts.

**23. AN ADULT AS FOUND IN SECTION 121.311.** The word "adult," as it appears in § 121.311, is used in the ordinary sense of the word to denote a person 18 years of age or older (http://www.faa.gov/about/initiatives/cabin_safety/regs/legal/media/age_adult.pdf).

**24. USE OF AN APPROVED CRS FOR A CHILD WITH DISABILITIES.** The majority of individuals using CRSs on aircraft are young children typically weighing 40 pounds or less. However, there are some people who, because of physical challenges, need the support and security that a restraint system provides in order to travel safely on aircraft. Aircraft operators should ensure F/As are aware that older children (who have not reached their eighteenth birthday) may use a properly approved CRS that is appropriate for that child's size and weight.

9/24/15                                                                                              AC 120-87C

In this case, the aircraft operator may not prohibit the use of the CRS. There are several companies manufacturing CRSs approved for use on aircraft specifically designed for larger children who are physically challenged.

**25.   USE OF A NON-APPROVED CRS FOR A CHILD, OR A NON-APPROVED RESTRAINT SYSTEM FOR AN ADULT, WITH DISABILITIES.** In the case of a person who, because of physical challenges, needs the support and security of a non-approved CRS or restraint system, the individual, his or her guardian, or the aircraft operator (on the individual's behalf) may request an exemption to certain operating rules addressing the use of the CRS on the aircraft. Upon application, the FAA will determine whether the exemption request will be granted in order to allow the use of a non-approved restraint system during all phases of flight. As part of the conditions and limitations of granting the exemption, the individual or the parent/guardian must advise the air carrier about the contents of the exemption at least 48 hours before the date of each flight and have a copy of the grant of exemption available for the aircraft operator to review when using a non-approved CRS or restraint system on aircraft.

**26.   HOW TO PETITION FOR EXEMPTION.** To find out how to submit a petition for exemption, refer to http://www.faa.gov/regulations_policies/rulemaking/petition/. To review previously granted exemptions regarding the use of restraint systems, refer to the FAA's Automated Exemption System at http://aes.faa.gov/. To view previously granted exemptions regarding the use of specialized restraint for adults, type "12485," or "9364" in the "Docket Search" field. To view previously granted exemptions regarding the use of non-approved restraint for children, type "17184," "29824,", "28630" or "8264", "9834" in the "Docket Search" field.

**27.   IMPROVING EMERGENCY EVACUATION CAPABILITIES.** To improve emergency evacuation capabilities, the CRS should remain attached to the passenger seat during an emergency evacuation, and only the child should be removed from the aircraft. Researchers from CAMI, Aerospace Medical Research Division (AAM-600), have completed two studies designed to determine the most favorable methods for the emergency evacuation of infants from aircraft. All CAMI Aerospace Medicine Technical Reports can be found at: http://www.faa.gov/library/reports/medical/oamtechreports/.

   **a.   Slide Evacuation.** The purpose of the first study, Aerospace Medicine Technical Report DOT/FAA/AM-01/18, was to determine the most favorable methods for the evacuation of infants via an inflatable emergency evacuation slide. The results of this study strongly suggest that jumping onto the slide should be the favored boarding maneuver, as opposed to sitting down and sliding which slows the progress of the evacuation. The carrying position that provides the most protection for the child would include cradling the child's head and neck with the hand (for a vertical position) or in the arm (for horizontal positions), keeping the child's arms, legs and feet enfolded as much as possible by the adult's arms.

   **b.  Overwing Exit Evacuation.** The purpose of the second study, Aerospace Medicine Technical Report DOT/FAA/AM-05/2, was to determine the most favorable methods for evacuation of infants through a Type III overwing exit. The results of this study suggest that carrying the infant vertically should be the favored egress maneuver through the Type III exit, as opposed to carrying the child horizontally or passing the child to another passenger on the outside of the Type III exit.


John Barbagallo
Deputy Director, Flight Standards Service

**RILEY SAFER HOLMES & CANCILA LLP**
SONDRA A. HEMERYCK (*pro hac vice*)
shemeryck@rshc-law.com
ELI LITOFF (*pro hac vice*)
elitoff@rshc-law.com
STEVEN E. VOGEL (*pro hac vice*)
svogel@rshc-law.com
1 S. Dearborn Street, Suite 2200
Chicago, IL 60603
Telephone:    (312) 471-8700
Facsimile:    (312) 471-8701
JEFFREY R. WILLIAMS (CSB No. 084156)
jwilliams@rshc-law.com
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Telephone:    (415) 275-8550
Facsimile:    (415) 275-8551

*Attorneys for Defendant*
UNITED AIRLINES, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC BRENMAN, AVIVA COPAKEN, SEAN MINYARD, ROBERT MONROE, and CINDY PAWLOWSKI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED AIRLINES, INC.,<br><br>Defendant. | **Case No. 3:25-cv-06995-JD**<br><br>**DECLARATION OF NOEMI KELLEY**<br><br>DATE: January 22, 2026<br>TIME:  10:00 a.m.<br>COURTROOM: 11<br><br>Honorable James Donato<br>United States District Judge |

I, Noemi Kelley, declare as follows:

1.    I make this declaration in support of Defendant United Airlines, Inc.'s ("United") Motion to Dismiss the First Amended Complaint filed by Plaintiffs Marc Brenman, Aviva Copaken, Sean Minyard, Robert Monroe and Cindy Pawlowski (collectively, "Plaintiffs") in the above-captioned matter. I am over 18 years of age, have personal knowledge of the facts set forth

in this Declaration and, if called to testify as a witness, can testify fully and competently as to those facts.

2.      I am the Manager – Legal Department Operations & Administration in the Legal Department of United. As part of my duties as Manager in the Legal Department, I am responsible for maintaining copies of United's Contract of Carriage (the "CoC"). This Declaration is based on my personal knowledge and my review of United's records that are kept and maintained in the ordinary course of United's business.

3.      Attached hereto as Exhibit 1 is a true and correct copy of the current version of the CoC, which has been in effect since January 22, 2025. In accordance with United's standard practice, the attached CoC has been available on United's website, www.united.com, since that date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 7, 2025.

_____
Noemi Kelley

# EXHIBIT 1

**UNITED AIRLINES, INC.**
**CONTRACT OF CARRIAGE**

**(revised January 22, 2025)**

Transportation of Passengers and Baggage provided by United Airlines, Inc. and Carriers doing business as United Express, are subject to the following terms and conditions, in addition to any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt. To the extent there is a conflict between this Contract of Carriage and any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt, this Contract governs. By purchasing a ticket or accepting transportation, the passenger agrees to be bound by these controlling terms of this Contract of Carriage, and no covenants at law or in equity shall be implied or incorporated. Note, only the English version of United's Contract of Carriage governs the transportation of Passengers and Baggage provided by United Airlines, Inc. and Carriers doing business as United Express.

**Table of Contents**

|  |  | PAGE |
|---|---|---|
| RULE 1 | DEFINITIONS | 2 |
| RULE 2 | STANDARD FORMAT OF ELECTRONIC RULES FOR TARIFF FILING PURPOSES | 8 |
| RULE 3 | APPLICATION OF CONTRACT | 9 |
| RULE 4 | RESERVATIONS — CONFIRMATION/FARE QUOTES/DISCLOSURES | 10 |
| RULE 5 | CANCELLATION OF RESERVATIONS | 10 |
| RULE 6 | TICKETS | 12 |
| RULE 7 | TICKET VALIDITY PERIOD | 13 |
| RULE 8 | RETURNED CHECK CHARGE | 14 |
| RULE 9 | DELETED | 14 |
| RULE 10 | TRANSATLANTIC SURCHARGES | 14 |
| RULE 11 | PACIFIC SURCHARGES | 14 |
| RULE 12 | WESTERN HEMISPHERE SURCHARGES | 14 |
| RULE 13 | ACCEPTANCE OF CHILDREN/MINORS AND INFANTS | 14 |
| RULE 14 | SPECIAL SERVICES | 15 |
| RULE 15 | MEDICAL SERVICES | 16 |
| RULE 16 | SERVICE ANIMALS | 17 |
| RULE 17 | GROUND TRANSFER SERVICE | 18 |
| RULE 18 | SERVICE PROVIDED BY UNITED EXPRESS AND OTHER CODESHARE PARTNERS | 19 |
| RULE 19 | TRAVEL DOCUMENTS | 19 |
| RULE 20 | SCREENING OF PASSENGERS AND BAGGAGE | 19 |
| RULE 21 | REFUSAL TO TRANSPORT | 19 |
| RULE 22 | SMOKING POLICY | 21 |
| RULE 23 | BAGGAGE | 21 |
| RULE 24 | FLIGHT DELAYS/CANCELLATIONS/AIRCRAFT CHANGES | 33 |
| RULE 25 | DENIED BOARDING COMPENSATION | 36 |
| RULE 26 | REROUTING | 38 |
| RULE 27 | REFUNDS | 38 |
| RULE 28 | ADDITIONAL LIABILITY LIMITATIONS | 41 |
| RULE 29 | CUSTOMER SERVICE COMPLAINTS | 46 |
| RULE 30 | CONSENT TO USE OF PERSONAL DATA | 46 |

**RULE 1    DEFINITIONS**

As used in this Contract of Carriage, the following terms, whether or not capitalized, shall have the meanings ascribed below:

Add-On-Fare:  See "Arbitrary"

Adult means a person who has reached his/her eighteenth birthday as of the date of commencement of travel.

Africa means the area composed of all the countries on the continent of Africa, other than Algeria, Morocco, Sudan, Tunisia, and Egypt, but including the following Islands:  Cape Verde, Comoros, Madagascar, Mauritius, Reunion, Sao Tome y Principe, and Seychelles.

Alternate Transportation means air transportation with a confirmed reservation at no additional charge (by any scheduled airline licensed by DOT), or other transportation accepted and used by the passenger in the case of denied boarding.

Animals means domesticated cats and dogs.

Applicable Adult Fare means the fare which would be applicable to an adult for the transportation excepting those special fares applicable to a passenger's status, e.g., military fares, adult standby, etc.

Airline Designator Code is the two letter identification code that reflects the Marketing Carrier, which may be different from the carrier operating the flight.

Arbitrary means an amount published for use only in combination with other fares for the construction of Through Fares.  It is also referred to as "Proportional Fare", "Basing Fare", and "Add-On-Fare".

Area No. 1 (or "Area 1") means the area composed of all of the North and South American continents and the islands adjacent thereto, Greenland, Bermuda, the West Indies, the islands of the Caribbean Sea, and the Hawaiian Islands (including Midway and Palmyra).

Area No. 2 (or "Area 2") means the area composed of all of Europe (including that part of the Russian Federation in Europe) and the islands adjacent thereto, Iceland, the Azores, all of Africa and the islands adjacent thereto, Ascencion Island and that part of Asia lying west of and including Iran.

Area No. 3 (or "Area 3") means the area composed of all of Asia and the islands adjacent thereto except that portion included in Area No. 2, all of the East Indies, Australasia, the islands of the Pacific Ocean except those included in Area No. 1, and the Russian Federation (East of the Ural Mountains).

Asia means the area composed of Afghanistan, Bangladesh, Bhutan, Brunei, China, Hong Kong, India, Indonesia, the Islands of the Pacific in Area No. 3 north of the equator, Japan, Kazakhstan, Kampuchea, Korea, Kyrgyzstan, Laos, Malaysia, Maldive Islands, Myanmar, Nepal, Outer Mongolia, Pakistan, Philippines, Russian Federation (East of the Ural Mountains), Singapore, Sri Lanka, Taiwan, Tajikistan, Timor, Thailand, Turkmenistan, Uzbekistan and Viet Nam.

Australasia means the area composed of Australia, New Caledonia, New Zealand, New Hebrides, Fiji, Samoa, Cook Islands, Papua, New Guinea, Tahiti and the islands adjacent thereto.

Baggage means such reasonable articles, effects and other personal property of a ticketed Passenger as are reasonably necessary or appropriate for the wear, use, comfort or convenience of the Passenger in connection with the Passenger's trip. Unless otherwise specified, it shall include both checked and unchecked baggage and property of the Passenger.

Baggage Check or Baggage Claim Tag mean those portions of the ticket that identify the carriage of a Passenger's checked baggage and that are issued by the carrier as a receipt for the Passenger's checked baggage.

Baggage Rules mean the conditions associated with the acceptance of baggage, including all applicable service charges, and services incidental to the transportation of baggage. See Rule 23 for more information.

Baggage Tag means a document issued by the carrier solely for identification of checked baggage, the portion of which is attached by the carrier to a particular article of checked baggage.

Banker's Buying Rate ("BBR") means the rate at which, for the purpose of the transfer of funds through banking channels (i.e., other than transactions in bank notes, travelers cheques and similar banking instruments), a bank will purchase a given amount of foreign currency in exchange for one unit (or units) of the national currency of the country in which the exchange transaction takes place.

Banker's Selling Rate ("BSR") means the rate at which, for the purpose of the transfer of funds through banking channels (i.e., other than transactions in bank notes, travelers cheques and similar banking instruments), a bank will sell a given amount of foreign currency in exchange for one unit (or units) of the national currency of the country in which the exchange transaction takes place.

Basing Fare:  See "Arbitrary"

2

Cabin Baggage means Carry-On-Baggage that due to its size and nature requires the purchase of a seat on board the aircraft to transport the piece of baggage.

Calendar Month means the period of time starting with the start of any day in a month, identified by number, and ending with the start of the same day of the following month. When the same day does not occur in the following month, this period ends on the last day of the month.

Calendar Week means a period of seven days starting at 12:01 a.m. Sunday and ending at midnight of the following Saturday, provided that when used in reference to service offered only once a week between points of travel, it shall mean a period of eight days commencing with 12:01 a.m. on the day the flight operates.

Caribbean Area means the area composed of Anguilla, Antigua, Aruba, Bahamas, Barbados, Barbuda, Bermuda, Bonaire, British Virgin Islands, Cayman Islands, Cuba, Curacao, Dominica, Dominican Republic, Grenada, Guadeloupe, Haiti, Jamaica, Leeward Islands, Martinique, Montserrat, Netherlands Antilles, Nevis, Saba, St. Barthelemy, St. Eustatius, St. Kitts, St. Lucia, St. Maarten, St. Vincent, Trinidad and Tobago, Turks and Caicos Islands, West Indies and Windward Islands.

Carriage means transportation of Passengers and their baggage by air or ground, either gratuitously or for payment.

Carrier means the carrier (air or ground) issuing the ticket and all carriers that carry or undertake to carry the Passenger and/or his baggage thereunder.

Carry-on-Baggage means baggage, other than Checked Baggage, carried on board an aircraft by a ticketed Passenger also known as unchecked baggage.

Central Africa means the area composed of Malawi, Zambia and Zimbabwe.

Central America means the area composed of Belize, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua and Panama.

Checked Baggage means baggage that a ticketed Passenger has requested be carried by the carrier and for which the carrier has issued a Baggage Claim Tag to the Passenger.

Child means a person who has reached his/her second birthday but not his/her 12th birthday as of the date of commencement of travel.

Circle Trip means travel from a point and return thereto by a continuous, circuitous air route (including journeys comprising two (2) fare components but which do not meet the conditions of the round trip definition), provided, that where no reasonable direct scheduled air route is available between two points, a break in the circle may be traveled by any other means of transportation without prejudice to the circle trip.

Civic Aeronautics Board ("C.A.B.") means the United States Department of Transportation ("DOT").

Codeshare means an arrangement by which UA offers transportation service to a Passenger who is ticketed with the two letter airline designator code "UA" on a flight that is operated by a carrier other than UA.

Comparable air transportation means transportation provided by air carriers or foreign air carriers holding certificates of public convenience and necessity or foreign permits.

Confirmed reserved space means space on a specific date and on a specific flight and class of service that has been requested by a passenger, and that UA or its agent has verified by appropriate notation on the ticket as being reserved for the accommodation of the passenger.

Conjunction Ticket means two or more tickets concurrently issued to a Passenger and which together constitute a single contract of carriage.

Connection means a stop at an intermediate point on the route to be traveled where a change of planes is made and which does not fall within the definition of a stopover.

Consequential Damages means damages which are the result of an act but are not direct or immediate.

Contiguous United States or Continental United States mean the District of Columbia and all states of the United States other than Alaska or Hawaii.

Contract of Carriage means the terms and conditions contained in this document, as amended from time to time by the Carrier.

Country of Commencement of Transportation means the country from which travel on the first international sector takes place.

Country of Payment means the country where payment is made by the purchaser to the carrier or its agent. Payment by check, credit card or other banking instruments shall be deemed to have been made at the place where such instrument is accepted by the carrier or its agent.

3

Days means full calendar days, including Sunday and legal holidays, provided that for the purposes of notification, the balance of the day upon which notice is dispatched shall not be counted; and that for purposes of determining the duration of a validity period, the balance of the day upon which the ticket is issued or the flight commenced shall not be counted.

Department of Transportation ("DOT") means the United States Department of Transportation.

Destination means the ultimate point of the Passenger's journey as shown on the Ticket.

Domestic Carriage ("Domestic") means (except as otherwise specified) carriage in which, according to the Contract of Carriage, the place of departure, the place of destination or stopover, and the entire transportation is between points within the United States, or points within another sovereign state.

DOT Hazardous Materials Regulations are those regulations issued by the Materials Transportation Bureau of the Department of Transportation in Title 49 of the Code of Federal Regulations, Parts 171 through 180 (49 CFR 171-180).

Down Line Carrier means any carrier, other than the selecting carrier, who is identified as providing interline transportation to the passenger by virtue of the passenger's ticket.

East Africa means the area composed of Burundi, Djibouti, Ethiopia, Kenya, Rwanda, Somalia, Tanzania and Uganda.

Europe means the area composed of Albania, Algeria, Andorra, Armenia, Austria, Azerbaijan, Azores, Belarus, Belgium, Bosnia and Herzegovina, Bulgaria, Canary Islands, Croatia, Czech Republic, Denmark, Estonia, Finland, France, Georgia, Germany, Gibraltar, Greece, Hungary, Iceland, Ireland, Italy, Latvia, Lichtenstein, Lithuania, Luxembourg, Madeira, Malta, Monaco, Morocco, Netherlands, Norway, Poland, Portugal, Romania, Russian Federation (West of the Ural Mountains), San Marino, Slovakia, Slovenia, Spain, Sweden, Switzerland, Tunisia, Turkey in Europe and Asia, Ukraine, and the United Kingdom.

Fare Component means each local currency fare (except Add-On-Fares) where more than one such fare is used in construction of the total fare for a journey.

Flight Coupon means a portion of the Ticket that indicates travel points between which the coupon is good for carriage.

Force Majeure Event – any of the following situations: (a) Any condition beyond UA's control including, but not limited to, meteorological or geological conditions, acts of God, riots, terrorist activities, civil commotions, embargoes, wars, hostilities, disturbances, or unsettled international conditions, either actual, anticipated, threatened or reported, or any delay, demand, circumstances, or requirement due directly or indirectly to such condition; (b) Any strike, work stoppage, slowdown, lockout, or any other labor-related dispute involving or affecting UA's services; (c) Any governmental regulation, demand or requirement; (d) Any shortage of labor, fuel, or facilities of UA or others; (e) Damage to UA's Aircraft or equipment caused by another party; (f) Any emergency situation requiring immediate care or protection for a person or property; or (g) Any event not reasonably foreseen, anticipated or predicted by UA.

Foreign Air Transportation means transportation between a point in the United States and a point outside thereof.

Half Round Trip Fare means 50 percent of a specified or constructed round trip normal or special fare.  In the absence of a specified or constructed round trip normal fare, the one way normal fare is considered to be a half round trip normal fare.  If a specified or constructed one way special fare may be doubled to establish a round trip special fare, the one way special fare is considered to be a half round trip special fare.

Hawaii means Hilo, Honolulu, Kona, Lihue, and Maui.

IATA Rate of Exchange means the published rate of exchange issued by IATA from time to time.

Iberian Peninsula means the area composed of Gibraltar, Portugal (including Azores and Madeira) and Spain (including Balearic and Canary Islands).

Immediate Family Member means spouse, children, step-children, foster children, legally adopted wards, son/daughter-in-law, grandchildren, parents, step-parents, legal guardians, mother/father-in-law, grandparents, brother/sister, step-brother/sister, half-brother/sister, brother/sister-in-law, aunts/uncles and nieces/nephews.

Indian Ocean Islands means Comoros, Madagascar, Mauritius, Mayotte, Reunion and Seychelles.

Indian Subcontinent means the area composed of Afghanistan, Bangladesh, Bhutan, India, Nepal, Pakistan, Republic of Maldives and Sri Lanka.

Infant means a person who has not reached his/her second birthday as of the date of commencement of travel.

Interchange flight means a flight operated over the routes of two or more carriers without change of equipment.

Interline Transfer Point means any point at which the Passenger transfers from the services of one carrier to the services of another carrier.

Interline Transportation/Interline Agreement means carriage on the services of more than one carrier where carriers agree to accept each other's tickets and baggage.

Interline Itinerary means flights reflected on a single ticket involving more than one carrier.

International Carriage ("International") means any carriage other than Domestic Carriage, however, when the Warsaw and/or Montreal Conventions are applicable, the stated definitions of "International" therein shall prevail.

International Sector means a Sector of uninterrupted air travel for which the arrival and departure points are in two different countries.

NOTE:  For purposes of applying fares under this Contract of Carriage:
1)    Travel on a sector between the U.S.A. and Canada is not considered international, and
2)    For fare construction purposes, when transoceanic travel is involved in a fare component, travel on the transoceanic sector shall be considered the international sector.

Interstate Transportation means transportation between a point in any state of the United States and the District of Columbia and a point in any other state of the United States or the District of Columbia.

Intraline Transportation or "On-line" transportation means carriage solely over the services of a single air carrier.

Journey means all travel included on a Ticket or group of Conjunction Tickets.

Legal Guardian means one who legally has the care and management of an infant/minor.

Local Currency Fares means fares and related charges expressed in the currency of the Country of Commencement of Transportation.

Major Life Activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

Marketing Carrier means the carrier that sells flights under its Airline Designator Code, which code is identified on the first flight segment of the Passenger's ticket (i.e., Selected/Selecting Carrier for purposes of Interline Transportation to Canada only).

Maximum Outside Linear Dimensions means the sum of the greatest outside length plus the greatest outside width, plus the greatest outside height.

Medical Certificate means a letter or form from the Passenger's treating physician or hospital, where applicable, which must be signed and dated within one week of the first affected flight departure by the treating physician, or hospital in the country where the illness or treatment arose and which certifies the nature of the Passenger's illness and treatment.

Micronesia means the area composed of Guam, Johnston Island, Marshall Islands, Caroline Islands, Palau Island and Mariana Islands.

Mid-Atlantic Area means the area composed of Anguilla, Antigua, Bahamas, Barbuda, Barbados, Bermuda, Bolivia, Bonaire, Belize, Cayman Islands, Colombia, Costa Rica, Cuca, Curacao, Dominican Republic, Ecuador, El Salvador, French Guiana, Guadeloupe, Guyana, Haiti, Honduras, Jamaica, Martinique, Montserrat, Navis, Nicaragua, Panama, Peru, Puerto Rico, St. Kitts, St. Croix, St. Maarten, St. Thomas, Surinam, Trinidad, Tobago, and Venezuela.

Middle East means the area composed of Aden, Bahrain, Cyprus, Egypt, Iran, Iraq, Israel, Jordan, Kuwait, Lebanon, Muscat and Oman, Qatar, Saudi Arabia, Sudan, Syria, Trucial, United Arab Emirates and Yemen.

Military Agencies mean departments of the U.S.A. Army, Navy, and Air Force, the Marine Corps, the Coast Guard, the respective academies of the Army, Navy, Air Force, and Coast Guard, and the National Guard.  The Reserve Officer Training Corps is not included.

Military Passenger means military personnel of the Military Agencies who are on active duty status or who have been discharged from active military service within seven days of the date of travel.

Minor means a person who has reached his/her second birthday but not his/her 18th birthday as of the date of commencement of travel.

Montreal Convention means the Convention for the Unification of Certain Rules for International Carriage by Air, signed at Montreal, May 28, 1999.

Netherlands Antilles means the islands of Bonaire, Curacao and St. Maarten.

Normal Fare means the full fare established for regular or usual service, the application of which is not dependent upon any limited period of ticket validity or other special circumstances.  Unless otherwise herein specified, Normal Fares shall be considered to include the following, all year one-way, round trip, circle trip and open jaw trips, First Class, Business Class,

Executive Class, Economy Class, Basic Economy, one-class Standard Service, Standard Services, Tourist/Coach Class service, Thrift Class service fares, and on-season and off-season fares.

North America means the area composed of Alaska, Canada, the Continental U.S.A. and Mexico.

North Central Pacific means all routes between points in Canada/U.S.A. and points in Area No. 3, except points in the Southwest Pacific, via the Pacific Ocean.

On-line means air transportation wholly on the same carrier.

On-line Tariff Data Base means the remotely accessible, on-line version, maintained by the filer, of (1) the electronically filed tariff data submitted to the "official DOT tariff database," and (2) the DOT approvals, disapprovals and other actions required by DOT.

On-line Transfer Point means any point at which the Passenger transfers from one service of a carrier to another service of the same carrier (bearing a different flight number).

Open-Jaw Trip means travel which is essentially of a round trip nature but the outward point of departure and inward point of arrival and/or outward point of arrival and inward point of departure are not the same.

Operating Carrier means the carrier that operates the actual flight.

Origin means the initial starting place of the journey.

Other Charges means charges such as taxes, fees, etc., not to be shown in the fare construction box of the ticket, excluding excess baggage charges.

Outward point means the stopover point on the passenger's itinerary that is the furthest from the passenger's point of origin.

Oversold Flight means a flight where there are more Passengers holding valid confirmed Tickets that check-in for the flight within the prescribed check-in time than there are available seats.

Participating Carrier includes both the selecting carrier and the down line carrier who has been identified as providing interline transportation to the passenger by virtue of the passenger's ticket.

Passenger means any person, except members of the crew, carried or holding a confirmed reservation to be carried in an aircraft with the consent of the carrier.

Passenger Coupon means that portion of the Ticket constituting the Passenger's written evidence of the Contract of Carriage.

Proportional Fare:  See "Arbitrary" above.

Qualified Individual with a Disability means any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more Major Life Activities, has a record of such an impairment, or is regarded as having such an impairment.  The phrases used in this definition are further defined in 14 CFR Part 382.3.

Related Charges means those charges to be shown in the fare construction box of the ticket and excess baggage charges.

Reroute means a change of routing, carriers, fares, class of service, flight or date from that originally provided on the ticket, but does not apply to open tickets.

Resident ("a Resident") means a person whose usual residence is in a certain country, provided that a more restricted definition may apply under local law.

Round-Trip means travel from one point to another and return by any air route for which the same normal all year through one way fare of the same class applies from the point of origin, provided that this definition shall not apply to travel for which the same all year through one way fare is established, between two points, in either direction around the world.

Routing means the cities and/or class of service and/or type of aircraft via which carriage is provided by the carrier(s) between two points.

Scandinavia means the area composed of Denmark, Norway and Sweden.

Search and Rescue Animal means a trained animal that assists law enforcement officers in the search of contraband and or other items, or which provides assistance with rescue efforts.

Sector or Segment is the portion of a journey covered by a single Flight Coupon.

Selected Carrier means the carrier whose baggage rules apply to the entire interline itinerary.

Selecting Carrier means the carrier whose designator code is identified on the first flight segment of the passenger's ticket at the beginning of an interline itinerary.

Service Animal means a dog, regardless of breed or type, that is individually trained to do work or perform tasks for the benefit of a Qualified Individual with a Disability, including a physical, sensory, psychiatric, intellectual, or other mental disability, or a Search and Rescue Animal.

Service Animal Relief Attestation Form means a form made available by United that is consistent with the requirements of 14 CFR §382.75(b) concerning the U.S. Department of Transportation Service Animal Air Relief Attestation Form.

Service Animal Transportation Form means a form made available by United that is consistent with the requirements of 14 CFR §382.75(a) concerning the U.S. Department of Transportation Service Animal Air Transportation Form.

Single Ticket means the record of agreement that permits travel from origin to destination, and may include interline, code-share, and intraline segments.

South America means the area composed of Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, French Guiana, Guyana, Paraguay, Peru, Surinam, Uruguay and Venezuela.

South Asian Subcontinent means the area composed of Afghanistan, Bangladesh, Bhutan, India, Nepal, Pakistan, Maldives and Sri Lanka.

South East Asia means the area composed of Brunei Darussalam, China, Guam, Hong Kong, Indonesia, Kampuchea, Kazakhstan, Kyrgyzstan, Laos, People's Democratic Republic of, Malaysia, Mongolia, Myanmar, Philippines, Singapore, Taiwan, Province of, Tajikistan, Thailand, Turkmenistan, Russian Federation (East of the Ural Mountains), Uzbekistan and Viet Nam.

South Pacific means the area composed of all routes between points in the U.S.A./Canada and points in the Southwest Pacific via the Pacific Ocean.

Southwest Africa means points within Africa composed of Botswana, Lesotho, Mozambique, Namibia, South Africa and Swaziland.

Southwest Pacific means that area composed of American Samoa, Australia, Cook Islands, Fiji, French Polynesia, Gilbert and Ellice Islands, Loyalty Islands, New Caledonia, New Hebrides, New Zealand, Papua, New Guinea, Samoa, Society Islands, Tonga, and intermediate islands.

Special Drawing Right ("SDR") means a special unit of currency, the value of which fluctuates and is recalculated each banking day. These values are known to most commercial banks and are reported in some newspapers and in the IMF Survey, published weekly by the International Monetary Fund, Washington, D.C. 20431.

Special Fare means a fare other than a normal fare.

Stopover means a deliberate interruption of travel by the Passenger, agreed to in advance by the carrier, at a point between the place of departure and the place of destination. For International flights a Stopover will also be deemed to occur at an intermediate point from which the Passenger is not scheduled to depart on the date of arrival, but if there is no connecting departure scheduled on the date of arrival, departure on the next day within 24 hours of arrival shall not constitute a Stopover. If a portion of the routing is traveled by surface transportation, one Stopover shall be deemed to have been taken for such portion. For Domestic flights, a Stopover will also occur when a Passenger arrives at a point and fails to depart from such point on:
1)  The first flight on which space is available; or
2)  The flight that will provide for the Passenger's earliest arrival at intermediate or junction transfer point(s) or destination point, via the carrier and class of service as shown on the Passenger's Ticket; provided, however, that in no event will a Stopover occur when the Passenger departs from the intermediate/junction point on a flight shown in the carrier's official general schedule as departing within four hours after arrival at such point.

Summary Page at the End of an Online Purchase (for Rule 23 I) only) means a page on the Carrier's website which summarizes the details of a ticket purchase transaction just after the passenger has agreed to purchase the ticket from the Carrier and has provided a form of payment.

Surface Sector means transportation by means other than air between two intermediate points in a Fare Component.

Through Fare means a fare applicable for travel between two consecutive fare construction points via an intermediate point(s).

Ticket means the record of agreement, including electronic tickets, e.g., "United Electronic Tickets" or "eTickets," for Passenger air transportation provided by UA under certain terms and conditions to the Passenger named on the Ticket and in accordance with applicable governing tariffs and regulations. An "eTicket" is the record of the ticket agreement maintained and processed within the carrier's electronic reservation system. A receipt is provided to the purchaser of the ticket that contains a reference for retrieving the record within the carrier's reservation system and summary of the ticket information. The carrier may mandate the issuance of an e-ticket, regardless of market, carrier, form of payment, and customer type.

Ticketed Point means points shown in the 'good for passage' section of the ticket plus any other point(s) used for fare construction and shown in the fare construction box of the ticket, provided that two flight numbers of two carriers such as for an interchange flight will not be permitted on one Flight Coupon.

Transatlantic Sector means that portion of travel covered by a single Flight Coupon from the point of departure in Area No. 1 to the point of arrival in Area No. 2 and vice versa.

Transfer means a change from the flight on one carrier to the flight of another carrier, or a change from the flight of a carrier to another flight of the same carrier bearing the same flight number, or a change from the flight of a carrier to another flight that is a service bearing a different flight number of the same carrier, irrespective of whether or not a change of aircraft occurs.

Transfer Point means any point at which the Passenger Transfers.

Transit Point means any stop at an intermediate point on the route to be traveled (whether or not a change of aircraft is made) which does not fall within the definition of a Stopover.

Transoceanic means the portion of travel covering the area over an ocean and may refer to travel that is either transatlantic or transpacific.

Transpacific Sector means the portion of travel covered by a single Flight Coupon from the point of departure in Area No. 1 to the point of arrival in Area No. 3 and vice versa.

UA means United Airlines, Inc.

UA Ticket Stock means tickets printed, imprinted or issued electronically with the UA carrier code (016) as part of the ticket serial number.

Ultimate ticketed destination applies only to situations where a passenger's origin is a non-Canadian point and the itinerary includes at least one stop in Canada, as well as at least one stop outside of Canada. If the stop in Canada is the farthest checked point and the stop is more than 24 hours, the ultimate ticketed destination is Canada. (For Rule 23 I) only).

United means United Airlines, Inc.

United Express carriers are Carriers not wholly owned or operated by United Airlines, Inc. but operating with the UA designator code under the trade name "United Express."

Unaccompanied Minor means a Child/Minor 5 to 14 years of age when traveling alone or not accompanied on the same flight and in the same compartment by a companion Passenger at least 18 years of age or with a Legal Guardian or parent.

United Kingdom (or "U.K.") means the area composed of England, Scotland, Wales, Northern Ireland, Channel Islands and Isle of Man.

United States of America (or the "United States" or the "U.S.A.") means, unless otherwise specified, the area composed of the 48 contiguous states, the District of Columbia, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, Midway, and Wake Islands.

United States Department of Defense means the U.S.A. Department of the Army, Navy, and Air Force, and the U.S.A. Marine Corps.

Validate means a confirmation that the Ticket has been officially issued by the carrier.

Warsaw Convention means the Convention for the Unification of Certain Rules relating to International Carriage by Air, signed at Warsaw, October 12, 1929, or where applicable, that Convention, as amended, including without limitation, by the Protocol signed at The Hague September 28, 1955.

West Africa means the area composed of Angola, Benin, Burkina Faso, Cameroon, Cape Verde, Central African Republic, Chad, Congo (Brazzaville), Cote D'Ivoire, Equatorial Guinea, Gabon, The Gambia, Ghana, Guinea, Guinea-Bissau, Liberia, Mali, Mauritania, Niger, Nigeria, Sao Tome y Principe, Senegal, Sierra Leone, Togo and Congo (Kinshasa).

Western Hemisphere means the area composed of the Continental United States, Alaska, Hawaii, Puerto Rico, U.S. Virgin Islands, Canada, Greenland, Mexico, Central and South America, and the Caribbean Area.

**RULE 2    STANDARD FORMAT OF ELECTRONIC RULES FOR TARIFF FILING PURPOSES**

Rule number reserved for Airline Tariff Publishing Company ("ATPCO") filings.

**RULE 3    APPLICATION OF CONTRACT**

A)    These rules constitute the conditions of carriage upon which UA agrees to provide Domestic and International Carriage and are expressly agreed to by the Passenger.  These Rules are also the tariffs filed by UA in accordance with certain government regulations.

B)    This Contract of Carriage is subject to applicable laws, regulations, rules, and security directives imposed by governmental agencies, including but not limited to those imposed during or as a result of a national emergency, war, civil unrest or terrorist activities.  In the event of a conflict between the Rules contained herein and such government laws, regulations, rules, security directives and their corresponding effects on UA's operation, the latter shall prevail.

C)    The rules herein are applicable to transportation of Passengers and Baggage provided by UA.  See Rule 18 regarding application of these rules to Codeshare services provided by UA on flights operated by a carrier other than UA.

D)    Certain International Carriage is subject to the rules relating to liability established by, and to all other provisions of the Warsaw and/or Montreal Conventions.  Any provisions of these rules that are inconsistent with any provision of the applicable Convention shall, to that extent, but only to that extent, be inapplicable to International Carriage.

E)    Except as otherwise provided within specific fare rules, transportation is subject to the Contract of Carriage and charges in effect on the date on which the Ticket is issued.  References to pages, rules, items and notes are coterminous and include revisions, supplements and reissues thereof.

F)    Where the Ticket has been purchased and issued before the effective date of an increase in the applicable fare, the increase will not be collected, provided there is no change in Origin, Destination, Stopover point(s), flight(s) or dates shown on the original Ticket.  These provisions apply whether an increase results from a change in fare level, a change in conditions governing the fare or a cancellation of the fare itself.

G)    UA is responsible only for transportation of Passengers and Baggage provided by UA, which includes Codeshare services provided by UA on flights operated by a carrier other than UA.  See Rule 18 regarding application of these rules to Codeshare services. When UA undertakes to issue a Ticket, check baggage, or make any other arrangements for transportation over the lines of any other carrier on an interline basis (whether or not such transportation is part of a through service), UA will act only as agent for the other carrier in these limited capacities, and will assume no responsibility for the acts or omissions of such other carrier, including but not limited to providing flight status information, delays and other acts or omissions that arise from their flight operations.

H)    No employee or agent of UA has the authority to alter, modify, or waive any fare rules or any provision of the Contract of Carriage unless authorized by a corporate officer of UA.  UA's appointed agents and representatives are only authorized to sell Tickets for air transportation pursuant to approved fares, rules, and regulations of UA.  Failure or delay on the part of either party to exercise any right or power herein shall not operate as a waiver thereof.

I)    Unless specifically stated otherwise herein or where any limitation would expressly violate any applicable law, UA shall not be liable for any consequential, compensatory, indirect, incidental or punitive damages arising out of or in connection with the performance of its obligations under these rules.

J)    UA's obligations hereunder extend only to the Ticketed Passenger.  There are no third party beneficiaries to these rules.

K)    Except where provided otherwise by law, UA's conditions of carriage, rules and tariffs are subject to change without notice, provided that no such change shall apply to Tickets issued prior to the effective date of such change.

L)    The invalidity of any provision herein by local law shall not affect the validity of any other provision that shall remain in full force and effect.

M)    If UA makes arrangements for Passengers with any third party to provide any services other than carriage by air, or if UA issues a ticket or voucher relating to transportation or services (other than carriage by air) provided by a third party such as hotel reservations or car rental, UA does not assume responsibility for the ground transportation of any Passenger or his or her baggage.  The terms and conditions of the third party service provider will apply, as well as Rule 17 B) below.

N)    Except as otherwise provided below, fare rule provisions, local or joint fares, including Arbitraries, contained in the On-line Tariff Database maintained by Airline Tariff Publishing Company on behalf of UA is considered to be part of International Passenger Rules and Fares Tariff No. IPR-2, C.A.B. No. 376, NTA(A) No. 210.I EXCEPTION:  For Fares Published by Rule, see C.A.B. No. 737, NTA(A) No. 476.

O)    By purchasing a ticket or accepting transportation under this Contract of Carriage, the Passenger agrees to be bound by the Federal Aviation Act (49 U.S.C. 40101, et seq.), including the Airline Deregulation Act (49 U.S.C. 41713).

P)    By purchasing a ticket or accepting transportation under this Contract of Carriage, Passenger agrees that any lawsuit brought by Passenger against UA and Carriers doing business as United Express will be brought only in Passenger's individual capacity, and may not be brought in or asserted as part of a class action proceeding.

Q) You agree that you will notify United of any dispute arising out of or related to transportation covered by this Contract by submitting your concerns via the form at https://www.united.com/en/us/customercare, including a description of the nature of the dispute. Following delivery of such submission, you agree to allow United a period of sixty (60) days to provide a substantive response and to try to resolve the dispute prior to filing any lawsuit, arbitration, administrative or any other proceeding against United related to the dispute. Compliance with the notification procedures set forth herein shall be a condition precedent to your right to file any lawsuit, arbitration, administrative or any other proceeding against United. You agree that your failure to comply with the notification procedures set forth herein prior to filing a lawsuit, arbitration, administrative or any other proceeding against United shall entitle United to recover reasonable attorneys' fees incurred in defending the lawsuit, arbitration, administrative or other proceeding.

**RULE 4    RESERVATIONS — CONFIRMATION/FARE QUOTES/DISCLOSURES**

A) A reservation for space on a given flight of UA is valid when the availability and allocation of such space is confirmed by UA or an authorized agent of UA and entered into the carrier's reservations system. At the time of reservation, UA requires the full name consisting of full first and last name for each passenger to be entered into the name field of the reservation, and other government mandated information, including but not limited to date of birth and gender. EXCEPTION: Only one name will be required for reservations for passengers whose passports reflect only one name. Reservations that do not contain the full name of each passenger, other required information, or fraudulent information will be automatically cancelled within 72 hours of reservation confirmation. UA requires ticketing at the time of reservation. UA will allow a 100% refund to the original form of payment if the request is made within 24 hours of ticketing and if the reservation is made one week or more prior to the scheduled flight departure and the ticket is purchased directly through UA.

B) Subject to payment or other satisfactory credit arrangements, a validated Ticket will be issued by UA or the authorized agent of UA indicating such confirmed reserved space provided the Passenger applies to UA or the authorized agent of UA for such Ticket within the Check-In Time Limits specified in Rules 5 D) and E). Such reservation of space is subject to cancellation by UA without notice if the Passenger does not comply with this Rule. EXCEPTION: Where other rules, including fare rules, provide for the issuance, validation, or purchase of a Ticket within specific time limits, these specific time limits will apply.

C) Once a Passenger obtains a Ticket indicating confirmed reserved space for a specific flight and date either from UA or its authorized agent, the reservation is confirmed even if there is no record thereof in UA's reservation system.

EXCEPTION: Tickets shall not be valid if reservations are cancelled pursuant to Rule 5 or cancelled by the passenger or his/her representative.

D) Seat assignments, regardless of class of service, are not guaranteed and are subject to change without notice. UA reserves the right to reseat a Passenger for any reason, including but not limited to from a United First or Business class seat, United Polaris® seat, United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which the applicable fee, miles, or other compensation has been paid, and if a Passenger is improperly or erroneously upgraded to a different class of service. If a Passenger is removed from a United First or Business class seat, United Polaris® seat, United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which a fee, miles, or other compensation has been paid, and the Passenger is not re-accommodated in a seat of equal or greater value, or if a Passenger is downgraded from a class of service and is not re-accommodated in a seat in an equal or greater class of service for which a fee, miles, or other compensation has been paid, the Passenger may be eligible for a refund in accordance with Rule 27. UA also prohibits Passengers from selling their seat assignments at any time and/or exchanging them at the time of boarding without first advising a member of the crew.

E) UA may limit the number of Passengers carried at any fare level and certain fares will not necessarily be available on all flights. The number of seats which UA shall make available on a given flight will be determined by UA. Further, UA cannot guarantee any fare levels, fares, or seats/inventory associated with flights on Codeshare partners or on other airlines.

F) UA does not intend to file tickets priced at a zero or close to zero fare. If an erroneous fare or a fare that is reasonably apparent as erroneous is inadvertently published for sale and a ticket is issued at the erroneous fare before it has been corrected, UA reserves the right to cancel the ticket purchase and refund all amounts paid by the purchaser or, at the purchaser's option, to reissue the ticket for the correct fare. In this event, UA will also reimburse any reasonable, actual, and verifiable out-of-pocket expenses incurred by the purchaser in reliance upon the ticket purchase. The purchaser must provide receipts or other evidence of such actual costs incurred in support of any reimbursement request.

**RULE 5    CANCELLATION OF RESERVATIONS**

A) UA has the right to cancel reservations (whether or not confirmed) of any Passenger whenever such action is necessary to comply with any governmental regulation, upon any governmental request for emergency transportation in connection with the national defense, or whenever such action is necessary or advisable by reason of weather or other conditions

beyond UA's control, (including, but not limited to acts of God, force majeure events, strikes, civil commotions, embargoes, wars, hostilities, or other disturbances, whether actual, threatened, or reported).

B) UA has the right to cancel reservations (whether or not confirmed) due to the Passenger's failure to comply with the rules set forth herein, including but not limited to, the Passenger's failure to pay for the applicable Ticket under the conditions applicable to the fare for such travel.

C) Failure to Occupy Space - If a Passenger fails to occupy space which has been reserved for him/her on a flight of UA and UA fails to receive notice of the cancellation of the reservation before the departure, or if any carrier cancels the reservation of any Passenger, UA may cancel all reservations (whether or not confirmed) held by such Passenger on the flights of UA or any carrier for continuing or return space.

D) Check-In Time Limits - UA has the right to cancel reservations (whether or not confirmed), deny boarding and/or refuse the acceptance of checked baggage of any Passenger who fails to present himself/herself within the applicable check-in or loading gate time limits for Passengers and/or Baggage.

    1) Domestic flights, except those departing Guam:

        a) Passenger must complete the purchase of the ticket(s), check-in, check baggage, and obtain a boarding pass at least 60 minutes prior to scheduled departure.

        b) All Passengers must be present at the loading gate for boarding at least 15 minutes prior to scheduled departure. NOTE: If the Passenger's itinerary includes an international destination, the international time limits in D) 2) below apply to all flights in the itinerary.

    2) All non-stop International flights (including flights departing Guam and St. Thomas, U.S. Virgin Islands):

        a) Passenger must complete the purchase of the ticket(s), check-in, check baggage, and obtain a boarding pass at least 75 minutes prior to scheduled departure.
EXCEPTIONS:

            (i) In the Philippines, Passenger must complete check-in, check baggage and obtain a boarding pass at least 60 minutes prior to scheduled departure.

            (ii) Within the Federated States of Micronesia; Republic of the Marshall Islands; Commonwealth of the Northern Mariana Islands; Republic of Palau; Canada; St. Thomas, U.S. Virgin Islands; Accra, Ghana; Lagos, Nigeria; and Tel Aviv, Israel, Passengers must complete check-in, check baggage and obtain a boarding pass at least 90 minutes (1 hour, 30 minutes) prior to scheduled departure.

        b) All Passengers must be at the loading gate for boarding at least 30 minutes prior to scheduled departure. EXCEPTIONS: Within the Federated States of Micronesia, Republic of the Marshall Islands, and Brussels, Belgium, Passengers must be at the loading gate for boarding at least 60 minutes (1 hour) prior to scheduled departure.

E) The time limits provided by UA in this Rule are minimum time requirements. Passenger and baggage processing times may differ from airport to airport. It is the Passenger's responsibility to arrive at the airport with enough time to complete any ticketing, check-in, baggage and security screening processes, and boarding requirements within these minimum time limits. NOTE: Please see www.united.com for more information.

F) UA is not liable for any consequential, compensatory, or other damages when it cancels reservations (whether or not confirmed) of any Passenger in accordance with this Rule, but if the reservation was canceled according to paragraph A) of this Rule, see Rule 24.

G) All of UA's flights are subject to overbooking which could result in UA's inability to provide previously confirmed reserved space for a given flight or for the class of service reserved. In that event, UA's obligation to the Passenger is governed by Rule 25.

H) In addition to exercising any of its remedies in Rule 6 K) below, UA reserves the right to cancel bookings and/or reservations which it deems fraudulent, abusive, illogical, fictitious, which are booked and/or reserved with no intention of flying, or for which the passenger makes a misrepresentation without notice to the passenger or the individual making the booking. The types of improper reservations that UA will cancel without notice include, but are not limited to: reservations made without having been requested by or on behalf of the named passenger; reservations made to hold or block seats for the purpose of obtaining lower fares, MP award inventory, travel certificates, or upgrades that may not otherwise be available; reservations made to manipulate, abuse, or circumvent any of UA's fare rules, policies or provisions; reservations made for the same passenger on flights traveling on or about the same date between one or more of the same or nearby origin or destination cities; reservations made for flights that are or likely will be delayed or cancelled with the intention of making a claim against or receiving a benefit from United concerning the flight delay; reservations where UA suspects credit card fraud or other fraud related to payment; and reservations with connections that depart before the arrival on the inbound flight.

11

**RULE 6    TICKETS**

A)   When more than one Ticket must be issued to properly reflect all of the information required for a complete flight itinerary, the individual Tickets will be cross-referenced by their Ticket numbers and are considered to be a single Ticket or "Conjunction Ticket."

B)   A Ticket will not be issued, and in any case UA will not be obligated to carry any Passenger until the Passenger has paid the applicable fare or has complied with credit arrangements established by UA.

C)   No person will be entitled to transportation except upon presentation of a valid Ticket.

D)   Lost Tickets.  See Rule 27 F).

E)   A Ticket which has not been validated or which has been altered, mutilated, or improperly issued, is not valid.

F)   Flight Coupons will be honored only in the order in which they were intended to be used and, in the case of written Tickets, only if all unused Flight Coupons and Passenger Coupons are presented together.

G)   Tickets are not transferable unless otherwise stated on the Ticket at the time it was issued. The purchaser of a Ticket and/or the Passenger intending to use such Ticket is responsible for ensuring that the Ticket accurately states the Passenger's name. Presentation of a Ticket by someone other than the ticketed Passenger renders the Ticket void, and UA is not liable to the owner of a ticket for honoring or refunding such ticket when presented by another person.  If a Ticket is in fact used by an unauthorized person with or without the knowledge or consent of the person to whom the Ticket was issued, UA will not be liable for the destruction, damage, or delay of such unauthorized person's baggage or other personal property, or for the death or injury of such unauthorized person arising from or in connection with such unauthorized use.  As used herein, "unauthorized person" means any person other than the person to whom the ticket is issued and who is entitled to be transported or to a refund in accordance with the rules in this Contract of Carriage.

H)   A Ticket will be valid only for flight(s) for which reservation(s) have been made and only between the points named on the ticket or applicable Flight Coupons.  A Passenger holding an unused open-date Ticket or portion thereof or Exchange Order for onward travel, or who wishes to change a ticketed reservation to another date, shall not be entitled to any preferential right with respect to the obtaining of reservations.

I)   Passengers Occupying Two Seats – Upon request, or if determined necessary by UA, and given availability, a Passenger will be permitted to the exclusive use of two seats subject to the payment of two applicable fares for the points between which the two seats will be used.  A Ticket will be issued for each seat and the normal Checked Baggage Allowances will apply in connection with each such Ticket presented to UA. The carry-on allowance is limited to the allowance for one individual.

J)   Prohibited Practices:

1)   Fares apply for travel only between the points for which they are published.  Tickets may not be purchased and used at fare(s) from an initial departure point on the Ticket which is before the Passenger's actual point of origin of travel, or to a more distant point(s) than the Passenger's actual destination being traveled even when the purchase and use of such Tickets would produce a lower fare.  This practice is known as "Hidden Cities Ticketing" or "Point Beyond Ticketing" and is prohibited by UA.

2)   The purchase and use of round-trip Tickets for the purpose of one-way travel only, known as "Throwaway Ticketing" is prohibited by UA.

3)   The use of Flight Coupons from two or more different Tickets issued at round trip fares for the purpose of circumventing applicable tariff rules (such as advance purchase/minimum stay requirements) commonly referred to as "Back-to-Back Ticketing" is prohibited by UA.

4)   The failure to comply with applicable stayover requirements, the failure to meet the purpose or status requirement associated with the Ticket's fare category, and the purchase or use of a Ticket that UA determines circumvents the applicable fare rules.

5)   Obtaining a ticket, service, product, or refund through fraudulent or deceptive means, including but not limited to by credit card or other payment fraud, whether actual or suspected, by submitting a chargeback for services that have been rendered, or by submitting fraudulent documentation.

6)   Any practice that United believes, in its sole discretion, is exploitative, abusive or that manipulates/bypasses/overrides United's fare and ticket rules.

K)   UA's Remedies for Violation(s) of Rules - Where a Ticket is booked, held, purchased and/or used in violation of the law, these rules or any fare rule (including Hidden Cities Ticketing, Point Beyond Ticketing, Throwaway Ticketing, or Back-to-Back Ticketing), UA, without notice to the passenger, has the right in its sole discretion to take all actions permitted by law, including but not limited to, the following:

1)   Invalidate the Ticket(s);

2) Cancel any remaining portion of the Passenger's itinerary, Ticket, or Flight Coupon and/or void out any associated electronic travel certificate or credit;

3) Confiscate any unused Flight Coupons until the amount reflected in 5) below is collected;

4) Permanently ban or refuse to board the Passenger and to carry the Passenger's baggage, unless the difference between the fare paid and the fare for transportation used is collected prior to boarding;

5) Assess the Passenger any amounts owed to UA, including but not limited to for seat blocking, for the actual value of the service or ancillary product, and for the full value of a Ticket, which shall be the difference between the lowest fare applicable to the Passenger's actual itinerary and the fare actually paid, including after the transportation or service have been provided;

6) Delete miles, points, credits or any other benefits in or related to the Passenger's frequent flyer account (UA's MileagePlus Program), revoke the Passenger's Elite status, if any, in the MileagePlus Program, terminate the Passenger's participation in the MileagePlus Program, terminate any other air transportation agreement between UA and the Passenger, or take any other action permitted by the MileagePlus  Program Rules in UA's "MileagePlus Rules;"

7) Charge a delivery fee and penalty, set at United's discretion, to send Checked Baggage to the Passenger; and

8) Take legal action with respect to the Passenger.

L) UA may mandate the issuance of an e-Ticket regardless of market, carrier, form of payment, or customer type (including mileage plus and participating carrier frequent flyer members). In addition to all applicable charges, UA will assess a 50.00 USD fee for issuance of a paper ticket.

M) UA will assess a 50.00 USD/50.00 CAD fee to assist with a voluntary change on tickets originally issued via any external ticketing source (travel agency, internet agency, other airline, etc.). The fee is non-refundable and applies in addition to all applicable charges.

N) Within the 50 U.S. States and Canada, UA will assess a 50.00 USD/50.00 CAD charge for tickets purchased at any airport location, a 25.00 USD/25.00 CAD charge for tickets purchased through Contact Centers, and a 30.00 USD/30.00 CAD charge for tickets purchased or changed through a City Ticket Office. Charges may vary outside the 50 U.S. States and Canada. These booking service charges are non-refundable and apply in addition to all applicable charges.

O) Unless prohibited by local law, UA may restrict acceptable forms of payment for its tickets, products, or services to debit or credit card.

**RULE 7    TICKET VALIDITY PERIOD**

A) Nonrefundable Fares: Nonrefundable fares have no value after ticketed departure time. <u>EXCEPTION</u>: When the Passenger cancels the ticketed flight reservations prior to the ticketed departure time, the period of validity for that ticket applies.

B) Period of Validity - Except as otherwise provided in this Rule or required by the applicable local law of a foreign jurisdiction, any eligible Ticket issued by UA or its authorized agent on UA Ticket Stock must begin travel within one year from the date of issuance and will be valid for transportation for one year from the date on which transportation commences at the point of origin as designated on the original Ticket or, if no portion of the Ticket is used, one year from the date of issuance of the original Ticket. When an unused fare Ticket is completely exchanged, the original ticket validity applies. When fares are combined to create Round/Circle/Open-Jaw Trips, the most restrictive provisions will apply to the entire transportation.

C) Extension of Validity Period:

1) If the Passenger is prevented from using the Ticket, or a portion thereof during the period of validity specified in this Rule due to a UA flight cancellation or because UA is unable to provide space on the flight, UA will, without additional collection of fare, extend the ticket validity period of such Passenger's Ticket until the first flight of UA on which space is available in the class of service for which the fare has been paid.

2) If a Passenger is unable to commence or continue travel because of the death or serious illness of the Passenger, the Passenger's immediate family member(s), or the Passenger's traveling companion(s), UA may, in its sole discretion, waive or refund any applicable change fees associated with changing the ticket(s).  See Rule 27 or visit UA's website, www.united.com, for details regarding UA's Refund Policy.

D) Waiver of Minimum Stay Requirements - Special Fare - In the event of the death of a Passenger enroute, the minimum stay and group travel requirements with regard to any special fares will be waived for Passengers who are immediate family members of the deceased Passenger or were otherwise actually accompanying the deceased Passenger, on the following conditions:

1) The ticket must be endorsed "earlier return on account of death of (name of Passenger)"; and

13

2) A copy of the death certificate duly executed by the competent authorities under the applicable laws of the country in which death has occurred must be presented to UA at the time of reticketing.  Passengers will be accommodated under this provision only in the class of service originally ticketed.

Note:  If the death certificate is not available at the time the Passenger requests reticketing under this provision, or if documentation satisfactory to UA has not been provided, the Passenger(s) requesting reticketing will be accommodated only upon payment of the fare applicable to transportation actually used and a request for a refund may later be filed with UA with the documents required.  Upon receipt of the request for a refund and all supporting documents, UA will determine whether a refund to the Passenger is appropriate.  If so, the maximum refund will be the difference between the total fare paid by the Passenger and the amount such Passenger would have paid if a waiver had been originally furnished under the provisions of this Rule.

E) Ticket Issue Date - The date when payment is made by credit card, or the ticket invoice date established when payment is made by other acceptable form of payment, will constitute the date a Ticket is "issued" in determining the validity period under this Rule.

## RULE 8    RETURNED CHECK CHARGE

UA will collect 25 USD/25 CAD for each returned check.  This charge is non-refundable and is not subject to any discount.

## RULE 9    DELETED

## RULE 10    TRANSATLANTIC SURCHARGES

For details concerning transatlantic surcharges, see UA's International Fare service surcharges filed with ATPCO referencing this Rule.

## RULE 11    PACIFIC SURCHARGES

For details concerning transpacific surcharges, see UA's International Fare service surcharges filed with ATPCO referencing this Rule.

## RULE 12    WESTERN HEMISPHERE SURCHARGES

For details concerning Western Hemisphere surcharges, see UA's International Fare service surcharges filed with ATPCO referencing this Rule.

## RULE 13    ACCEPTANCE OF CHILDREN/MINORS AND INFANTS

A) Children/Minors/Infants Traveling Accompanied

1) Children under the age of twelve (12) must be "accompanied" by an Adult Passenger or the child's Parent/Legal Guardian on the same flight and in the same compartment.  UA reserves the right to require and charge the applicable service charge for Unaccompanied Minor service when a child age five (5) to fourteen (14) is traveling with a passenger who is not at least 18 years old or the child's Parent/Legal Guardian.

2) United does not accept infants in incubation (except as permitted under Rule 15C) or infants under seven days old.

3) Lap Children (infants under the age of two years):

a) Additional infants under the age of two years must occupy a seat and be ticketed at the applicable adult fare.

b) Infants under the age of two years for whom a seat at the applicable adult fare has not been purchased, may not occupy a seat.

NOTE:  Infants who are carried in an adult's lap do not require a Ticket for domestic travel.  Infants traveling internationally and to and from Canada require a Ticket, which may be discounted off of the applicable fare.  In many cases a Ticket is required for an infant to travel on international flights even if no fare is paid.  In addition, some international destinations may carry service charges.  A USD 0 value or fee only Ticket may be issued for an infant.

4) Children who have reached their second birthday are required to purchase a seat and occupy a seat with a separate seat belt.  Infants reaching their second birthday after outbound flights will be required to purchase a Ticket and occupy a seat for the entirety of their itinerary regardless of whether or not they have reached their second birthday on the outbound flight.

5) Infant/child Seats:  Children unable to sit upright with the seat belt fastened must be carried in an approved infant/child seat, if not being held by an Adult Passenger as a lap child.  Infant/child seats:

a) Must be FAA approved and be clearly marked with the original NHTSA label, must be approved by a foreign government with a label showing that the seat was manufactured under the standards of the United Nations, or must conform to the Canadian Motor Vehicle Safety Standard (CMVSS) 213 or 213.1 whereby a label of compliance must be affixed to the seat indicating compliance with the same.

14

  b) Must be used in unoccupied aircraft seats and cannot be held in an adult's lap.

  c) Cannot be used in an Exit Row.

  d) Must remain properly secured to an aircraft seat at all times unless stored as a carry-on.

 6) Proof of age may be required by UA for any child, minor, or infant traveling accompanied.

B) Children/Minors Traveling Unaccompanied

 1) UA requires Unaccompanied Minor service for children/minors age five (5) to fourteen (14) who are not accompanied by a passenger who is at least 18 years old or a Parent/Legal Guardian. The policies for UA's Unaccompanied Minor service apply only to non-stop flights operated by UA and Carriers doing business as United Express. UA does not offer unaccompanied minor service to or from other carriers.

 2) Unaccompanied children under five (5) years of age are not accepted on flights operated by UA and Carriers doing business as United Express.

 3) UA's Unaccompanied Minor service is mandatory for unaccompanied children age five (5) to fourteen (14) years old. For minors age fifteen (15) through seventeen (17) for whom UA's Unaccompanied Minor service is not purchased, UA will assume no financial or guardianship responsibilities beyond those applicable to an adult Passenger.

 4) Unaccompanied children/minors must be brought to the airport of departure by a parent, legal guardian, or responsible adult 30 minutes early (in addition to regular airport processing times shown for the airport). This parent, legal guardian, or responsible adult shall remain with the unaccompanied child(ren)/minor(s) until the unaccompanied child(ren)/minor(s) has boarded and the plane is airborne, and who shall confirm that the unaccompanied child(ren)/minor(s) will be met by another parent, legal guardian, or responsible adult upon deplaning at the final destination and shall furnish UA with that individual's name, address, and phone number(s).

 5) The parent, legal guardian, or responsible adult receiving the unaccompanied child(ren)/minor(s) upon deplaning at the final destination may be required to present a government-issued photo ID that matches the name and address provided by the parent or guardian who delivered the child to the departure airport, and may also be required to complete and sign documentation relating to such unaccompanied child(ren)/minor(s). UA reserves the right to refuse to release an unaccompanied minor to anyone other than the pre-designated individual.

 6) When two or more unaccompanied minors are traveling together, the most restrictive age requirement will apply.

 7) Proof of age may be required by UA.

C) Unaccompanied Minor Service Charge

 1) Service charges for Unaccompanied Minor service is subject to change at UA's discretion. The fare for Unaccompanied Minor service for children age five (5) to fourteen (14) years old includes the applicable adult fare in addition to a service charge of 150 USD/150 CAD assessed for each one-way journey from the child's boarding point to the child's final destination. One service charge assessed for each one-way journey applies to two or more children traveling together on the same reservation.

 2) For purposes of this Rule, Unaccompanied Minor service includes reasonable supervision for Unaccompanied Minors from boarding until deplaning at the final destination.

## RULE 14  SPECIAL SERVICES

A) Definition of Non-Ambulatory under this Rule:

 1) Persons who are unable to move themselves or need the support of another person to walk or move, but who are otherwise capable of caring for themselves without assistance throughout the flight are considered Non-Ambulatory.

 2) If a Passenger uses a wheelchair for convenience, the Passenger is not considered to be Non-Ambulatory.

 3) A child or infant is not considered to be Non-Ambulatory merely because of his/her age, except when requiring an Infant Transport System.

 4) If the Passenger can move himself/herself from his/her seat to the nearest emergency exit without the aid of another person, the Passenger is not considered to be Non-Ambulatory, regardless of the degree of impairment.

B) Qualifications for Acceptance of Non-Ambulatory Passengers - Non-Ambulatory Passengers are accepted when accompanied by an assistant able to assist the Non-Ambulatory Passenger to evacuate the aircraft in accordance with 14 CFR Part 382.29. See Rule 21.

C) Qualified Individual with a Disability - UA requires a Passenger, including a Qualified Individual with a Disability, to provide up to 48 hours' advance notice and check-in one hour before the check-in time for the general public for Domestic U.S. flights and for International flights as set forth in Rules 5 D) and 5 E) if such Passenger wishes to receive any of the following service accommodations:

 1) Transportation of an electric wheelchair on an aircraft with fewer than 60 seats.

15

2) Provision by UA of hazardous materials packaging for a battery for a wheelchair or other assistive device.

3) Accommodation for a group of ten or more Qualified Individuals with Disabilities who make reservations and travel as a group.

4) Provision of an on-board wheelchair on an aircraft with more than 60 seats that does not have an accessible lavatory.

5) Provision by UA of carrier-supplied in-flight medical oxygen (if applicable).

6) Use of a ventilator, respirator, Continuous Positive Airway Pressure (CPAP) machine, or Passenger's own Personal Oxygen Concentrator (POC).

Qualified Individuals with a Disability traveling with Service Animals must comply with the requirements of Rule 16.

D) When Travel Assistance is Required:

1) If UA determines that an assistant is essential for safety, UA may require that a Passenger, including a Qualified Individual with a Disability, meeting any of the following criteria travel with an assistant as a condition of being provided air transportation:

a) A person who, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from UA personnel, including the safety briefing required by 14 CFR, Part 121.571(a)(3), (a)(4) and 135.117(b);

b) A person with a mobility impairment so severe that the person is unable to physically assist in his or her evacuation of the aircraft; or

c) A person who has both severe hearing and severe vision impairments if the person cannot establish some means of communication with UA personnel adequate to permit the transmission of the required safety briefing.
NOTE:  If UA determines that a person meeting the criteria in subparagraphs (a), (b) or (c) above must travel with an assistant, contrary to the individual's self-assessment that he/she is capable of traveling independently, UA will not charge for the transportation of the assistant.
EXCEPTION:  For Passengers traveling to/from Canada, UA will accept a disabled person's determination of his/her self-reliance.

NOTE: Flight attendants and other crew members cannot assist with any medical services, assistance inside the lavatory, or in actual feeding.

2) If, because there is not a seat available on a flight for an assistant whom UA has determined to be necessary, a Qualified Individual with a Disability with only one confirmed reservation is unable to travel on the flight, the Qualified Individual with a Disability shall be eligible for denied boarding compensation in accordance with Rule 25.  For purposes of determining whether a seat is available for an assistant, the assistant shall be deemed to have checked in at the same time as the Qualified Individual with a Disability.

E) For Rules regarding wheelchairs, see Rules 23 and 28.

## RULE 15  MEDICAL SERVICES

A) Onboard Medical Oxygen Service - UA may provide on-board medical oxygen service when requested in advance and only in limited markets in the Micronesia area. Passengers requesting on-board medical oxygen service will be required to give UA a minimum 48 hours advance notice and check-in one hour before the check-in time for the general public for Domestic U.S. and International flights as set forth in Rule 5 D) and E). Contact UA to verify availability and additional conditions of service.  UA is not liable for failure to provide this service in emergency or other circumstances beyond its control.

B) Passenger-Provided Portable Oxygen Concentrators - Portable oxygen concentrators (POCs) approved by the Federal Aviation Administration (FAA) may be carried and used on board flights operated by UA worldwide, at no charge, in accordance with specific FAA requirements. Passengers utilizing POCs are required to give UA a minimum 48 hours advance notice and check-in one hour before the check-in time for the general public for Domestic U.S. and International flights as set forth in Rule 5 D) and E) and must also meet the following conditions:

1) Check www.united.com for a list of specific POCs currently approved by the FAA.

2) Non-approved POC brands and models that do not contain compressed or liquid oxygen may be carried in the cabin if they meet United's carry-on size and weight requirements. Alternatively, they may be transported as checked baggage. UA may accept other brands and models for use on board in the future as they become approved by the FAA and UA.

3) Passengers must satisfy specific requirements prior to boarding the aircraft.  The Passenger must:

a) provide advance notice in the reservation record that he/she is planning to use a POC on board the flight.

b) have a signed written Doctor's statement that:

16

(i)      states the user of the POC has the physical and cognitive ability to see, hear and understand the device's aural and visual cautions and warnings and is able, without assistance, to take appropriate action in response to those cautions and warnings.

(ii)      states whether or not oxygen use is medically necessary for all or a portion of the flight(s) listed on the Passenger's itinerary.

(iii)      specifies the maximum oxygen flow rate in liters per minute corresponding to the pressure in the cabin of the aircraft under normal operating conditions.

(iv)      may be reviewed at the airport prior to boarding and must be kept by the Passenger and provided upon request by UA personnel at any time during travel. Passengers may use and print out the Medical Verification Statement available on UA's website, www.united.com.

c)    ensure that he/she has ample batteries to power the POC for the duration of his/her flight plus 3.0 additional hours to allow for unanticipated delays and any ground connection time where the POC is planned to be used. (NOTE: aircraft in -seat electrical power is not available for Passenger use with POCs).

d)    ensure that all extra batteries are properly protected from short circuiting by either:

(i)      having recessed battery terminals or;

(ii)      packing them so that the batteries do not contact metal objects including the terminals of other batteries.

4)    Failure to meet the requirements will result in denied use of the POC during travel. Passengers planning on traveling with POCs are solely responsible for advising UA as soon as reservations are confirmed, regardless of whether the reservations were made through a travel agent, on the internet or directly with UA, in order to confirm specific requirements and to provide the airline with required information.

5)    When travelling on or connecting to or from any flight other than a UA or a United Express flight, the Passenger is responsible for notifying and making independent arrangements directly with the other airline.

6)    POCs are assistive devices for Passengers with disabilities. As such, they do not count toward carry-on or checked baggage limits, whether or not they are used on board. They must be able to fit underneath the seat or in an overhead storage compartment. A Passenger using a POC may not sit in an exit row or bulkhead seat. Additionally, a Passenger using a POC during takeoff and landing may not sit in an aisle seat.

7)    UA is not liable for POC equipment failures, failure of the batteries that power the POC, or any other losses or damages alleged by the Passenger or any other person arising out of the use or possession of the POC, unless caused by the gross negligence or willful misconduct of UA.

C)   Medical Transport Services - These services are limited and provided only in the Micronesia region. Passengers must provide 48 hours' advance notice for these services (UA will make reasonable efforts to accommodate Passengers who fail to meet the 48-hour reservation/notification requirement, but will not be obligated to do so). Subject to UA's approval based upon the availability of space, appropriate equipment, aircraft type, and pursuant to the following conditions:

1)    Passengers on Stretchers

a)    Passenger must comply with UA's medical procedures;

b)    Passenger must pay for all seats required for stretcher transportation as determined by UA;

c)    Passenger must be accompanied by two assistants, provided at the Passenger's expense, one being a medical escort and the other a family member or guardian;

d)    The cost of ambulance service, hospitalization and other ground services shall be paid by the Passenger;

e)    The normal Baggage Allowance will apply to each fare paid; and

f)    The loading and unloading of the stretcher Passenger is the responsibility of the stretcher Passenger's assistants and must be arranged by the Passenger at his or her own expense.

2)    All necessary medical documentation must be completed and provided to UA prior to flight.

## RULE 16  SERVICE ANIMALS

A)   Service Animals: UA accepts for transportation, without charge, trained Service Animals for travel with a Qualified Individual with a Disability who requires the animal to assist them in the performance of necessary activities. The animal will be permitted to accompany the Passenger in the cabin, if it meets the conditions of acceptance noted below.

1)    Conditions of Acceptance

a)    Other than for Search and Rescue Animals, the Passenger must submit to United a Service Animal Air Transportation Form that has been completed on or after the date the Passenger purchased the Ticket and at least 48 hours prior to scheduled departure. If the Ticket has been purchased less than 48 hours prior to departure, the Service Animal Transportation Form must be submitted to United prior to departure. Such form must be submitted to United in accordance with United's policies. Failure to provide United a fully and

17

accurately completed Service Animal Air Transportation Form as required by this paragraph may result in the Passenger's being denied transportation on the scheduled flight.

b) Evidence that an animal is a Service Animal include identification cards, other written documentation, the type of harness or markings on the harness, tags, or other credible assurances of the Qualified Individual with a Disability using the animal. UA, in its sole discretion, will determine if the evidence is sufficient.

c) Service Animals must be properly harnessed or leashed and remain under the direct control of the Passenger. A Service Animal in addition to its owner-Passenger will be denied boarding, removed from the flight by UA, and in UA's sole discretion, permanently banned if the animal is too large or heavy to be accommodated in the cabin in the space immediately in front of the Passenger, cannot be contained or controlled by the Passenger, or otherwise exhibits behavior that poses a threat to the health or safety of other passengers or a significant threat of disruption.

d) On a flight segment scheduled to take 8 hours or more, the Passenger with a Service Animal other than a Search and Rescue Animal must submit to United a Service Animal Relief Attestation Form that has been completed on or after the date the Passenger purchased the Ticket and at least 48 hours prior to scheduled departure. If the Ticket has been purchased less than 48 hours prior to departure, the Service Animal Transportation Form must be submitted to United prior to departure. Such form must be submitted to United in accordance with United's policies. Failure to provide United a fully and accurately completed Service Animal Relief Attestation Form as required by this paragraph may result in the Passenger's being denied transportation on the scheduled flight.

2) UA accepts for transportation, without charge, a properly harnessed dog trained in explosive detection, drug search, and rescue, or other specific functions, when accompanied by its handler on official emergency business as authorized by an appropriate federal, state, or local government agency. Such official duty status must be documented in writing to the satisfaction of UA. The dog will be permitted to accompany its handler into the cabin, but not to occupy a seat.

3) Local regulations at the Passenger's final or intermediate destination(s) may apply and impose further requirements or restrictions, including but not limited to, carriage in the passenger cabin, limitations on the designation of Service Animals to dogs only, or the non-recognition of animals as trained and qualified Service Animals.

4) Trainers are permitted to bring one Service Animal onboard free of charge that is training to assist disabled passengers. This service animal must not occupy a seat, and must meet all other conditions specified in this Rule.

B) Service Animals may not occupy a seat. Service Animals will be transported in the Passenger's lap or in the Passenger's foot space, unless this would be inconsistent with safety requirements set by the US Federal Aviation Administration, and may not encroach into another Passenger's foot space. If no other seat accommodation can be made and the animal is too big to fit safely in the cabin, the animal will be denied boarding, and as a result, this may require the Passenger to re-book his or her flight.

C) Passengers with Service Animals will not be seated in emergency exit rows. They may not obstruct an aisle or other area that must remain unobstructed in order to facilitate an emergency evacuation.

D) The Passenger affirms that to the best of his or her knowledge, the Service Animal has not behaved aggressively or caused serious injury to another person or dog and does not pose a threat to the health and safety of others, and assumes full responsibility for the safety, well-being, and conduct of its animal, including the interaction of the animal with crew and other Passengers or Passenger property that may come in contact with the animal while on board the aircraft, and for compliance with all UA and governmental requirements, regulations, or restrictions, including entry permits and required health certificates of the country, state, or territory from and/or to which the animal is being transported. Any Passenger or his or her Service Animal who, by failing to comply with this Section, causes UA or its passengers any loss, damage or expense of any kind, consents and acknowledges that he or she shall reimburse UA for any such loss, damage or expense.

## RULE 17   GROUND TRANSFER SERVICE

A) UA may provide or procure ground transfer service between airports and city centers, between airports and any point in a Passenger's itinerary, or to places of lodging.

B) Except where ground transfer service is directly operated by UA, it is agreed that any such service is performed by independent operators. Such independent operators are not agents or servants of UA, and UA assumes no responsibility for the ground transfer of any passenger and/or his/her baggage. Anything done by an employee, agent or representative of UA in assisting the Passenger to make arrangements for such independent ground transfer service shall in no way make UA liable for the acts or omissions of such independent operator.

C) In cases where UA maintains and directly operates local transfer services for its Passengers, the terms, conditions, rules and regulations of UA, including but not limited to, those stated or to which reference is made in UA's Tickets, Baggage Checks and baggage valuation agreements shall be deemed applicable to such local ground transfer services. No portion of the air transportation fare shall be refundable in the event local ground services are not used by the Passenger.

18

**RULE 18    SERVICE PROVIDED BY UNITED EXPRESS AND OTHER CODESHARE PARTNERS**

A)    UA has arrangements with certain other carriers to enable UA to provide Codeshare services to Passengers on flights operated by these carriers.  Transportation provided by UA under a Codeshare arrangement with these carriers is designated by a flight number that includes UA's two-letter airline designator code, "UA".  NOTE: For travel to or from the European Union and for reservations made in the European Union, UA will indicate the identity of the operating carrier at the time of reservation or as soon as administratively feasible.

B)    For Codeshare services on flights operated by another carrier, UA is responsible for the entirety of the Codeshare journey for all obligations to Passengers established in these rules.  The rules contained herein with respect to ticketing will apply to UA Codeshare services on flights operated by partner airlines. Notwithstanding the foregoing, the baggage liability provisions set forth in Rule 28 shall govern the liability of UA with respect to any transportation subject to this Contract.

C)    When another foreign or U.S. Codeshare partner operates a flight on which UA's designator code "UA" appears, the operating carrier's contingency plan for lengthy tarmac delays will apply to that flight.

**RULE 19    TRAVEL DOCUMENTS**

A)    Each Passenger desiring transportation across any international boundary is responsible for obtaining prior to travel and presenting upon request at any time all necessary travel documents, which shall be in good condition, and for complying with the laws of each country flown from, through or into which he/she desires transportation.  Any Passenger who, by failing to comply with the laws of each country flown from, through or into which he/she desires transportation, causes UA any loss, damage or expense of any kind, consents and acknowledges that he or she shall reimburse UA for any such loss, damage or expense. UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such documents or compliance with such laws, or for the consequences to any Passenger resulting from his/her failure to obtain and present such documents, which shall be in good condition, or to comply with such laws.  Where legally permitted, UA reserves the right to hold, photocopy or otherwise reproduce a travel document presented by any Passenger.  UA also reserves the right to deny boarding to any Passenger whose necessary travel documents are not in good condition according to UA's reasonable belief, or which otherwise do not comply with laws of the specific country the Passenger is departing from, transiting through, or traveling to.

B)    Subject to applicable laws and regulations, the Passenger must pay the applicable fare whenever UA, on government order, is required to return a Passenger to his/her point of origin or elsewhere due to the Passenger's inadmissibility into/or deportation from a country. The fare will be the applicable fare in effect at the time of the rebooking for the return travel.  Any difference between the applicable fare and the fare paid will be collected from the Passenger.  UA will apply to the payment of such fares any funds or miles paid by the Passenger for unused carriage or any funds or miles of the Passenger in possession of or accessible/available to UA.  The fare collected for carriage to the point of refusal of entry or deportation, as well as for return travel, will not be refunded by UA unless the law of such country requires that the fare be refunded.

C)    This Rule and its limitations include, but are not limited to, Travel Documents related to travel by minors. Parents/guardians of minors are responsible for compliance with all requirements and procedures for minors travelling internationally, including, but not limited to documentary evidence, such as a notarized letter of relationship and permission for the minor's travel from the parent or legal guardian not present.

**RULE 20    SCREENING OF PASSENGERS AND BAGGAGE**

Passengers and/or their baggage are subject to security screening, including but not limited to, security profiling, physical pat-downs and inspections, x-ray screening, manual bag searches, questioning of Passengers, and use of electronic or other detectors or screening or security devices, in the sole discretion of the government, airport or UA, and with or without the Passenger's presence, consent or knowledge. Neither UA nor its employees or agents is liable for any damage, loss, delay (including refusal to transport), confiscation of property, injury or other harm relating to or arising out of security screening conducted by an agent of the airport or any local, state, or federal agency or a Passenger's failure to submit to or comply with such security screening.

**RULE 21    REFUSAL TO TRANSPORT**

UA shall have the right to refuse transport on a permanent or temporary basis or shall have the right to remove from the aircraft at any point, any Passenger for the following reasons:

A)    Breach of Contract of Carriage – Failure by Passenger to comply with the Rules of the Contract of Carriage.

B)    Government Request, Regulations or Security Directives – Whenever such action is necessary to comply with any government regulation, Customs and Border Protection, government or airport security directive of any sort, or any governmental request for emergency transportation in connection with the national defense.

C) Force Majeure and Other Unforeseeable Conditions – Whenever such action is necessary or advisable by reason of weather or other conditions beyond UA's control including, but not limited to, acts of God, force majeure, strikes, civil commotions, embargoes, wars, hostilities, terrorist activities, or disturbances, whether actual, threatened, or reported.

D) Search of Passenger or Property – Whenever a Passenger refuses to submit to electronic surveillance or to permit search of his/her person or property.

E) Proof of Identity – Whenever a Passenger refuses on request to produce identification satisfactory to UA or who presents a Ticket to board and whose identification does not match the name on the Ticket. UA shall have the right, but shall not be obligated, to require identification of persons purchasing tickets and/or presenting a ticket(s) for the purpose of boarding the aircraft.

F) Failure to Pay – Whenever a Passenger has not paid the appropriate fare for a Ticket, Baggage, or applicable service charges for services required for travel, has not paid an outstanding debt or Court judgment, or has not produced satisfactory proof to UA that the Passenger is an authorized non-revenue Passenger or has engaged in a prohibited practice as specified in Rule 6.

G) Across International Boundaries – Whenever a Passenger is traveling across any international boundary if:

1) The government required travel documents of such Passenger appear not to be in order according to UA's reasonable belief; or

2) Such Passenger's embarkation from, transit through, or entry into any country from, through, or to which such Passenger desires transportation would be unlawful or denied for any reason.

H) Safety – Whenever refusal or removal of a Passenger may be necessary for the safety of such Passenger or other Passengers or members of the crew including, but not limited to:

1) Passengers or Passengers' Service Animals whose conduct is unlawful; indecent, lewd, or sexual in nature; harassing; disruptive; disorderly; offensive; abusive; unsanitary; or violent;

2) Passengers who fail to comply with or interfere with the duties of the members of the flight crew, federal regulations, or security directives;

3) Passengers who assault any employee of UA, including the gate agents and flight crew, any employees of carriers doing business as United Express, any UA or United Express vendor employee, or any UA Passenger;

4) Passengers who, through and as a result of their conduct, cause a disturbance such that the captain or member of the cockpit crew must leave the cockpit in order to attend to the disturbance;

5) Passengers who are barefoot, not properly clothed, or whose clothing is lewd, obscene or offensive;

6) Passengers who appear to be intoxicated or under the influence of drugs (other than a qualified individual whose appearance or involuntary behavior may make them appear to be intoxicated or under the influence of drugs);

7) Passengers wearing or possessing on or about their person concealed or unconcealed deadly or dangerous weapons; provided, however, that UA will carry law enforcement personnel who meet the qualifications and conditions established in 49 C.F.R. §1544.219;

8) Passengers who are unwilling or unable to follow UA's policy on smoking or use of other smokeless materials;

9) Unless they comply with Rule 6 I), Passengers who are unable to sit in a single seat with the seat belt properly secured, and/or are unable to put the seat's armrests down when seated and remain seated with the armrest down for the entirety of the flight, and/or passengers who significantly encroach upon the adjoining passenger's seat;

10) Passengers who are manacled or in the custody of law enforcement personnel;

11) Passengers who have resisted or may reasonably be believed to be capable of resisting custodial supervision;

12) Pregnant Passengers in their ninth month, unless such Passenger provides a doctor's certificate dated no more than 72 hours prior to departure stating that the doctor has examined and found the Passenger to be physically fit for air travel to and from the destination requested on the date of the flight, and that the estimated date of delivery is after the date of the last flight;

13) Passengers who are incapable of completing a flight safely, without requiring extraordinary medical assistance during the flight, and Passengers who appear to have symptoms of or have a communicable disease (or there is reason to believe there was exposure to a communicable disease) or other condition that could pose a direct threat to the health or safety of themselves or others on the flight, or who refuse a medical screening for such disease or condition, whether suspected or actual. (NOTE: UA requires a medical certificate for Passengers who wish to travel under such circumstances. Visit UA's website, www.united.com, for more information regarding UA's requirements for medical certificates);

14) Passengers who fail to travel with the required safety assistant(s), advance notice and/or other safety requirements pursuant to Rules 14 and 15;

15) Passengers who do not qualify as acceptable Non-Ambulatory Passengers (see Rule 14);

20

16) Passengers who have or cause a malodorous condition (other than individuals qualifying as disabled);

17) Passengers whose physical or mental condition is such that, in United's sole opinion, they are rendered or likely to be rendered incapable of comprehending or complying with safety instructions without the assistance of an escort. The escort must accompany the escorted passenger at all times;

18) Unaccompanied passengers who are both blind and deaf, unless such passenger is able to communicate with representatives of UA by either physical, mechanical, electronic, or other means. Such passenger must inform UA of the method of communication to be used;

19) Passengers who are unwilling to follow UA's policy that prohibits voice calls after the aircraft doors have closed, while taxiing in preparation for takeoff, or while airborne;

20) Passengers who refuse to wear a mask or face covering while at the airport and/or onboard UA and United Express flights if UA or United Express believe, in their sole discretion, that a failure to wear such a mask or facial covering may pose a risk to the health or safety of others; and

21) Passengers flying into the U.S. from a foreign country or from a foreign country into the U.S. who: i) refuse to provide proof of full vaccination, ii) proof of a negative pre-departure test result for COVID-19, and iii) contact tracing information within 72 hours of their flight's departure, the sufficiency of which for each of the three items is subject to UA's approval.

I)  Any Passenger who, by reason of engaging in the above activities in this Rule 21, causes UA any loss, damage or expense of any kind, consents and acknowledges that he or she shall reimburse UA for any such loss, damage or expense. UA has the right to refuse transport, on a permanent basis, any passenger who engages in any of the activities in this Rule. In addition, the activities enumerated in this Rule shall constitute a material breach of contract, for which UA shall be excused from performing its obligations under this contract.

J)  UA is not liable for its refusal to transport any passenger or for its removal of any passenger in accordance with this Rule. A Passenger who is removed or refused transportation in accordance with this Rule may be eligible for a refund upon request.  See Rule 27 A). As an express precondition to issuance of any refund, UA shall not be responsible for damages of any kind whatsoever. The passenger's sole and exclusive remedy shall be Rule 27 A).

## RULE 22  SMOKING POLICY

Smoking (including use of electronic simulated smoking materials and smokeless cigarettes) is not permitted on any flights operated by UA. Use of betel nut (i.e., betel chewing) or any other type of chewing tobacco is also prohibited on all flights operated by United. Federal law also prohibits smoking in an airplane lavatory and tampering with, disabling, or destroying any smoke detector installed in any airplane lavatory.  Federal law provides for a penalty of up to $2,000 for tampering with the smoke detector installed in this lavatory.  Individuals are subject to FAA enforcement action and substantial monetary penalties for violation of this law and related regulations. By purchasing a ticket or accepting transportation, the Passenger agrees to comply with UA's policy on smoking and use of other smokeless materials, as well as applicable federal law, and UA reserves the right to seek reimbursement from any Passenger whose failure to do so causes UA any loss, damage or expense.

## RULE 23  BAGGAGE

A)  General Conditions of Acceptance - Passengers may check Baggage for carriage in the cargo compartment of the aircraft and/or may carry Baggage on board the aircraft subject to provisions in this Rule.  UA will accept Baggage subject to the following conditions:

1) Passengers must present a valid Ticket for transportation over the lines of UA or over the lines of UA and one or more other carriers with which UA has an Interline Transportation agreement.

2) UA has the right to refuse to transport Baggage on any flight other than the one carrying the Passenger.

3) UA will refuse to accept property for transportation when the size, weight, character or type of packaging renders it unsuitable for transportation on the particular aircraft which is to transport it, or when the property cannot be accommodated without harming or annoying Passengers or which poses a risk to other baggage or cargo, or which is not suitable or adequately packed to withstand ordinary handling, unless the passenger executes a release form.

4) All Baggage or other property for which UA assumes custody and for which it issues a Baggage Claim Check shall be deemed acceptable for transportation by air.

5) Baggage will not be checked:

   a) To a point that is not on the Passenger's Routing;

   b) Beyond the Passenger's next point of Stopover or, if there is no Stopover, beyond the final Destination of the Ticket;

   c) Beyond a point to which all applicable charges have been paid;

    d)    Beyond a point at which the Passenger is to Transfer to a connecting flight, if that flight is scheduled to depart from an airport different from the one at which the Passenger is scheduled to arrive; or

    e)    To an intermediate point unless the intermediate point to which the Baggage is to be checked is a permissible Stopover point or a scheduled layover at the fare paid (except if the Passenger is making a connection to the first available UA flight departing from such intermediate point and the connection exceeds four hours, the Passenger may reclaim his/her Baggage at such intermediate connecting point). This section e) does not apply if a Passenger's routing is affected by a Schedule Change or an Irregular Operation.

6)    UA has the right to refuse to accept Baggage from the Passenger if the Passenger fails to present the Baggage within the Check-in time limits specified in Rules 5 D) and E), or if the Passenger will be voluntarily separated from his or her Baggage (other than those Passengers whose flight is oversold and who volunteer to take a later flight). UA may require a signed release of liability as a condition of Baggage acceptance in these circumstances.

7)    It is the Passenger's responsibility to attach proper identification to Baggage, and UA is not liable for a Passenger's failure to do so. It is also the Passenger's responsibility to claim the checked baggage at the baggage claim area, and UA assumes no obligation to verify the identity of the bearer at the destination airport.

8)    Checked Baggage will generally be carried on the same aircraft as the Passenger unless such carriage is deemed impractical by UA, in which event the carrier will make arrangements to transport the Baggage on the next flight on which space is available. UA will charge fees to a Passenger for the delivery of Baggage when the Passenger fails to check-in within the applicable check-in time and it results in his/her Baggage traveling on a different flight.

9)    All baggage is subject to inspection by UA and/or the TSA. However, there is no obligation that UA perform an inspection. UA will refuse to transport or will remove at any point baggage that the passenger refuses to submit for inspection.

10)    UA will not accept baggage or other personal property for storage.

B)    Baggage Allowance - When a Passenger presents a valid Ticket for transportation between points on UA, transportation of the Passenger's Baggage between such points will be subject to the terms and conditions of this Rule, as well as the Additional Liability Limitations found in Rule 28.  For purposes of this Rule, "Baggage Allowance" is defined as the number of pieces of Baggage that will be carried subject to payment of applicable service charge(s), either as Checked Baggage or Carry-on Baggage, provided such Baggage meets the specified Maximum Outside Linear Dimensions and maximum weight of each piece.

1)    Checked Baggage Allowance - UA will accept up to two pieces of Checked Baggage weighing 50.0 pounds/23.0 kilograms or less and a Maximum Outside Linear Dimension of 62 inches (158cm) (measured by adding the width + length + height) subject to payment of the applicable service charge(s).  First and second Checked Baggage service charges, available on UA's Baggage Calculator, vary depending on the type of fare purchased, date of purchase, date of travel, active military status, the Passenger's itinerary (e.g., domestic or international), and/or when and where baggage is checked and the applicable service charge is paid (e.g., checked and pre-paid at united.com or at the airport). In addition, the following provisions apply for Checked Baggage:

    a)    UA may, at its sole discretion, change, consider and make exceptions to its Baggage Allowance policy (e.g., to the number, size, weight, type, and/or applicable service charges) for certain MileagePlus members, First Class and Business customers, certain credit card holders, active military personnel, and/or other Passengers depending on the fare class purchased.

    b)    Applicable Baggage service charges(s) paid are non-refundable.  A Passenger who does not travel as a result of a cancellation, Schedule Change, or Irregular Operations will be eligible for a refund.  See Rule 27 C). United will also reimburse Passengers for any fee charged to transport bag(s) that are lost.

    c)    UA may allow certain sporting equipment and other items to be checked in lieu of one piece of Baggage.  See Rule 23 E) for more information.

    d)    Boxes weighing 50.0 pounds/23.0 kilograms or less and 42 linear inches (107 cm) may be accepted as Checked Baggage on flights operating as United Express to the Caribbean, Central America, and Mexico.

    e)    For travel to, from or within Micronesia, Baggage is limited to two checked bags, 1 checked bag and 1 checked box or 1 checked bag and 1 checked cooler not to exceed Maximum Outside Linear Dimensions of 62 linear inches (158 cm) and weighing 50.0 pounds/23.0 kilograms or less.

    f)    If bags exceed the maximum linear dimensions, weight, or allowance, excess baggage charges may also apply. Baggage weighing 100 pounds (45 kg) or more will not be accepted as checked baggage.

    g)    The items listed below will not be included as part of the Checked Baggage Policy, and can be checked free of charge:

        (i)    Assistive devices (e.g. cane, one set of crutches, one set of braces, prosthetic devices, or a wheelchair).  For additional information on wheelchairs, see G) 4) below.

        (ii)    For flights departing from Hawaii, one box of pre-packaged fruit up to a maximum weight of 30 pounds.

    (iii)    For each accompanied child, one child/infant's car restraint seat and one of the following items: a collapsible stroller, a compact folding stroller, *or* a folding wagon.

2) Carry-on Free Baggage Allowance - UA will accept one piece of Carry-on Baggage free of charge, which, for purposes of this Rule, is referred to as the "Carry-on Free Baggage Allowance", and one personal item such as a shoulder bag, backpack, briefcase, laptop bag or similar item, except, however, UA will not accept any Carry-on Baggage for passengers traveling on a Basic Economy fare and Basic Economy passengers whose baggage is checked at the gate will be charged the applicable checked bag service charge, plus a 25 USD/25 CAD gate handling service charge.  Carry-on Baggage must not exceed the Maximum Outside Linear Dimensions of 9 inches (22 cm) x 14 inches (35 cm) x 22 inches (56 cm), which includes its wheels and handles. Personal items must not exceed 9 inches (22 cm) x 10 inches (25 cm) x 17 inches (43 cm), which includes any wheels and handles. A personal item that exceeds these maximum linear dimensions but is not greater than 9 inches (22 cm) x 14 inches (35 cm) x 22 inches (56 cm) will be considered as Carry-on Baggage. Carry-on Baggage or personal items suspected of being oversized may require being placed into a sizing unit to determine acceptability. Carry-on Baggage that exceeds the Maximum Linear Dimensions allowed or that exceeds the Carry-on Free Baggage Allowance will be considered as Checked Baggage and is subject to Checked Baggage service charges. For flights departing Yap, Federated States of Micronesia (YAP), the maximum weight of carry-on baggage is 25 lbs/11.3 kg; any bag heavier than this amount will be considered as Checked Baggage and is subject to Checked Baggage service charges, such as Excess and Oversize/Overweight Baggage charges. Carry-on Baggage may be stored in carry-on compartments of the aircraft if so equipped, or it must be retained in the Passenger's custody and stored under a seat or in an overhead compartment approved for the carriage of such Baggage. See Rule 23 F) 5) below for UA's Carry-on policy regarding musical instruments. Carry-on Baggage is subject to the following additional conditions:

a) Operations, space constraints, security directives and/or other safety considerations may require limitations to the allowable Carry-on Baggage on a specific flight.

b) UA reserves the right in its sole and absolute discretion to determine the suitability and place of storage of any items to be carried in the cabin of the aircraft.

c) UA reserves the right to check a Passenger's Carry-on Baggage for any reason, including if the Carry-on Baggage cannot be safely stowed, or the Carry-on Baggage is not compliant with the Maximum Outside Linear Dimensions specified in section 2) above.

d) In addition to the Carry-on Free Baggage Allowance listed above, the following items do not count toward the one Carry-on plus one personal item:

    (i)    An overcoat or wrap.

    (ii)    An umbrella.

    (iii)   A reasonable amount of reading material.

    (iv)   A pet carrier (charges apply) (the carrier must be small enough to fit underneath the seat without blocking any person's path to the main aisle of the aircraft, and it must be stowed properly before the forward customer entry door to the aircraft is closed).

    (v)    A collapsible wheelchair.

    (vi)   A government approved child/infant restraint seat meeting Federal Motor Vehicle and FAA Approval Standards.

    (vii)  A camera.

    (viii)A diaper bag.

    (ix)   A breast pump.

    (x)    A limited amount of Airport Duty Free items, merchandise purchased in the airport, or food.  These items must be stowed in the same manner as Carry-on Baggage.

    (xi)   Assistive devices (a cane, one set of crutches, prescription medications and any medical devices needed to administer the medications, a Portable Oxygen Concentrator (POC), etc.).  These items must be stowed in the same manner as Carry-on Baggage.

    (xii)  A compact folding stroller that complies with the Carry-on Baggage restrictions above.

3) Baggage Allowance for Children:

a) Children paying for a seat will receive the appropriate baggage allowance for that seat in addition to one stroller or folding wagon and one car seat;

b) Lap children will be granted a Baggage Allowance of one stroller or folding wagon and one car seat. Infants traveling internationally on 10% of an Adult fare are also allowed one stroller or folding wagon and one car seat in addition to their standard Baggage Allowance.

4) Passenger Reroutes - A Passenger rerouted in accordance with Rule 24 will be entitled to the maximum Baggage Allowance applicable for the trip originally purchased, regardless of whether the Passenger is transferred to a different class of service or whether the Passenger is entitled to a fare refund.

C) Excess and Oversize/Overweight Baggage Limits and Charges

1) Except as otherwise provided in the terms of this Contract of Carriage or by law, articles transported as Checked Baggage may not exceed the Maximum Outside Linear Dimensions of 115 linear inches (292 cm) or a maximum weight of 99.9 pounds (45.3 kg).

2) UA may, in its sole discretion, change, consider or make exceptions to its Excess or Oversize/Overweight Baggage policy (e.g., to the number, size, weight, type and/or applicable service charges).

3) Charges apply for Excess and Oversize/Overweight Baggage, in addition to applicable Baggage service charges(s) required to be paid pursuant to UA's general Baggage Allowance policy.  These charges apply each way (i.e., based on a one-way trip) and are cumulative (i.e., Baggage that is excess and also oversized and/or overweight will be subject to both Excess Baggage *and* Oversize/Overweight Baggage charges).

4) Excess and Oversize/Overweight Baggage charges, available on UA's Baggage Calculator, may vary depending on the type of fare purchased, date of purchase, date of travel, active military status, the Passenger's itinerary (e.g., domestic or international), and/or when and where Baggage is checked and the applicable service charge is paid (e.g., checked and pre-paid at united.com or at the airport).

5) UA's acceptance of Excess and Oversize/Overweight Baggage shall be on a space-available basis only, and shall be subject to the load capacities of the aircraft in use. United may prohibit Checked Baggage exceeding either 70 lbs or more than 115 linear inches.

6) Excess and/or Oversize/Overweight Baggage charges will apply from the point at which Baggage is accepted for transportation to the point at which Baggage is checked or transported in the Passenger compartment.  Baggage connecting to other airlines also may be subject to the connecting airline's Excess and/or Oversize/Overweight Baggage charges, in addition to UA's Excess and/or Oversize/ Overweight Baggage charges.

7) Excess Baggage Embargos – Excess and Oversize/Overweight Baggage may not be accepted on flights to/from certain destinations or during certain specified dates (usually holiday periods).  Contact United's Customer Contact Center for a list of cities and effective dates.

8) Declaration of Higher Value for Checked Baggage

   a) Passengers are not permitted to declare a higher value for Checked Baggage on UA or carriers doing business as United Express. When personal property, including Baggage, is tendered for transportation via two or more carriers other than UA with different maximum limits on declared value, the lowest limit for any such carrier shall apply to all carriers participating in such transportation.

D) Cabin Baggage Requiring a Seat - When a Passenger requests that an item be carried in the Passenger cabin of the aircraft as Cabin Baggage, and it is determined by UA in its sole and absolute discretion that the item is acceptable in the cabin but is so fragile and/or bulky as to require the use of a seat, the items will be accepted and considered Cabin Baggage. Examples include, but are not limited to, large or valuable musical instruments, media cameras, artifacts, garment bags, and similar items of a delicate nature or unusual size. In addition to the Carry-on Baggage conditions specified in Section B 2) a) and b) above, the following provisions also apply to Cabin Baggage Requiring a Seat:

1) Ticketed items are subject to thorough inspection.

2) Such items must be able to withstand the rigors of flight and should be packaged or covered, as necessary, to prevent contents from escaping and to avoid possible injury to other passengers. It is prohibited for either the instrument or the case to contain any object not otherwise permitted to be carried in an aircraft cabin because of the rules contained in this Contract, or any applicable law, regulation, rule, and/or security directive.

3) Ticketed items must be carried aboard the aircraft and strapped in a seat adjacent to the owner using the seatbelt securely (eliminating the possibility of shifting).

4) The weight of the item (including any case or covering) is not to impose any load on these seats or floor structure that exceeds the load limitations for these components, and cannot exceed 165 pounds, or the applicable weight restrictions for the aircraft.

5) No article secured to a seat may obstruct access to, or use of, any emergency or regular exit; block or protrude into any aisle or exit path; or obstruct any passenger's view of the overhead fasten seatbelt and no smoking signs or any required exit sign or video monitor/screens.

   NOTE: Due to the cabin configuration and FAA regulations, Cabin Baggage locations may vary.

6) No article may be secured in an emergency exit seat.

7) A seat for ticketed Cabin Baggage must be reserved in advance and the applicable charges must be paid.

8) UA will charge 100 percent of the applicable Adult fare for the portion of the trip on which the extra seat is used. The Cabin Baggage will not be included in determining Baggage Allowance or Excess Baggage Charges.

NOTE: Cabin-Seat baggage may not be accepted on some aircraft with weight/size restrictions.

NOTE: UA personnel, including flight attendants and other crew members, cannot assist with the movement or placement of Cabin Baggage Requiring a Seat.

E)    Sports Equipment/Special Items – The sports items listed below, and which must weigh less than 50.0 pounds (23.0 kg) and a maximum outside linear dimension of 62 inches (158cm), will be accepted as Baggage by UA in accordance with the following provisions, accepted at applicable first and second checked bag service charges, and/or special item handling charges specified below.  Charges are based on a one-way trip and are applicable from the point at which the item is accepted to the point to which the item is transported. Where an item is not included in the Baggage Allowance, and not specified as a special item listed below, it will be treated as excess baggage (first bag service charge, second bag service charge or excess bag service charge may apply, as well as applicable oversize and overweight service charges). Special item fees are based on a per item basis. Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for damage to the Sports Equipment/Special Items specified below when carried as Checked Baggage.

NOTE: Flights operating as United Express do not accept certain items listed below.

1)    Archery Equipment - One item of archery equipment (a bow case containing bows, a quiver with arrows, or a maintenance kit of sufficient strength to protect items from damage) will be considered as one item of sporting equipment and allowed in place of one checked bag. United is not liable for damage to archery equipment that is not contained in a hard-sided case.

2)    Baseball Equipment – One bag of baseball equipment will be considered as one item of sporting equipment and will be allowed in place of one checked bag. Baseball bats are not permitted in carry-on baggage.

3)    Bicycles - United accepts non-motorized bicycles with single or double seats (including tandem) or up to two non-motorized bicycles packed in one case as checked baggage. If the bicycle(s) are packed in a container that is over 50.0 pounds/23.0 kilograms, it will be subject to standard overweight charges and first and second bag fees may also apply. If the bicycle(s) are packed in a container that is 50.0 pounds/23.0 kilograms or less, if applicable, the first or second bag service charge applies. Handlebars must be turned sideways and protruding pedals and accessories must be removed, or all loose items must be enclosed in plastic foam or similar protective material, or the bicycle must be enclosed in a sealed box.  United is not liable for damage to bicycles that do not have the handlebars fixed sideways and pedals removed, handlebars and pedals encased in plastic foam or similar material, or bicycles not contained in a cardboard containers or hard-sided cases. If your itinerary includes a United Express flight, please contact United for information regarding aircraft cargo hold. Bicycles will not be accepted during excess baggage embargos.

4)    Boogie/Skim/Speed Boards - One boogie/skim/speed board or one boogie/skim/speed board bag containing up to two boards will be considered as one item of sporting equipment and allowed in place of one checked bag.

5)    Bowling Equipment - One set of bowling equipment consisting of a bowling bag (up to three in one bag), one to three bowling balls, and one pair of shoes will be considered as one item of sporting equipment and allowed in place of one checked bag. Bowling equipment weighing more than 50.0 pounds (23.0 kg) will be subject to overweight baggage charges.

6)    Camping Equipment – Tents, backpacks or knapsacks, and sleeping bags will be accepted as checked baggage. Certain items made of cloth, plastic, vinyl or other easily torn material and those having aluminum frames, outside pockets, straps, buckles and other protruding parts will be accepted as fragile items. UA shall not be liable for fragile items. Lanterns, stoves and heating equipment which use liquid fuel, propane, butane or similar will not be accepted as checked or carry-on baggage in accordance with DOT hazardous materials regulations.

7)    Fencing Equipment – One suitable container or packaging securely encasing fencing equipment will be considered as one item of sporting equipment and allowed in place of one checked bag.  EXCEPTION:  Fencing containers that do not contain only fencing equipment will be subject to Overweight/Oversize Excess Baggage Charges.

8)    Firearms/Shooting Equipment/Stun Guns – One item of shooting equipment per Passenger will be considered as one checked bag only when permitted by governmental regulations, and subject to the conditions below including UA's firearm policy. One item of shooting equipment is defined as: One hard-sided shooting equipment case containing up to five firearms, with or without scopes, and 11 pounds (five kgs.) of ammunition. Firearms carried in addition to this allowance will be assessed at the current excess baggage charge.

a)    International firearm regulations and laws vary by destination and transiting country. Contact appropriate consulates or embassies to obtain specific entry requirements applicable to destination(s). UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such regulations or compliance with such laws, or for the consequences to any Passenger resulting from his/her failure to comply with such regulations or laws.

b)    A Firearm will be accepted only from a customer who is 18 years of age or older.

c)    Curbside check-in of a firearm is not permitted.

d)    Advanced arrangements must be made.

25

e) The firearm, including a hand gun, must be packed in a hard-sided container with a lock. The container must be locked at the time of acceptance by UA and the key or combination must remain in the customer's possession. The locked hard-sided container holding a handgun may be placed inside an unlocked soft-side piece of luggage. Containers may be purchased from UA. United is not liable for damage to a firearm or a hand gun that is not contained in a hard-sided case. EXCEPTION: For travel to/from the United Kingdom, handguns, pistols, rifles, and shotguns must be packed in a hard side rifle case.

f) Baggage containing firearms will not be accepted knowingly for transportation by UA at any point unless a declaration, signed by the Passenger presenting such Baggage and dated on the day the Baggage is accepted for transportation, is attached to the inside of the case declaring that the firearm is not loaded.

g) Properly packaged small arms ammunition up to a maximum of 11 pounds (five kgs.) may be checked as Baggage. The ammunition may be packed in the same container as the firearm or in a separate container. Ammunition must be packed in the manufacturer's original package or securely packed in fiber, wood or metal containers and the ammunition inside the container must be protected against shock and secured against movement. The Passenger shall make a written declaration confirming that the above provisions are met. Ammunition with explosive or incendiary projectiles will not be accepted.

h) Except for military missions (e.g., CRAF), at no time will fully automatic weapons be acceptable as Checked or Carry-on Baggage.

i) When a firearm that is used for sporting purposes is carried on the aircraft, the Passenger must have entry permits for the country/countries of transit and Destination. UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such entry permits, or for the consequences to any Passenger resulting from his/her failure to obtain such entry permits.

  (i) EXCEPTION: This provision may not apply to authorized persons who are performing a duty on board an aircraft, such as a law enforcement officer or diplomatic courier. Such Passenger may be permitted to retain custody of a firearm and ammunition upon identification at the time of check-in. The firearm will be transported in a section of the aircraft that is inaccessible to the customer.

j) Stun Guns- Stun guns with their dry cell batteries removed are accepted in checked baggage only and solely for domestic travel, and when permitted by local, state, and/or governmental laws and regulations, which vary by destination. UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such regulations or compliance with such laws, or for the consequences to any Passenger resulting from his/her failure to comply with such laws or regulations. Tasers are prohibited as either carry-on or checked baggage.

UA, at any time, without notice and for any reason, can suspend the carriage of firearms, shooting equipment, and stun guns.

9) Fishing Equipment - Two rods, one reel, one landing net, one pair of fishing boots and one fishing tackle box (all properly encased) will be considered as one item of sporting equipment and allowed in place of one checked bag. The total of all fishing equipment must weigh 50.0 pounds/23.0 kilograms or less, or overweight charges may apply. Fishing equipment containers must not exceed 115 linear inches or oversized charges may apply. For United Express flights, fishing equipment exceeding 80 linear inches will not be accepted as checked baggage.

10) Golfing Equipment – One standard-sized golf bag containing golf related equipment and personal items will be permitted and accepted as Checked Baggage, subject to the limits set forth in Rule 23(B)(1). Applicable overweight charges based on a customer's baggage allowance will apply. All contents must be properly encased in a suitable container. The golf bag must be covered or enclosed in a heavy, rigid carrying case. UA assumes no liability for damages to items contained in a soft-sided case.

11) Gymnastic Equipment –One item of gymnastic equipment or one suitable container or packaging that securely contains gymnastic equipment will be considered as one item of sporting equipment and allowed in place of one checked bag. EXCEPTION: Gymnastic cases weighing over 50.0 pounds (23.0 kg) that do not contain only gymnastic equipment will be subject to Overweight/Oversize Excess Baggage Charges.

12) Hang Gliding Equipment - Subject to the conditions and charges specified below, individual components of hang-gliding equipment can generally be packed in separate bags for each component. United will accept a maximum of two items per bag for a set of four component bags. Hang gliding equipment must not exceed 99.9 pounds (45.4 kg), and maximum length allowed varies by aircraft type.

a) United will accept hang gliding equipment as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

b) Hang gliding equipment is not accepted as checked baggage on United Express flights, and is not accepted during excess baggage embargoes.

c) Allow an extra 30 minutes at check-in.

13) Hockey/Lacrosse Sticks/Curling Brooms or Brushes – Up to two hockey, curling brooms/brushes, or lacrosse sticks taped together plus one hockey, curling, or lacrosse bag will be considered as one item of sporting equipment and

26

allowed in place of one checked bag. A duffel bag containing hockey, lacrosse, or curling equipment is treated as a normal checked bag. A duffel bag containing hockey equipment is subject to applicable overweight and oversize excess baggage charges. Hockey, curling brooms/brushes, or lacrosse sticks carried in addition to the free baggage allowance will be assessed at current excess baggage charges.

14) Javelins – One hard sided container encasing javelins that are taped together will be considered as one item of sporting equipment, if aircraft size and load conditions permit, and allowed in place of one checked bag. Javelins carried in addition to the free baggage allowance will be assessed at current excess baggage charges.

15) Kiteboards - Subject to the conditions and charges specified below, United will accept one kiteboard or one bag containing kite board equipment as checked baggage. The board must be well padded or the entire board must be encased in a suitable container to avoid scratching.

   a)   United will accept kiteboards as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

   b)   Kiteboards greater than 115 linear inches (292 cm) will not be accepted as checked baggage. Kite boards greater than 80 linear inches (203 cm) will not be accepted as checked baggage on United Express flights. Kiteboards are not allowed during excess baggage embargos (except to Costa Rica).

   c)   Allow an extra 30 minutes at check-in.

16) Oars - One pair of oars or one oar case containing up to two oars will be considered as one item of sporting equipment, if aircraft size and load conditions permit, and allowed in place of one checked item. Oars carried in addition to the free baggage allowance will be assessed at current excess baggage charges.

17) Paintball Equipment - One bag containing equipment used in the paintball sport will be considered as one item of sporting equipment, if aircraft size and load conditions permit, and allowed in place of one checked item. Paintball guns are not permitted as carry-on baggage. A paintball gun may be checked in an unlocked soft or hard sided case. Paintball ammunition must be packed in the manufacturer's original package or securely packed in a container that will protect the paint balls from breakage. Compressed gas cylinders must be empty and have the regulator removed to allow for a visual inspection by a TSA Security Screener. Unopened paintball air canisters in original plastic packaging are sold empty and Passengers do not need to demonstrate that the canisters are empty.

18) Parachutes/Parasails - A sports parachute or parasail will be considered as one items of sporting equipment and allowed in place of one checked item. A parachute or parasail taken onboard the aircraft must meet carry-on size restrictions for placement underneath an aircraft seat. When checked as baggage, all excess, oversize and overweight charges will apply.

19) Pool cues –One pool cue case containing pool cues will be accepted as Checked Baggage.

20) Scuba/Diving Equipment – One suitable dive bag securely containing scuba/diving equipment will be considered as one item of sporting equipment and allowed in place of one checked bag. Dive bags weighing more than 50.0 pounds and/or that are over 62 linear inches will be charged as sporting equipment and special item charges apply. An empty dive tank or up to 3 rebreather tanks will not be included in determining the free baggage allowance and will be subject to a 150 USD/150 CAD service charge (each way) for flights within the U.S., Canada, Puerto Rico and the U.S. Virgin Islands. A 200 USD service charge (each way) applies for all other travel.

   NOTE: The empty dive/rebreather tank must have the regulator valve completely disconnected from the tank. The tank must not be sealed (i.e. the tank has an open end). The tank must have an opening to allow for a visual inspection by a TSA Security Screener. For rebreather equipment, soda lime that is 4% Sodium Hydroxide or less will be accepted in checked baggage. Soda lime that is 4.1% Sodium Hydroxide will not be accepted in checked baggage.

21) Skating Equipment – One pair of ice skates, roller skates, and rollerblades will be considered as one item of sporting equipment and allowed in place of one checked bag. For Domestic Carriage only, ice skates are permitted in carry-on baggage. Skating equipment carried in addition to the baggage allowance will be assessed at the current excess baggage charge. Skating equipment is subject to applicable overweight and oversize excess baggage charges.

22) Surfboards – Subject to the conditions and charges specified below, one surfboard or one surfboard bag containing up to four boards per customer with a maximum weight of 50.0 pounds/23.0 kilograms and maximum length of 115 linear inches (293 cm) will be accepted as Checked Baggage. Oversize fees will apply for any surfboard that is greater than 62 (158 cm) linear inches. The skeg/fin must be removed or well padded. The entire board must be encased in a suitable container to avoid scratching.

   a)   United will accept surfboards as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

   b)   Surfboards or surfboard bags more than 115 linear inches (292 cm) will not be accepted as checked baggage. On United Express flights, surfboards or surfboard bags more than 80 linear inches (203 cm) will not be accepted as checked baggage, and will not be accepted during baggage embargos (except for Costa Rica). If your itinerary includes United Express, please contact United for information regarding aircraft cargo hold limits.

c) Allow an extra 30 minutes at check-in.

23) Tennis Equipment – One tennis racket case containing tennis rackets and balls will be considered as one item of sporting equipment and allowed in place of one checked bag. Tennis equipment must be properly protected or a limited liability form must be signed.

24) Water Skiing/Snow Skiing/Snowboard Equipment/Wakeboards

a) One item of ski equipment (one pair of water skis, one snowboard, one wakeboard, up to two pairs of snow skis and associated equipment in one snowboard bag, or one ski boot) with a weight of 50.0 pounds/23.0 kilograms or less is allowed in place of one checked bag. If more than one set of ski equipment is checked, each additional set of equipment (as outlined above) will be counted as one item, and the associated service charge(s) will apply. Acceptance is subject to aircraft size and load conditions.

b) Ski Bags and ski boot bags weighing more than 50.0 pounds (23.0 kg) that contain other items in addition to or in place of appropriate snow or water skiing equipment or ski boots will be subject to Overweight/Oversize Excess Baggage Charges.

25) Wave Ski - Subject to the conditions and charges specified below, one wave ski or one bag containing equipment used in wave skiing with a weight of 50.0 pounds/23.0 kilograms or less and a maximum length of 115 linear inches (293 cm) will be accepted as Checked Baggage. Oversize fees will apply for any wave ski that is greater than 62 (158 cm) linear inches. The board must well-padded or the entire board must be encased in a suitable container to avoid scratching.

a) United will accept wave skis as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

b) Wave skis greater than 115 linear inches (292 cm) will not be accepted as checked baggage. On United Express flights, wave skis greater than 80 linear inches (203 cm) will not be accepted as checked baggage. Wave skis will be transported subject to load capacities of the aircraft on any itinerary involving a United Express flight. Wave skis will not be accepted during excess baggage embargos.

26) Windsurfing Equipment- Subject to the conditions and charges specified below, windsurfing boards will be accepted as Checked Baggage. For purposes of this provision, one windsurfing board not exceeding 115 linear inches and not exceeding 99.9 pounds (45.3 kg) with one boom, one mast, one sail and necessary hardware will be considered as one item of windsurfing equipment.

a) Windsurfing equipment must be padded and enclosed in suitable packing sufficient to protect from scratches or dents or other damage.

b) United will accept windsurfing equipment as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

c) Windsurfing equipment cannot be accommodated on any itinerary involving a United Express flight, and is not accepted during excess baggage embargos. Additional size or acceptance limitations may apply dependent upon aircraft type and configuration.

d) Allow an extra 30 minutes at check-in.

F) Fragile and Perishable Items –Fragile and perishable items include, but are not limited to, examples in Limitation of Liability, Rule 28 K). Upon request and subject to operational needs or space availability, a fragile or perishable item may be carried in a seat subject to the provisions and applicable charges in D) above. A fragile or perishable item may be accepted as Checked Baggage in accordance with this Rule only if it is packaged appropriately (*e.g.*, in an original, factory-sealed carton, in a cardboard mailing tube, in a container/case designed for shipping such item or packed with protective internal material). Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for loss or damage of contents or delay in delivery which result from the unsuitability of such item(s) as Checked Baggage and/or the inadequacy of its packaging and not from the carrier's failure to exercise the ordinary standard of care. UA is not liable for damage to a customer's Carry-on Baggage or other in-cabin property that contains fragile or perishable items when such damage is caused by the fragile or perishable items. Customers are responsible for all damage caused by their property, whether such damage is to their own property or to someone else's property.

1) Antlers - Subject to the conditions and charges specified below, one set of antlers retained as hunting trophies per ticketed Passenger will be accepted as Checked Baggage, if aircraft size and load conditions permit.

a) Antlers will not be included in determining the Baggage Allowance and will be subject to a service charge of 150 USD/150 CAD per item. For international travel, a 200 USD/200 CAD per item service charge applies.

b) Antlers must be as free of residue as possible.

c) The skull must be wrapped and tips protected.

d) Maximum Outside Linear Dimensions must not exceed 120 inches. However, on United Express Canadair regional jet flights the linear dimensions of the antlers cannot exceed 33 in. x 43 in. (83 cm x 109 cm) and overall linear dimensions must not exceed 98 in. (248 cm).

e) The Passenger must make all arrangements and assume full responsibility for complying with any applicable laws, customs, and/or other governmental regulations, requirements, or restrictions of the county, state or territory to and from which the antlers are being transported.

2) Dry Ice and Other Restricted and Prohibited Articles

a) Any articles deemed a hazardous material pursuant to DOT Hazardous Materials Regulations (49 CFR 171-177), the IATA Dangerous Goods Regulations and revisions and reissues thereof (hereinafter the "Haz-Mat Regulations") will only be accepted subject to advance arrangements and compliance with the Haz-Mat Regulations. (NOTE: Any obligations of UA which may arise under this Rule or Rule 28 are not applicable when undeclared articles deemed hazardous material are discovered in checked baggage and confiscated and/or destroyed.)

b) Limited quantities of dry ice, a maximum of 5.5 pounds (2.5 kilograms) per Passenger, will be accepted for carriage as checked or Carry-on Baggage provided the Baggage is properly designed to permit the release of carbon dioxide, and the container is labeled, "DRY ICE" or "CARBON DIOXIDE SOLID." The packaging must also show the net weight and identify the perishable item being preserved by the dry ice. Each container cannot have more than the maximum allowed per customer. Multiple Passengers cannot pool their portions together, even within the same traveling party.

c) A 150 USD/150 CAD service charge applies to the transportation of dry ice as checked baggage on flights within or between the U.S. and Canada, and a 200 USD service charge applies to the transportation of dry ice as checked baggage on flights to all other destinations.

d) UA may require acceptance of such articles at locations other than the passenger terminal.

e) E-Cigarettes or Personal Vaporizers will not be accepted in Checked Baggage.

f) Hoverboards, smart wheels, and any other self-balancing or self-propelled luggage, vehicles or devices are not accepted as checked or carry-on baggage.

g) Lithium batteries, power banks, and spare batteries are not accepted as checked baggage. These types of batteries must be removed from any checked or carry-on baggage, including baggage checked at the gate. All batteries integrated as a part of the bag themselves (sometimes referred to a smart bags) must also be removed if checked or brought on as carry-on baggage. Any items with non-removeable lithium batteries are not allowed on any United or United Express flights. Cell phones and computers installed with a lithium battery of less than 100 watt hours are permitted in carry-on and checked baggage.

h) The following items are prohibited as checked and carry-on baggage: Avalanche packs; fuel; mace and other self-defense sprays; fireworks, gunpowder, flares, flare guns and holiday poppers; gasoline-powered equipment; bleach, drain cleaners, epoxy, fuel, gel fuel, glue, insecticides, paint, torch lighters, spray starch, strike-anywhere matches and certain aerosols; ready-to-eat meals (MREs); and shock absorbers.

i) Any items prohibited by the TSA.

j) Illegal drugs, marijuana, and any cannabis infused products, such as Cannabidiol (CBD) oil are prohibited in Checked or carry-on Baggage.

k) Commercial products are prohibited in Checked or carry-on Baggage. Such prohibited commercial products include: Automotive parts; major appliances (e.g., refrigerators, dish washers, washing machines, dryers, and televisions); bulk quantities of clothing; bulk quantities of food; and anything else determined to be a commercial product in UA's sole discretion. Commercial products may be carried as airfreight only and subject to applicable freight rates and availability.

3) Liquor - Subject to the conditions below, alcoholic beverages in retail packaging may be checked as baggage.

a) For alcoholic beverages less than 24 percent alcohol by volume (including most wines and beers) there are no restrictions on the amount that may be accepted in checked baggage or purchased after completing security screening at the checkpoint (Duty Free). If traveling internationally, alcoholic beverages may be subject to customs limits in the arrival country.

b) For alcoholic beverages between 24 and 70 percent alcohol by volume there is a limit of 5 liters (1.3 gallons) per customer that may be accepted in checked baggage, or that may be purchased after completing security screening at the checkpoint (Duty Free). Packaging must be in receptacles smaller than 5 liters. Alcoholic beverages more than 70 percent alcohol by volume will not be accepted.

c) All alcoholic beverages must be packed to prevent leakage and damage to other bags. UA shall not be liable for breakage or spillage of alcoholic beverages. Normal checked baggage allowance limits, excess charges and carry-on limits apply.

d) Up to 3 oz. (100ml) of an alcoholic beverage may be taken through the security checkpoint provided it is less than 70 percent alcohol by volume, in a container that is 3 oz. or smaller, and is carried in a plastic zip-top bag.

e) Alcohol transported on an airplane cannot be consumed on board

29

4) Musical Instruments - Musical instruments may be carried as Checked Baggage or as Cabin Baggage subject to the provisions in D) above. As part of a Passenger's one carry-on plus one personal item allowance and subject to UA's Carry-on Baggage conditions specified in Section B 2) a) and b) above, a small musical instrument such as a violin or a guitar can be carried in lieu of a carry-on bag if the instrument can be stowed safely in an overhead bin or under the Passenger's seat and there is space for its stowage at the time the Passenger boards. If the musical instrument appears too large or irregularly shaped to fit under the seat or in the overhead compartment, or, if at the time the customer boards the aircraft, there is no space to stow it, it will not be accepted for in cabin stowage and will be checked to the Passenger's final destination and subject to the applicable checked-baggage and gate-checked handling charges. In the case of Basic Economy passengers, a small musical instrument may be carried on in addition to a personal item if it can be stowed safely in an overhead bin or under the Passenger's seat and there is space for its stowage at the time the Passenger boards. A larger musical instrument brought to the gate as a carry-on by a Basic Economy passenger and any instrument that cannot fit under the Passenger's seat or in open overhead bin space available at the time the Basic Economy passenger boards will be checked to the Passenger's final destination and subject to the applicable checked-baggage and gate-checked handling charges. All musical instruments, whether carry-on or checked, should be in a hard sided case, and stringed instruments should have the strings loosened to protect the neck from damage due to expansion and contraction which result from temperature variations. Checked instruments cannot exceed 165 pounds and 150 linear inches (or the applicable weight/size restriction for the aircraft) and will be included in determining the Baggage Allowance, and when in excess (over 2 checked items), overweight or oversize (115 linear inches is considered oversized, and over 50.0 pounds (23.0 kg) is considered overweight), will be subject to the Excess, Oversize, and Overweight Baggage Charge. Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for damage to musical instruments or musical instrument cases.

5) Seafood - Seafood will be accepted and included in determining the Checked Baggage Allowance only if it is wrapped in a sealed protective material and packed in a leak-proof container. Seafood is subject to applicable excess, overweight and/or oversize charges. UA is not liable for seafood. Seafood will not be accepted if packed in wet ice or in a Styrofoam container.

6) UA will not accept wet ice or items containing wet ice as Checked or Carry-on Baggage.

7) UA will not accept perishable items packed in Styrofoam containers.

8) For travel to, from or within Micronesia, perishable items will only be accepted for transportation if within the Checked Baggage Allowance.

9) ZAM ZAM Water - Subject to the conditions below, one container or jerkin containing up to 10 liters (2.64 gallons) of ZAMZAM water will be accepted as checked baggage by UA at no extra charge in addition to the Baggage Allowance.

   a) Containers or Jerkins containing ZAMZAM water must be properly packed in a plastic covering to prevent leakage and damage to other bags. UA is not liable for breakage or spillage of ZAMZAM water and/or containers.

   b) ZAMZAM containers or jerkins are not permitted as Carry-on or Cabin Baggage.

   c) Jerkins or ZAMZAM water containers in excess of one will be subject to excess baggage charges.

G) Other Checked Baggage Items - The items listed below will be accepted as Baggage by UA in accordance with the following specified provisions.

1) Government approved child/infant seat - A government approved child/infant seat that conforms to all applicable Federal Motor Vehicle standards and approved in accordance with US FAR 121.311, including car seats approved for airline travel, will be accepted in addition to a Passenger's baggage allowance. When checked as baggage, all oversize and overweight charges will apply. First and second bag charges do not apply. A government approved child/infant seat for use in the Passenger compartment is permitted only when an additional seat is reserved for the Infant, a Ticket is purchased, and the seat can be secured properly by a seat belt. The accompanying Adult Passenger is responsible for ensuring that the seat functions correctly, that the Infant does not exceed the seat's limitations, that the Infant is properly secured in the seat and that the seat is secured to the aircraft seat. UA is not liable for damage to child/infant seats when carried or brought onboard as anything other than Checked Baggage.

2) U.S. Military Baggage Allowance - Active U.S. military and their accompanying dependents on personal travel are allowed three (3) bags up to 70 pounds each with a maximum dimension of 62 linear inches without excess or overweight charges being assessed. Active U.S. military personnel on orders and active U.S. military personnel and their dependents (whether accompanying or non-accompanying) on orders for relocation are allowed five (5) bags up to 100 pounds each in United Economy, United Business, United Polaris business class, United First and United Polaris first class with a maximum dimension of 115 linear inches without excess, overweight or oversize charges being assessed. Non-accompanying dependents on travel not related to an order for relocation are not entitled to this additional baggage allowance.

30

3) Strollers and Folding Wagons– United accepts one collapsible stroller, one compact folding stroller, *or* one folding wagon in addition to a Passenger's baggage allowance. One non-collapsible stroller may be carried as Checked Baggage in lieu of one piece of Baggage (62 inches Maximum Outside Linear Dimensions). This item will be included in determining the Baggage Allowance, and when in excess, overweight or oversize, such item will be subject to the Excess Baggage Charge. Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for damage to strollers or folding wagons when carried as Checked Baggage.

4) Wheelchairs – Up to two wheelchairs per Passenger will be accepted as Baggage by UA at no extra charge in addition to the Baggage Allowance. Excess and/or Oversize/Overweight baggage charges pursuant to Rule 23 C) may apply for checking in additional wheelchair(s) that are used for recreational purposes.

    a) In-cabin stowage of a wheelchair shall be in accordance with 14 CFR, Part 382, Subpart I.

    b) If no in-cabin storage space is available, the wheelchair will be carried in the cargo compartment of the aircraft.

    c) All types of wheelchairs will be accepted (collapsible, noncollapsible or powered wheelchairs with wet cell, dry cell or lithium batteries).

    d) For battery powered wheelchairs:

        (i) Passenger must check in at least one hour before the check-in time for the general public for Domestic U.S. flights and for International flights as set forth in Rules 5 D) and 5 E).

        (ii) The battery must be disconnected and/or wheelchairs with dry cell/lithium batteries must be secured to prevent accidental activation.

        (iii) Wheelchairs containing lithium ion batteries will be accepted as checked baggage provided the battery is securely attached to the wheelchair, and has a means to prevent unintentional activation or short circuiting.

        (iv) Lithium ion batteries for collapsible wheelchairs must be removed and carried in carry-on baggage only. A maximum of one spare battery not exceeding 300 WH or two spare batteries not exceeding 160 WH must be carried in carry-on baggage only.

H) Animals Other than Service Animals (For rules applicable to these animals, see Rule 16) - The transportation of live animals (other than Service Animals) in the cabin of the aircraft is subject to the provisions of this Rule. UA will accept domesticated cats and dogs for transportation as in-cabin Baggage for domestic carriage and travel between U.S.A./Canada and Mexico, the Caribbean, Central and South America. (Exception: In-cabin pets will not be accepted for travel to/from Australia, Barbados, Brazil, Cuba, Guam, French Polynesia, Guyana, Hawaii, Hong Kong, Iceland, Ireland, Jamaica, Marshall Islands, Federated States of Micronesia, New Zealand, Northern Mariana Islands, Norway, Palau, Philippines, Saint Kitts and Nevis, South Africa, Sweden, Trinidad and Tobago, United Arab Emirates, and United Kingdom). Certain unusual animals/reptiles pose unavoidable safety and/or public health concerns and UA will not accept dogs of certain breeds, Snakes, other reptiles, ferrets, lagomorphs (i.e., rabbits and hares), rodents and spiders as in-cabin baggage. Carriage of any other pets as in-cabin Baggage will be at UA's discretion.

1) General Conditions of Acceptance

    a) Advance arrangements must be made. Space must be reserved for animals in the passenger cabin. Animals without reserved space will be accepted, if space is available, only after the animals for whom space has been reserved have been accommodated.

    b) The animal must be harmless, inoffensive, odorless and require no attention during transit.

    c) The animal must be confined in a cage or container subject to inspection and approval by UA before acceptance and must meet the department of agriculture requirements prior to acceptance.

    d) The container must be stored and remain under the seat directly in front of the Passenger at all times, and the animal must remain in the container at all times. The passenger will not be permitted in a row immediately behind a bulkhead, or adjacent to an emergency exit. In the event the animal becomes offensive or causes a disturbance during transit, the animal may be removed, at the Captain's discretion, at the first stop and placed on an alternative carrier at the Passenger's expense.

    e) The Passenger must make all arrangements and assumes full responsibility for complying with any applicable laws, customs, and/or other governmental regulations, requirements, or restrictions of the country, state or territory to and from which the animal is being transported, including furnishing valid health and rabies vaccination certificate when required. UA will not be liable for loss or expense due to the passenger's failure to comply with this provision, and UA will not be responsible if any pet is refused passage into or through any country, state, or territory.

    f) UA will accept no more than one in-cabin pet container per Ticketed Passenger. UA may refuse to accept any pet if, in its sole discretion, it is not properly or safely confined in a container approved by UA.

    g) There may be only one small cat or dog per container, and the animal must be able to stay comfortably, a determination made in UA's sole discretion, in the container under the seat for the entirety of the flight.

    h)    UA will not transport an animal as in-cabin Baggage if the animal is in the custody of an Unaccompanied Minor age five (5) to fourteen (14) years old.

    i)    The total number of Passengers carrying pet and the total number of in-cabin pets permitted on a single flight is limited by aircraft type and cabin.

    j)    UA reserves the right to refuse carriage of animals in cabin at any time.

NOTE: Animals will not be accepted for carriage on some United Express flights.

2)   Pet Containers

    a)    Containers must be leak-proof and subject to inspection and approval by UA prior to acceptance. UA may refuse to accept any animal if, in its sole discretion, the animal is not properly confined in a container approved by UA.

    b)    Containers must be made of metal, wood, polyethylene, fiberglass or composite material of similar strength.

    c)    Containers must be ventilated on at least two sides and prevent any part of the animal from protruding outside of the container.

    d)    Containers made totally of wire are not accepted.

    e)    Approved soft side carriers specifically designed as pet carriers are acceptable.

    f)    In-cabin animal containers must not exceed 17.5 inches in length by 12 inches in width by 9 inches in height for hard sided containers and 18 inches in length by 11 inches in width by 11 inches in height for soft sided containers, except for on Boeing 737 MAX aircraft, where the maximum height for both a soft and a hard-sided carrier is 10 inches.

    g)    Containers in such condition as to allow possible escape by an animal will not be accepted for transportation.

    h)    Passengers are responsible for ensuring that the containers and their animals' travel meet all governmental requirements for the safe and humane transportation of the animal being transported, including, but not limited to being the correct size, and ensuring that the animal is small enough to stay comfortably in the container at all times under the Passenger's seat and for the entirety of the flight.

    i)    Containers for transporting dogs and cats may be purchased from UA.

3)   Carriage of Animals - (including their containers) is subject to the applicable service charge of a 150 USD/ 150 CAD each way (300 USD/300 CAD for round-trip travel).

4)   Abandonment of Animals - An animal that is unclaimed by its owner or its owner's agent for a period of more than three (3) days after the scheduled carriage has occurred or was to occur, shall be deemed abandoned and UA will make reasonable efforts to return the animal to the owner or the owner's agent designated for that purpose. If the owner or the owner's agent cannot (or refuses to) be located after a period of three days, then the animal may be turned over to a local animal shelter or pound or otherwise handled as UA may deem proper without any liability to UA. Any costs associated with: (1) returning the animal deemed abandoned to the owner or the owner's agent or (2) caring, feeding, or transporting the abandoned animal, among other things, shall be borne solely by the owner or owner's agent.

5)   Limitation of Exclusion from Liability

    a)    UA will not be liable for illness or injury to an animal or death of an animal.

    b)    UA will not be liable for loss or expense due to the Passenger's failure to comply with the provisions of this Rule, including, without limitation, if any animal is refused passage into or through any state or country.

I)   Interline Baggage Acceptance

1)   Applicability-Rule 23 I) solely applies to interline itineraries on a Single Ticket whose origin or ultimate ticketed destination is in Canada. For definitional understanding of the terms used in this Rule, see Rule 1 for clarification.

2)   Baggage Rules Determination

    a)    Checked Baggage: When UA is the Selecting Carrier it will select and apply its own checked baggage rules found in Rule 23 throughout the Passenger's Interline Itinerary. When a Passenger makes a voluntary change to his or her itinerary, the checked baggage rules of the new Selected Carrier apply. The Selected Carrier's checked baggage service charges apply at any point where bags are checked, including stopovers. See Rule 23 B) 1) above for UA's Baggage Rules concerning special status, Rule 23 C) 7) regarding embargoes that may affect interline travel, and Rules 23 D), E), F), G) and H) regarding the transportation of special items.

    b)    Carry-On Baggage: Each Operating Carrier's carry-on baggage allowances and policies will apply to each flight segment in an Interline Itinerary, other than carry-on baggage charges, which are governed by the Selected Carrier's baggage rules. See Rule 23 B) above for UA's Carry-On Baggage allowances and policies.

    c)    Where UA is a Participating Carrier or is not the Selected Carrier on an interline itinerary but is an Interlining Carrier that is providing transportation to the passenger based on ticket issued, UA will apply the Selected Carrier's baggage rules throughout the Interline Itinerary.

3) Disclosure of Baggage Rules-For baggage rules provisions related to a passenger's first and second checked bag and the passenger's carry-on baggage (i.e., the passenger's "standard" baggage allowance), when UA sells and issues a ticket for an interline itinerary, it will disclose to the passenger on a summary page at the end of an online purchase and/or on the passenger's e-ticket receipt at the time of ticketing, the baggage information relevant to the passenger's itinerary and the applicable baggage rules of the Selected Carrier.

**RULE 24   FLIGHT DELAYS/CANCELLATIONS/AIRCRAFT CHANGES**

A) General

1) U.S.A. Origin Flights - Where the UA flights originate in the U.S.A., the provisions of this Rule apply to a Passenger who has a Ticket and a confirmed reservation on a flight that incurs a Schedule Change, Force Majeure Event or Irregular Operations.

2) Non-U.S.A. Origin Flights - Where the UA flight originates outside the U.S.A., the following provisions apply to a Passenger who has a Ticket and a confirmed reservation on a flight:

a) If local or international laws regulate a Schedule Change, Force Majeure or Irregular Operations, then the procedures in Rule 24 will not be applied.

b) If no local law otherwise regulates a Schedule Change, Force Majeure or Irregular Operations, then the procedures in Rule 24 will be applied.

3) Schedules are Subject To Change Without Notice - Times shown on tickets, timetables, published schedules or elsewhere, and aircraft type and similar details reflected on tickets or UA's schedule are not guaranteed and form no part of this contract.  UA may substitute alternate carriers or aircraft, delay or cancel flights, and alter or omit stopping places or connections shown on the ticket at any time. UA will promptly provide Passengers the best available information regarding known delays, cancellations, misconnections and diversions, but UA is not liable for any misstatements or other errors or omissions in connection with providing such information.  No employee, agent or representative of UA can bind UA legally by reason of any statements relating to flight status or other information. Except to the extent provided in this Rule, UA shall not be liable for failing to operate any flight according to schedule, or for any change in flight schedule, with or without notice to the passenger.

B) Definitions - For the purpose of this Rule, the following terms have the meanings below:

1) Schedule Change – an advance change in UA's schedule (including a change in operating carrier or itinerary) that is not a unique event such as Irregular Operations or Force Majeure Event as defined below.

2) Connecting Point – a point to which a Passenger holds or held confirmed space on a flight of one carrier and out of which the Passenger holds or held confirmed space on a flight of the same or another carrier.  All airports through which a city is served by any carrier will be deemed to be a single Connecting Point when the receiving carrier has confirmed reservations to the Delivering Carrier.

3) Delivering Carrier – a carrier on whose flight a Passenger holds or held confirmed space to a Connecting Point.

4) Force Majeure Event – any of the following situations:

a) Any condition beyond UA's control including, but not limited to, meteorological or geological conditions, acts of God, riots, terrorist activities, civil commotions, embargoes, wars, hostilities, disturbances, or unsettled international conditions, either actual, anticipated, threatened or reported, or any delay, demand, circumstances, or requirement due directly or indirectly to such condition;

b) Any strike, work stoppage, slowdown, lockout, or any other labor-related dispute involving or affecting UA's services;

c) Any governmental regulation, demand or requirement;

d) Any shortage of labor, fuel, or facilities of UA or others;

e) Damage to UA's Aircraft or equipment caused by another party;

f) Any emergency situation requiring immediate care or protection for a person or property; or

g) Any event not reasonably foreseen, anticipated or predicted by UA.

5) Misconnection – occurs at a Connecting Point when a Passenger holding confirmed space on an Original Receiving Carrier is unable to use such confirmed space because the Delivering Carrier was unable to deliver him/her to the Connecting Point in time to connect with the Original Receiving Carrier's flight.
NOTE: The same rules regarding Delivering and Original Receiving Carrier responsibilities apply at the subsequent point(s) of Misconnection as would apply at the point of original Misconnection.

6) Original Receiving Carrier(s) – a carrier or combination of connecting carriers on whose flight(s) a Passenger originally held or holds confirmed space from a Connecting Point to a destination, next Stopover or Connecting Point.

7) Irregular Operations – any of the following irregularities:

    a)    Delay in scheduled departure or arrival of a carrier's flight resulting in a Misconnection;

    b)    Flight or service cancellation, omission of a scheduled stop, or any other delay or interruption in the scheduled operation of a carrier's flight;

    c)    Substitution of aircraft type that provides different classes of service or different seat configurations;

    d)    Schedule changes which require Rerouting of Passengers at departure time of the original flight; or

    e)    Cancellation of a reservation by UA pursuant to Rule 5.

EXCEPTION: UA shall have no obligation to honor another carrier's ticket that does not reflect a confirmed reservation on UA, unless the issuing carrier reissues the ticket for any changes in routing. In the event such carrier is not available to do so, UA reserves the right to reroute passengers only over its own lines between the points named on the original ticket.

C)    Schedule Change - When a Passenger's Ticketed flight is affected because of a Schedule Change, UA will, at its election, arrange one of the following:

    4)    Transport the Passenger on its closest available flight to the Destination, next Stopover point, or transfer point shown on its portion of the Ticket, without Stopover in the same class of service (subject to availability), at no additional cost to the Passenger; provided that if UA determines that such alternate transportation results in a significant change and the Passenger chooses not to accept such alternate transportation, United will  provide a refund;

    5)    When a Schedule Change results in the cancellation of all UA service between two cities, at UA's sole discretion, UA may reroute Passengers over the lines of one or more carriers in an equivalent class of service; provided that if UA determines that such alternate transportation results in a significant change and the Passenger chooses not to accept such alternate transportation, United will provide a refund;

    6)    Unless the Schedule Change results in a significant change as determined by UA, advise the Passenger that the value of his or her Ticket may be applied toward future travel on United within one year from the date of issue without a change or reissue fee; or

    7)    Unless the Schedule Change results in a significant change as determined by UA, and if the Passenger is not offered transportation as provided in C) 1) or 2) above and does not choose to apply the value of his or her Ticket toward future travel as provided in C) 3) above, the Passenger will be eligible for a refund upon request.  See Rule 27 A).

D)    Force Majeure Event - In the event of a Force Majeure Event, UA without notice, may cancel, terminate, divert, postpone, or delay any flight, right of carriage or reservations (whether or not confirmed) and determine if any departure or landing should be made, without any liability on the part of UA.  UA may re-accommodate Passengers on another available UA flight or on another carrier or combination of carriers, or via ground transportation, or may refund, in its sole discretion, any unused portions of the Ticket in the form of a travel certificate or travel credit.

E)    Irregular Operations

    1)    Liability - Except to the extent provided in this Rule and the Warsaw and/or Montreal Conventions, UA shall not be liable for any Irregular Operations.

    2)    Delay, Misconnection or Cancellation

        a)    When a Passenger's ticket is affected because of Irregular Operations caused by UA, UA will take the following measures:

            (i)    Transport the Passenger on its own flights, subject to availability, to the Destination, next Stopover point, or transfer point shown on its portion of the Ticket, without Stopover in the same class of service, at no additional cost to the Passenger; or

            (ii)    At its sole discretion, UA may arrange for the passenger to travel on another carrier. United may also, at its sole discretion, and if acceptable to the passenger, arrange for the passenger to travel via ground transportation.

        b)    In the event a Passenger misses an onward connecting flight on which space is reserved because the Delivering Carrier did not operate its flight due to Irregular Operations or a Schedule Change, the Delivering Carrier is responsible to arrange for carriage of the Passenger or to make a refund.

    3)    If a Passenger is not transported as provided in E) 2) above and if the Irregular Operation(s) results in a significant change as determined by UA, the Passenger will be eligible for a refund.  Otherwise, a Passenger must make a request for a refund. See Rule 27 A).

    4)    If space is only available and used on a UA flight(s) of a lower class of service than originally purchased by the passenger, UA will provide a refund of the difference in fare pursuant to Rule 27 C) 5).

F)    Amenities for Delayed Passengers

    1)    Lodging - UA will provide at its option either one night's lodging, or, if no lodging is provided and upon the passenger's request only, reimbursement for one night's lodging in the form of an electronic travel certificate that

may be applied to future travel on UA up to a maximum amount determined by UA when a UA flight on which a Passenger is being transported incurs Irregular Operations and the Passenger incurs a delay that is expected to exceed four hours between the hours of 10:00 p.m. to 6:00 a.m. local time. Where lodging has been offered but not accepted by a Passenger for whatever reason, UA is not liable to reimburse the Passenger for expenses relating to alternative lodging secured independently by the Passenger.

EXCEPTION: Lodging will not be furnished:

a)  To a Passenger whose trip is interrupted at a city which is his/her permanent domicile, origin point, or stopover point, or

b)  When the destination city airport that is designated on the Passenger's Ticket and the city airport that the Passenger is diverted to are both within the following city groups:

  (i)    Baltimore, MD (BWI)/Washington D.C. Dulles IAD)/Washington D.C. National (DCA)

  (ii)   Brownsville, TX (BRO/Harlingen, TX (HRL)/McAllen, TX (MFE)

  (iii)  Burbank, CA (BUR)/Los Angeles, CA (LAX)/Ontario, CA (ONT)/Orange County, CA (SNA)/Long Beach, CA (LGB)

  (iv)   Chicago, IL O'Hare (ORD)/Chicago, IL Midway (MDW)/Milwaukee, WI (MKE)

  (v)    Colorado Springs, CO (COS)/Denver, CO (DEN)

  (vi)   Dallas, TX Dallas-Ft. Worth International (DFW)/Dallas, TX Love Field (DAL)

  (vii)  Ft. Lauderdale, FL (FLL)/Miami, FL (MIA)/West Palm Beach, FL (PBI)

  (viii) Houston, TX Bush Intercontinental (IAH)/Houston, TX Ellington AFB (EFD)/Houston, TX Hobby(HOU)

  (ix)   Oakland, CA (OAK)/San Francisco, CA (SFO)/San Jose, CA (SJC)

  (x)    Newark, NJ Newark International (EWR)/New York, NY La Guardia (LGA)/New York, NY Kennedy (JFK)/White Plains, NY (HPN)

  (xi)   London, UK Gatwick (LGW)/London, UK Heathrow (LHR)

c)  When such interruption is due to circumstances outside UA's control.

2)  Snacks and Meals - UA will provide snacks and/or food and beverage vouchers in the event of an extensive delay caused by UA. Where food and beverage vouchers have been offered but not accepted by a Passenger for whatever reason, UA is not liable to reimburse the Passenger for expenses relating to food and beverage secured independently by the Passenger.

3)  Ground Transportation - When lodging is furnished in accordance with 1) above and ground transportation is not furnished by the hotel, UA will provide ground transportation to the place of lodging via public conveyance. Rule 17 also governs any provision of ground transportation to a place of lodging. Where ground transportation has been offered but not accepted by a Passenger for whatever reason, UA is not liable to reimburse the Passenger for expenses relating to alternative ground transportation secured by the Passenger.

4)  The sole and exclusive remedy for a passenger who has a claim under this Rule shall be the express amenities provided in this Rule. The passenger shall have no other claims or law or equity for actual, compensatory, or punitive damages. The provision of services in addition to those specifically set forth in this Rule to all or some passengers shall not be construed as a waiver of UA's rights or an expansion of its obligations. Neither shall any delay on the part of UA in exercising or enforcing its rights under this Rule be construed as a waiver of such rights.

G)  Carrier in Default - Notwithstanding the provisions of this Rule, UA will not accept for any purposes passenger tickets or related transportation documents issued by any carrier that is in substantial default of its Interline obligations or that voluntarily or involuntarily has become the subject of bankruptcy proceedings (the "Defaulting Carrier"). EXCEPTION: Notwithstanding the provisions of this paragraph, tickets issued by the Defaulting Carrier or its sales agent prior to the default will be accepted solely for transportation over the lines of UA provided such tickets were issued by such Defaulting Carrier in its capacity as agent for UA and specified transportation via UA. When tickets are accepted, no adjustments in fare will be made that would require UA to refund money to the passenger.

H)  In the event of a strike or work stoppage which causes any cancellation or suspension of operations of any other carrier, the provisions of this Rule will not apply with respect to passengers holding tickets for transportation on that carrier.

I)  "Class of service" in this Contract of Carriage refers to classes of service as determined by UA without regard to the specific level of ancillary services or amenities provided in that class of service (as compared to any originally scheduled flight). Any ancillary service or amenity, including but not limited to live television, wi-fi services, priority boarding, advance seat assignments, and meal service, are not guaranteed. Regardless of whether there is a Schedule Change, Irregular Operations, Force Majeure Event, or other change or circumstance that results in an ancillary service or amenity not being available on any flight, UA shall have no liability for, and shall owe no refund with respect to any failure to provide that amenity or ancillary service. EXCEPTION: If a Passenger has paid for a specific ancillary service or amenity

35

in advance of the flight as a separate fee specifically designated for such ancillary service or amenity and that ancillary service or amenity is not provided, the Passenger is eligible for a refund of the amount paid if a refund request is made within 90 days of the date the fee was originally paid or the flight date, whichever is later. UA is not liable to refund this fee otherwise eligible for refund if the request is received after that time.

**RULE 25   DENIED BOARDING COMPENSATION**

A)   Denied Boarding (U.S.A./Canadian Flight Origin) - When there is an Oversold UA flight that originates in the U.S.A. or Canada, the following provisions apply:

   1)   Request for Volunteers

      a)   UA will request Passengers who are willing to relinquish their confirmed reserved space in exchange for compensation in an amount determined by UA (including but not limited to check or an electronic travel certificate). The travel certificate will be valid only for travel on UA or designated Codeshare partners for one year from the date of issue and will have no refund value. If a Passenger is asked to volunteer, UA will not later deny boarding to that Passenger involuntarily unless that Passenger was informed at the time he was asked to volunteer that there was a possibility of being denied boarding involuntarily and of the amount of compensation to which he/she would have been entitled in that event.  The request for volunteers and the selection of such person to be denied space will be in a manner determined solely by UA.

   2)   Boarding Priorities - If a flight is Oversold, no one may be denied boarding against his/her will until UA or other carrier personnel first ask for volunteers who will give up their reservations willingly in exchange for compensation as determined by UA.  If there are not enough volunteers, other Passengers may be denied boarding involuntarily in accordance with UA's boarding priority:

      a)   Passengers who are Qualified Individuals with Disabilities and their Service Animal or travel assistant, unaccompanied minors under the age of 18 years, or minors between the ages of 5 to 14 years who use the unaccompanied minor service, and for Canada departures only, families traveling together, will be the last to be involuntarily denied boarding if it is determined by UA that such denial would constitute a hardship.

      b)   The priority of all other confirmed passengers may be determined based on a passenger's fare class, itinerary, status of frequent flyer program membership, whether the passenger purchased the ticket under select UA corporate travel agreements, and the time in which the passenger presents him/herself for check-in without advanced seat assignment.

   3)   Transportation for Passengers Denied Boarding - When UA is unable to provide previously confirmed space due to an Oversold flight, UA will provide transportation to such Passengers who have been denied boarding whether voluntarily or involuntarily in accordance with the provisions below.

      a)   UA will transport the Passenger on its own flight to the Destination without Stopover on its next flight on which space is available at no additional cost to the Passenger, regardless of class of service.

      b)   If space is available on another Carrier's flight regardless of class of service, such flights may be used upon United's sole discretion and the Passenger's request at no additional cost to the Passenger only if such flight provides an earlier arrival than the UA flight offered in 3) a) above.

   4)   Compensation for Passengers Denied Boarding Involuntarily

      a)   For passengers traveling in interstate transportation between points within the United States, subject to the exceptions in section d) below, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight at the rate of 200% of the fare to the Passenger's first Stopover or, if none, Destination, with a maximum of 1,075 USD if UA offers Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's Destination or first Stopover more than one hour but less than two hours after the planned arrival time of the Passenger's original flight. If UA offers Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's Destination or first Stopover more than two hours after the planned arrival time of the Passenger's original flight, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight at the rate of 400% of the fare to the Passenger's first Stopover or, if none, Destination with a maximum of 2,150 USD.

      b)   For passengers traveling from the United States to a foreign point, subject to the exceptions in section d) below, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight originating at a U.S. airport at the rate of 200% of the fare to the Passenger's first Stopover or, if none, Destination, with a maximum of 1,075 USD if UA offers Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's Destination or first Stopover more than one hour but less than four hours after the planned arrival time of the Passenger's original flight. If UA offers Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's Destination or first Stopover more than four hours after the planned arrival time of the Passenger's original flight, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight at the rate of 400% of the fare to the Passenger's first Stopover or, if none, Destination with a maximum of 2,150 USD.

    c)    For passengers traveling from Canada to a foreign point, subject to the exceptions in section d) below, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight originating at a Canadian airport as follows: 900 CAD if the passenger reaches his final destination within six hours of the time stated on the original ticket; 1800 CAD if the passenger reaches his final destination between six and nine hours of the time stated on the original ticket; and 2400 CAD if the passenger reaches his final destination more than nine hours after the time stated on the original ticket.

    d)    EXCEPTIONS:  A Passenger denied boarding involuntarily from an Oversold Flight shall not be eligible for denied boarding compensation if:

        (i)    The flight is cancelled;

        (ii)    The Passenger holding a Ticket for confirmed reserved space does not comply fully with the requirements in this Contract of Carriage Requirements regarding ticketing, check-in, reconfirmation procedures, and acceptance for transportation;

        (iii)    The flight for which the Passenger holds confirmed reserved space is unable to accommodate the Passenger because of substitution of equipment of lesser capacity when required by operational or safety reasons or, on an aircraft with a designed passenger capacity of 60 or fewer seats, the flight for which the passenger holds confirmed reserved space is unable to accommodate that passenger due to weight/balance restrictions when required by operational or safety reasons;

        (iv)    The Passenger is offered accommodations or is seated in a section of the aircraft other than that specified on his/her ticket at no extra charge.  Provided, if a Passenger is seated in a section for which a lower fare applies, the Passenger will be entitled to a refund applicable to the difference in fares;

        (v)    The Passenger is accommodated on Alternate Transportation at no extra cost, which at the time such arrangements are made, is planned to arrive at the airport of the Passenger's next Stopover, (if any), or at the Destination, not later than 60 minutes after the planned arrival time of the flight on which the Passenger held confirmed reserved space;

        (vi)    The Passenger is an employee of UA or of another Carrier or other person traveling without a confirmed reserved space; or

        (vii)    The Passenger does not present him/herself at the loading gate for boarding at least 15 minutes prior to scheduled domestic departures, and 30 minutes prior to scheduled international departures. See Rule 5 D) for additional information regarding boarding cut-off times.

5)    Payment Time and Form for Passengers Traveling Between Points within the United States or from the United States to a Foreign Point

    a)    Compensation in the form of check will be made by UA on the day and at the place where the failure to provide confirmed reserved space occurs, and if accepted by the Passenger, the Passenger will provide a signed receipt to UA.  However, when UA has arranged, for the Passenger's convenience, Alternate Transportation that departs before the compensation to the Passenger under this provision can be prepared and given to the Passenger, the compensation shall be sent by mail or other means to the Passenger within 24 hours thereafter.

    b)    UA may offer free or reduced rate air transportation in lieu of a check payment due under this Rule,  if the value of the transportation credit offered is equal to or greater than the monetary compensation otherwise due and UA informs the Passenger of the amount and that the Passenger may decline the transportation benefit and receive the monetary compensation.

6)    Payment Time and Form for Passengers departing Canada

    a) Compensation will be issued no later than either before the next scheduled departure time for the Passenger or within 48 hours after the Passenger has been denied boarding.

    b) Compensation may be paid in form of cash, prepaid card, EFT, bank check or, with the Passenger's written agreement, a travel voucher.

7)    Limitation of Liability - If UA's offer of compensation pursuant to the above provisions is accepted by the Passenger, such payment will constitute full compensation for all actual or anticipatory damages incurred or to be incurred by the Passenger as a result of UA's failure to provide the Passenger with confirmed reserved space.  If UA's offer of compensation pursuant to the above provisions is not accepted, UA's liability is limited to actual damages proved not to exceed 1350 USD per Ticketed Passenger as a result of UA's failure to provide the Passenger with confirmed reserved space.  Passenger will be responsible for providing documentation of all actual damages claimed.  UA shall not be liable for any punitive, consequential or special damages arising out of or in connection with UA's failure to provide the Passenger with confirmed reserved space.

B)    Denied Boarding Non-U.S.A./Canada Flight Origin - Where there is an Oversold UA flight that originates outside the U.S.A. or Canada, no compensation will be provided except where required by local or international laws regulating Oversold flights.

**RULE 26   REROUTING**

A)   Rerouting Eligibility - Unless the fare purchased otherwise indicates, UA will reroute a Passenger at the Passenger's request and upon presentation of the Ticket or portion thereof then held by the Passenger plus payment of any applicable fees, charges, and fare differentials.

B)   Fare Applicable to Rerouting or Change in Destination

1)   Passengers may change the routing and/or the ultimate destination designated on his/her Ticket in accordance with paragraph 2 below provided that, after transportation has commenced, a one-way Ticket will not be converted into a Round-Trip, Circle-Trip, or Open-Jaw Trip Ticket.

2)   Except as otherwise provided in Rule 25, the fare and charges applicable to any changes in itinerary, class of service, or change in ultimate destination made at the Passenger's request at an office of UA prior to arrival at the ultimate destination named on the original Ticket, shall be the fare and charges in effect on the date when the revised routing and/or ultimate destination is entered on the Passenger's new Ticket.  Any difference between the fare and charges so applicable to the original Ticket issued to the Passenger will be either collected from or refunded to the Passenger, as the case may be.  Basic Economy tickets, even if unused, have no residual value and cannot be applied towards the purchase of future travel.

C)   Fare Applicable to Upgrading Class of Service While in Flight

1)   When a Passenger moves from one compartment to another compartment of a combination compartment aircraft while in flight, an additional collection will be made in an amount equal to the difference between:

a)   The one-way fare from Passenger's point of origin on such flight to the last scheduled stop prior to the Passenger's change in compartment, applicable to the class of service used, plus the one-way fare from such stop to the Passenger's destination on such flight, applicable to transportation in the compartment to which the Passenger is moving, and

b)   The fare paid for transportation from the Passenger's origin to destination on such flight.  When the amount described in a) above is less than the amount in b) above, no additional payment will be required.
EXCEPTION:  Passengers traveling at a Round-Trip fare or any fare not having a one-way value, may upgrade all or any portion of their itinerary only upon payment of the full normal fare for the total itinerary.

c)   The passenger expressly authorizes UA to collect any additional applicable charges from the passenger arising out of a passenger occupying a class of service which is different than the class reflected on the passenger's boarding pass.

2)   The acceptance of such Passenger in the compartment to which he/she is moving for travel beyond the next scheduled stopping point in the flight will be subject to the availability of space.  Discounts, other than for children, will not apply.

**RULE 27   REFUNDS**

A)   Ticket Refunds - Involuntary

1)   The amount UA will refund upon surrender of the unused portion of the Passenger's Ticket for reasons pursuant to Rule 21 or Rule 24 will be as follows:

a)   If no portion of the Ticket has been used:  An amount equal to the fare and charges paid.

EXCEPTION:  UA shall not be obligated to refund any portion(s) of a fully unused Ticket which does not reflect a confirmed reservation on a UA flight involved in Irregular Operations, unless such Ticket was issued by UA.

b)   If a portion of the Ticket has been used:

(i)   One-way fares – An amount equal to the prorated value of the unused segment based on the fare component. UA will make no refund when alternate transportation is provided by UA and accepted by the passenger.

(ii)   Round-Trip, Circle-Trip, or Open-Jaw fare – An amount equal to the fare paid for the unused transportation from the point of termination to the destination or next Stopover point named on the ticket, or to a point at which transportation is to be resumed.  If both outbound and inbound fares on a domestic roundtrip ticket are the same, then 50% of the round-trip fare for the class of service paid, and for the unflown segment only.

(iii)   Area fare/flat rate fare – the refund amount will be computed by applying the same rate of discount, if any, applied in computing the original fare from the point of termination to the destination named on the Ticket, next Stopover, or the point where air transportation will be resumed via:
a.   The Routing specified on the Ticket, if the point of termination was on the Routing of the Ticket, or
b.   If the point of termination was not on the Routing specified on the Ticket, the direct Routing of any carrier operating service between such points.

      (iv)    If no fare of the type (fare basis) paid by the Passenger is published between the point of termination and the Passenger's destination or next Stopover point, the amount of the refund will be the same proportion of the normal coach (Y) fare published between the point of termination and the Passenger's destination or next Stopover point, as the fare paid is of the normal coach (Y) fare between the Passenger's point of origin or previous Stopover point and destination or next Stopover point.

            <u>Exception</u>:  UA shall not be obligated to refund any portion(s) of a Ticket which does not reflect a confirmed reservation on a UA flight involved in Irregular Operations, unless such ticket was issued by UA.

      (v)    The amount of refund will not exceed the fare component for the portion of the ticket from the last point of stopover to the next point of stopover or final destination.

c)    Refund will be made in accordance with this Rule, provided request for such refund has been made prior to the expiration of Ticket, where required.

2)    UA will make no refund but may, at its discretion, provide ground transportation to the destination airport without charge when the destination city airport designated on the Passenger's Ticket and the city airport where the flight terminates are both within any of the following city groups:

a)    Baltimore, MD (BWI)/Washington D.C. Dulles (IAD)/Washington D.C. National (DCA)

b)    Brownsville, TX (BRO/Harlingen, TX (HRL)/McAllen, TX (MFE)

c)    Burbank, CA (BUR)/Los Angeles, CA (LAX)/Ontario, CA (ONT)/Orange County, CA (SNA)/Long Beach, CA (LGB)

d)    Chicago, IL O'Hare (ORD)/Chicago, IL Midway (MDW)/Milwaukee, WI (MKE)

e)    Colorado Springs, CO (COS)/Denver, CO (DEN)

f)    Dallas, TX Dallas-Ft. Worth International (DFW)/Dallas, TX Love Field (DAL)

g)    Ft. Lauderdale, FL (FLL)/Miami, FL (MIA)/West Palm Beach, FL (PBI)

h)    Houston, TX Bush Intercontinental (IAH)/Houston, TX Ellington AFB (EFD)/Houston, TX Hobby (HOU)

i)    Oakland, CA (OAK)/San Francisco, CA (SFO)/San Jose, CA (SJC)

j)    Newark, NJ Newark International (EWR)/New York, NY La Guardia (LGA)/New York, NY/Kennedy (JFK)/White Plains, NY (HPN)

k)    London, UK Gatwick (LGW)/London, UK Heathrow (LHR)

3)    When a Passenger holding a Ticket for a higher class of service between a point of Origin and a Destination is required by the carrier to use a lower class of service for any portion of such carriage the amount of refund will be as follows:

a)    FOR UNRESTRICTED PREMIUM FARES: 50% of the prorated fare for that segment plus applicable variable taxes and fees.

b)    FOR SPECIAL AND RESTRICTED FARES: the lowest applicable fare at the time the ticket was purchased or the difference between the upgradeable and non-upgradeable fare type.

c)    This section does not apply to Passengers who purchase upgrades through miles and/or cash. If a Passenger pays for an upgrade that he does not receive, any recovery is limited to the amount paid for the upgrade in miles and/or cash.

B)    Ticket Refunds - Voluntary

For Tickets eligible for refunds, unless it is a refund as stated in Paragraph (A) above, UA will, upon the Passenger's surrender of the unused portion of a UA issued ticket or voided Ticket, refund to the Passenger as follows:

1)    If no portion of the Ticket has been used, in accordance with these rules, the refund will be an amount equal to the total fare and charges paid.

2)    If a portion of the Ticket has been used, in accordance with these rules, the refund will be an amount equal to the positive difference if any, between the fare and charges applicable to the Ticket issued to the Passenger, and the fare and charges applicable to the transportation of the Passenger covered by the used portion of the Ticket.

3)    Refund will be made, provided request for such refund has been made not later than the expiration date of the Ticket.

4)    UA assumes no obligation to issue a voluntary refund unless such Ticket was issued by UA on UA Ticket Stock.

5)    Any applicable administrative service charge or cancellation fee included as part of the published fare rule for the Ticket in question will be deducted from the amount to be refunded under 1) and 2) above.

6)    UA will issue refunds for eligible tickets within seven (7) business days of determining that a refund is due for credit card purchases and twenty (20) business days after receiving a complete refund request for purchases made with cash, check, or other forms of payment.

C)   Other Refunds

1)   Baggage service charges are non-refundable, but a Passenger who does not travel as a result of a flight cancellation, Schedule Change, or Irregular Operations will be eligible for a refund. United will also reimburse Passengers for any fee charged to transport bag(s) that are lost.

3)   Booking service charges are non-refundable, but Passengers may be eligible for a full refund upon request if the entire reservation is canceled within 24 hours of purchase and if the reservation is made one week or more prior to scheduled flight departure and purchased directly through UA.

4)   Day-of-departure upgrade fees are non-refundable, but if a flight for which an upgrade fee has been paid is affected by a flight cancellation, Schedule Change, or Irregular Operations, and the Passenger cannot be accommodated in First Class on a later flight, Passenger will be eligible for a refund upon request.

5)   Passengers who are eligible for a refund of service or other fee(s), must request a refund within 90 days of the date the fee(s) was originally paid or flight date, whichever is later.  UA is not liable to refund the service or other fees otherwise eligible for refund if the request is received after that time.

6)   If a Passenger is removed from a United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which a fee has been paid, and the Passenger is not re-accommodated in a seat of equal or greater value, or if a Passenger is downgraded from a class of service and is not re-accommodated in a seat in an equal or greater class of service for which a fee has been paid, the Passenger is eligible for a refund of this fee upon request.

D)   Persons to Whom Refund is Made - Except as provided below, UA will refund in accordance with this Rule only to the person named as the Passenger on the Ticket.
EXCEPTION 1:

1)   Tickets issued under a Universal Air Travel Plan (UATP) will be refundable only to the subscriber against whose account the Ticket was charged.

2)   Tickets issued against a Transportation Request issued by a government agency, other than the U.S.A Government, will be refunded only to the government agency that issued the Transportation Request.

3)   Tickets issued against a U.S.A Government Transportation Request (GTR) will be refunded only to the U.S.A. Government agency which issued the GTR by check made payable to the "Treasurer of the United States".

4)   Tickets issued against a credit card honored by UA will be refunded only to the account of the person to whom such credit card was issued.

5)   Tickets issued in the name of a minor will be refunded to the parent, guardian, or a third party as designated in accordance with Exception 2 below.
EXCEPTION 2:  If at the time of purchase, the purchaser designates on the Ticket another person or entity to whom refund shall be made, the refund will be made to the person so designated.  A refund made in accordance with this procedure to a person representing his/herself as the person so designated on the Ticket exchange order shall be deemed a valid refund, and UA will not be liable to the purchaser, or any other person for another refund.
EXCEPTION 3:  If at the time of application for refund, evidence is submitted that a company purchased the Ticket on behalf of its employees, or the travel agent has made a refund to its client, such refund will be made directly to the employee's company or the travel agent.

E)   Non-refundable Tickets:

1)   General Rule – Except as provided in Rules 4 and 27 C), UA will not refund any portion of a Ticket that is purchased with a non-refundable fare, including the fare and any taxes, fees, or other charges included within the total price paid for the Ticket.

2)   Application of Unused Ticket toward Future Ticket Purchase - UA may allow a portion of the non-refundable fare paid for an unused and unexpired non-refundable UA Ticket to be applied towards the purchase of future travel on UA, provided it is done in accordance with the applicable fare rule in place at the time of such request.  Change fees and other administrative charges may apply.  Basic Economy tickets, even if unused, have no residual value after date of departure and cannot be applied towards the purchase of future travel.  Any portion not so applied will not be refunded in any form.

F)   Lost Tickets

1)   Amount of Refund - When a Passenger loses a UA issued Ticket eligible for a refund, or the unused portion thereof, UA will, subject to the conditions set forth below, make a refund to the Passenger in the following amounts, as applicable.

a)   If no portion of the Ticket has been used, the refund will be an amount equal to the fare and charges paid, less service charges as indicated below.

b)   If a portion of the Ticket has been used, and

40

> (i)    The Passenger has purchased a new Ticket covering the same transportation as that covered by the unused portion of the lost Ticket, the refund will be an amount equal to the fare and charges paid for such new Ticket, or
>
> (ii)    The Passenger has not purchased a new Ticket covering the same transportation as that covered by the unused portion of the lost Ticket, and free transportation is not provided by UA, the refund will be an amount equal to the positive difference, if any, between the fare and charges paid, and the full normal fare and charges applicable to the transportation of the Passenger covered by the used portion of the Ticket, or
>
> (iii)    Where, in UA's judgment, a hardship exists and UA provides a free Ticket covering the lost portion(s) upon payment of service charges shown below, no further refund shall be due.

2)    Application for Refund of Lost Tickets

    a)    A refund will be made for eligible tickets in accordance with 1) above, provided application has been made no later than one month after the expiration date of the lost Ticket.

    b)    The application must be made on forms provided by UA for such refunds.

    c)    A refund will be made by UA upon application for such refund, provided that the lost Ticket or lost portion thereof has not previously been honored for transportation or refunded to any person during a period of three months from the date the loss is reported, and provided that the person to whom the refund is made agrees, in such form as may be provided by UA, to indemnify UA, including agreeing to return to UA such refund, for any loss or damage which it may sustain by reason of the use of the lost Ticket or portion thereof.

3)    Service Charge - UA will impose a service charge of 150.00 USD/150.00 CAD per ticket for handling request for refund of a lost Ticket or portion thereof.
EXCEPTION: No service charge will be imposed for Military Passengers when transportation is paid for with a U.S. Government Transportation Request (Form No. 1169).

4)    Non-refundable Tickets - UA will not refund any portion of a lost non-refundable Ticket, including the fare and any taxes, fees, or other charges. For applicable service charge, the Ticket will be reissued, if application is submitted prior to scheduled travel. Non-refundable Tickets will not be reissued after the date of travel reflected on each Flight Coupon.

G)    Foreign Currency Refunds

1)    All refunds will be subject to government laws, rules, regulations, or orders of the country in which the Ticket was originally purchased and of the country in which the refund is being made.

2)    Refunds will be made in the currency in which the fare was paid, or, at UA's election, in lawful currency of the country of the carrier making the refund in the amount equivalent to the amount due in the currency in which the fare or fares for the flight covered by the Ticket as originally issued was collected.

H)    Overcharge Refunds - Refund claims for overcharges must be submitted to UA in writing within 45 days after the operation of the flight Segment to which such overcharge claim relates, after which time no claim or legal action based on such overcharge can be maintained.

I)    Optional Services – Ticket refund will include fees charged to a Passenger for optional services that the Passenger was unable to use due to an oversale situation or flight cancellation.

## RULE 28   ADDITIONAL LIABILITY LIMITATIONS

For the purposes of international carriage governed by the Montreal Convention, the liability rules set out in the Montreal Convention are fully incorporated by reference herein and shall supersede and prevail over any provisions of this tariff which may be inconsistent with those rules.

A)    The Carrier shall be liable under Article 17 of the Warsaw Convention or Montreal Convention, whichever may apply, for recoverable compensatory damages sustained in the case of death or bodily injury of a passenger, as provided in the following paragraphs:

1)    The Carrier shall not be able to exclude or limit its liability for damages not exceeding 151,880 SDR for each passenger.

2)    The Carrier shall not be liable for damages to the extent that they exceed 151,880 SDR for each passenger if the Carrier proves that:

    (a)    such damage was not due to the negligence or other wrongful act or omission of the Carrier or its servants or agents; or

    (b)    such damage was solely due to the negligence or other wrongful act or omission of a third party.

3)    The Carrier reserves all other defenses and limitations available under the Warsaw Convention or the Montreal Convention, whichever may apply, to such claims including, but not limited to, the exoneration defense of Article

41

21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that the Carrier shall not invoke Articles 20 and 22(1) of the Warsaw Convention in a manner inconsistent with paragraphs (1) and (2) hereof.

4) With respect to third parties, the Carrier reserves all rights of recourse against any other person, including, without limitation, rights of contribution and indemnity.

5) The Carrier agrees that, subject to applicable law, recoverable compensatory damages for such claims may be determined by reference to the laws of the country of the domicile or country of permanent residence of the passenger.

B) In cases of bodily injury or death, the Carrier shall make an advance payment where the Carrier determines it is necessary to meet the immediate economic needs of, and hardship suffered by, a passenger as provided in the following paragraphs:

1) Unless a dispute arises over the identity of the person to whom an advance payment shall be made, the Carrier shall, without delay, make the advance payment to the passenger in an amount or amounts determined by the Carrier in its sole discretion. In the event of death of a passenger, the amount of the advance payment shall not be less than 16,000 Special Drawing Rights, which shall be paid to a representative of the passenger's next of kin eligible to receive such advance payment as determined by the Carrier in its sole discretion.

2) The Carrier shall make the advance payment as an advance against the Carrier's liability under the Warsaw Convention, or the Montreal Convention, whichever may apply. An advance payment shall not constitute recognition of liability. An advance payment shall be offset against, or deducted from the payment of, any settlement or judgment with respect to any claim for compensation on behalf of the passenger.

3) The Carrier, in making an advance payment, does not waive any rights, defenses, or limitations available under the Warsaw Convention, or the Montreal Convention, whichever may apply, to any claim, nor shall acceptance of an advance payment constitute a release of any claim, whatsoever, by any person.

4) The Carrier, in making an advance payment, preserves its right to seek contribution or indemnity from any other person for such payment, which shall not be deemed to be a voluntary contribution or contractual payment on the part of the Carrier.

5) The Carrier may recover an advance payment from any person where it is proven that the Carrier is not liable for any damage sustained by the passenger, or where it is proven that the person was not entitled to receive the payment, or where and to the extent that it is proven that the person who received the advance payment caused, or contributed to, the damage.

C) The Carrier shall be liable for damage occasioned by delay in the carriage of passengers by air, as provided in the following paragraphs:

1) The Carrier shall not be liable if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage, or that it was impossible for it or them to take such measures.

2) Damages occasioned by delay are subject to the terms, limitations and defenses set forth in the Warsaw Convention and the Montreal Convention, whichever may apply, in addition to any limitation or defense recognized by a Court with proper jurisdiction over a claim.

3) The Carrier reserves all defenses and limitations available under the Warsaw Convention or the Montreal Convention, whichever may apply to claims for damage occasioned by delay, including, but not limited to, the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention. Under the Montreal Convention, the liability of the Carrier for damage caused by delay is limited to 6,303 SDR per passenger. The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22 (5) of the Montreal Convention, whichever may apply.

D) The Carrier is liable for damages sustained in the case of destruction or loss of, damage to, or delay of checked and unchecked baggage, as provided in the following paragraphs:

1) Except as provided below, the liability of the Carrier is limited to 1,519 SDR for each passenger in the case of destruction, loss, damage, or delay of baggage, whether checked or unchecked, under the Warsaw Convention or the Montreal Convention, whichever may apply. Unless the passenger proves otherwise:

a. any baggage checked by a passenger shall be considered to be the property of that passenger;

b. a particular piece of baggage, checked or unchecked, shall not be considered to be the property of more than one passenger; and

c. unchecked baggage, including personal items, shall be considered to be the property of the passenger in possession of the baggage at the time of embarkation.

2) For purposes of determining liability with respect to lost, damaged or destroyed baggage under the Warsaw Convention, the weight of each piece of such baggage shall be deemed to be the maximum allowable weight for each piece of such baggage under the applicable restrictions, unless the actual weight is stated on the Baggage Check.

42

3) In the event of delivery to the Passenger of part but not all of the Passenger's Checked Baggage, or in the event of damage to part but not all of such Baggage, the liability of UA with respect to the undelivered or damaged portion under the Warsaw Convention shall be reduced proportionately on the basis of weight, regardless of the value of any part of the Baggage or contents thereof.

4) In the case of unchecked baggage, the Carrier is liable only to the extent the damage resulted from its fault, or that of its servants or agents. The Carrier is not liable for baggage carried in the passenger compartment of the aircraft and remaining in the personal possession of the passenger.
NOTE: Assistance provided by crewmembers to properly store such items does not transfer liability to the Carrier.

5) The Carrier is liable for damage sustained in case of destruction or loss of checked baggage upon condition only that the event which caused the destruction or loss took place on board the aircraft or during any period within which the checked baggage was in the charge of the Carrier. However, the Carrier is not liable if and to the extent that the damage resulted from the inherent defect, quality or vice of the baggage. Further, the Carrier's liability for the destruction, loss, damage or delay of baggage is subject to the terms, limitations and defenses set forth in the Warsaw Convention and the Montreal Convention, whichever may apply, in addition to any limitation or defense recognized by a Court with proper jurisdiction over a claim.

6) The Carrier reserves all defenses and limitations available under the Warsaw Convention and the Montreal Convention, whichever may apply to such claims including, but not limited to, the defense of Article 20 of the Warsaw Convention and Article 19 of the Montreal Convention, and the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that the Carrier shall not invoke Article 22(2) and (3) of the Warsaw Convention in a manner inconsistent with paragraph (1) hereof. The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22 (5) of the Montreal Convention, whichever may apply.

E) Under the Warsaw Convention and the Montreal Convention, whichever may apply, an action for damages must be brought within two years, and a complaint must be made to the carrier within seven calendar days in the case of damage to baggage, and 21 calendar days in the case of delay thereof. For baggage claims, reimbursement for any expenses will be based upon proof of claim acceptable to UA.

For purposes of all other carriage (including Domestic Carriage) not governed by the Montreal Convention or other applicable international law (unless specifically noted below), the following liability limitations and other exclusions apply:

F) UA shall not be liable for any death, injury, delay, loss or other damage of whatsoever nature (hereafter referred to collectively as "damage") arising out of or in connection with carriage or other services performed by UA, unless such damage is proven to have been caused by the sole negligence or willful misconduct of UA and there has been no contributory negligence on the part of the Passenger.

G) UA shall not be liable for any damage arising out of UA's compliance with any laws, government regulations, orders, rules, requirements or security directives or as a result of a Passenger's failure to comply with such laws, government regulations, orders, rules, requirements or security directives or as a result of Passenger's reliance on advice provided by UA regarding such laws, regulations, orders, rules, requirements or security directives. See also Rule 19.

H) UA shall not be liable for any punitive, consequential or special damages arising out of or in connection with carriage or other services performed by UA, whether or not UA had knowledge that such damage might be incurred.

I) Any limitations or exclusions of liability of UA shall apply to and be for the benefit of UA's agents, employees, vendors and representatives acting within the scope of their employment and also to any person whose aircraft is used by UA and its agents, employees or representatives acting within the scope of their employment.

J) Nothing herein shall be deemed to affect the rights and liability of UA with regard to any claims brought by, on behalf of, or in respect to any person who has willfully caused damage which resulted in death, wounding, or other bodily injury of a Passenger.

K) Additional Baggage Liability Limitations and Exclusions:

1) If all of the Passenger's Ticketed segments are for carriage within the U.S.A., the following apply:

a) Liability for the loss of, damage to or delay in delivery of a Passenger's personal property, including Baggage, when such personal property or Baggage has been checked (unless a higher value is declared in advance and additional charges are paid and personal property is not otherwise excludable), is limited to USD 4,700 per Ticketed Passenger. Passenger will be responsible for documenting and proving the actual value of the loss. For baggage claims, reimbursement for any expenses will be based upon proof of claim acceptable to UA.

b) When transportation is over the lines of UA and one or more carriers with a liability limitation exceeding USD 4,700 for each fare-paying Passenger and responsibility for loss, damage, or delay in the delivery of baggage cannot be determined, the liability limitation of USD 4,700 for each fare-paying Passenger will be

43

applied to all carriers. When transportation is via UA and one or more carriers, which exclude certain items in checked baggage from liability, UA will not be liable for the excluded items.

c)    UA assumes no responsibility or liability for Baggage or other items carried in the Passenger compartment of the aircraft or that a Passenger may leave at airports.

d)    In the case of loss of, damage to or delay in delivery of a Passenger's personal property, including Baggage, a preliminary notice of claim must be submitted to UA by the Passenger within twenty-four hours after arrival of the flight on which the Baggage was or was to be transported.  In the event of failure to give such preliminary notice of claim (absent extraordinary circumstances to be determined at UA's discretion), no action shall lie against UA.

e)    After preliminary notice of claim to UA by the Passenger, the Passenger must obtain a written claim form from UA.

f)    The completed written claim form pertaining to the claimed loss of, damage to or delay in delivery of a Passenger's personal property, including Baggage must be received by UA's System Tracing Center from the Passenger within 45 days after the flight date.  If the Passenger fails to return the completed written claim form within the specified time period (absent extraordinary circumstances to be determined at UA's discretion), no action shall lie against UA. No employee, agent or representative of UA can bind UA legally by reason of any statements relating to the baggage claims process or any other information, it is the Passenger's responsibility to follow the claims process in this Rule.

g)    Any baggage checked by a passenger shall be considered to be the property of that passenger.

2)    Wheelchairs and Other Assistive Devices

a)    With respect to Domestic Carriage and carriage to/from Canada only, carrier baggage liability limits do not apply to claims for loss, damage or delay concerning wheelchairs or other assistive devices.  The notice and claim requirements, however, do apply.

b)    In the case of a lost, damaged, or destroyed wheelchair or other assistive device, the Passenger must file a preliminary notice of claim with the Carrier at the airport immediately upon arrival. If the Passenger is unable to file a report upon arrival, they must contact the United Airlines Assistive Device Desk at 1-866-261-2395 (toll free within the U.S. and Canada) or 281-553-2395 (worldwide) or email AssistedDevice@united.com within 24 hours of arrival for Domestic Carriage and within seven calendar days of arrival for carriage to/from Canada.

c)    The Passenger must then complete a written claim form from UA within the time limitations defined in Rule 28 K) 2) b) above or under Rule 28 E), if applicable, and provide documentary proof of loss or damage such as the baggage incident report number, the passenger's itinerary, baggage tag, evidence of purchase, model, serial number and type of the wheelchair or other assistive device, and any other information that may be requested by the Carrier to verify the facts alleged and to assess the credibility of the claim. If a wheelchair or other assistive device can be returned to the Passenger in the condition in which it was received by making reasonable repairs, UA may, at the Passenger's request, make the repairs.

d)    UA has the right to inspect and document any pre-existing damage prior to acceptance of wheelchairs or other assistive devices as Checked Baggage.  UA reserves the right to refuse to transport large wheelchairs or other assistive devices that, due to the physical size of an aircraft compartment, cannot be carried upright safely without risk of serious damage to the wheelchair, or that would cause a load imbalance in a small baggage compartment and violate weight and balance safety requirements.  In such case, UA will use reasonable efforts to assist the Passenger in identifying a flight using an aircraft that can accommodate the wheelchair.

3)    EXCLUSIONS:  UA shall not be liable for the loss of, damage to or delay in delivery of any of the following:

a.    Antiques, artifacts, collectibles, religious items;

b.    Antlers;

c.    Backpacks not designed for travel, sleeping bags and knapsacks made of plastic, vinyl or other easily torn material with aluminum frames, outside pockets or with protruding straps and buckles;

d.    Business equipment and business samples;

e.    Portable multimedia players including, but not limited to, CD, DVD or MP3 players;

f.    Chinaware, glass, ceramics, pottery;

g.    Computer hardware/software and electronic components/equipment;

h.    Items checked in sacks or paper/plastic bags that do not have sufficient durability, do not have secure closures or do not provide sufficient protection to the contents;

i.    Items checked in corrugated/cardboard boxes, including cardboard boxes provided by UA, except for items that otherwise would be suitable for transportation without the cardboard box (e.g., bicycle, garment bag);

44

j.  Electronic and mechanical items, including cell phones, electronic games, and other related items;

k.  Eyeglasses, Binoculars, Prescription Sunglasses and Non-Prescription Sunglasses and all other eyewear and eye/vision devices;

l.  Flowers and plants;

m.  Garment bags not designed for travel;

n.  Irreplaceable items;

o.  Items made of paper (e.g., advertising displays, blueprints, maps, manuscripts, business/personal documents, historical documents, photos, books, negotiable papers, securities, etc.);

p.  Jewelry;

q.  Keys;

r.  Liquids, perfumes, alcohol/liquor, jerkins, ZAM ZAM water;

s.  Medicines and medical equipment (not used as assistive devices pursuant to 14 CFR 382.3);

t.  Money, gift cards and gift certificates;

u.  Musical instruments-Guitars, violins, violas, cellos, organs, harps, drums;

v.  Natural fur products;

w.  Perishable items such as medicine, flowers, and food (e.g., fruits and vegetables, cheese, fresh or frozen meat or poultry, seafood, baked goods, dry ice, and tobacco);

x.  Photographic/cinematographic/audio/video equipment, cameras and related items;

y.  Precious metals/stones;

z.  Tools, battery powered hand tools, tool boxes/containers, automotive towbars;

aa.  Totally unprotected items such as tennis racquets and umbrellas, either individually checked or tied/strapped to the outside of luggage;

bb.  Recreational and sporting goods, including but not limited to, archery equipment, baseball equipment, boogie/kite/skim/speed/skate boards, bicycles, bowling equipment, camping equipment, fencing equipment, golfing equipment, gymnastic equipment, hockey/lacrosse sticks, javelins, oars, paintball equipment, parachutes and parasails, pool cues, skating equipment, tennis equipment, water skiing/snow skiing/snowboards/wakeboards, hang gliding equipment, kayaks/canoes, personal human transporters, fishing rods, sculls, surfboards, windsurfing sailboards, scuba diving masks and pressure gauges, copes, and sporting trophies.

cc.  Silverware, knives, swords;

dd.  Strollers, folding wagons, bassinets, and infant carrying seats;

ee.  Watches (Timepieces);

ff.  Works of art such as paintings or sculptures; or

gg.  Any other similar valuable property or irreplaceable property included in the Passenger's Checked or Carry-on Baggage with or without the knowledge of UA.

4)  Assistance rendered to the Passenger by UA's employees and/or agents in loading, unloading, or storing unchecked, Carry-On Baggage or Cabin Baggage shall be considered as gratuitous service to the Passenger for which UA shall not be liable.

5)  UA's liability for Baggage is also limited in all of the following respects:

a)  UA shall not be liable for Baggage not claimed by Passenger immediately upon arrival.

b)  UA shall not be liable for damage caused by a Passenger's property, whether such damage is to the Passenger's own property or to other's property.

c)  UA shall not be liable for the loss of, damage to or delay in delivery of any Baggage accepted by another carrier for Interline Transfer to UA, if the Baggage is not acceptable for transportation as Checked Baggage by UA.

d)  A Passenger traveling with an animal shall be responsible for compliance with all governmental regulations and restrictions, including furnishing valid health and rabies vaccination certificates when required. UA will not be liable for loss or expense due to the Passenger's failure to comply with this provision, and UA will not be responsible if any animal is refused passage into or through any country, state or territory. (See Rule 23.)

e)  UA shall not be liable for any Baggage that has pre-existing damage, or for which UA has received a signed release form from the Passenger.

f)  UA shall not be liable for damage to Checked Baggage which does not impair the ability of such Baggage to function and specifically shall not be liable for damage arising from the normal wear and tear of handling, including minor cuts, scratches, scuffs, dents, punctures, marks or soil.

g) UA shall not be liable for loss of or damage to protruding parts such as wheels, feet, external pockets, pull and extending handles, hanger hooks, external locks, pull straps and security straps if this loss or damage occurred as a result of normal wear and tear.

h) UA shall not be liable for loss of or damage to articles due to a manufacturer's defect or due to overpacked Baggage, or for the destruction, loss or damage that results from an inherent defect, quality or vice of the Baggage.

i) UA shall not be liable for loss of or damage to articles which are strapped, fastened or otherwise secured to other Checked Baggage and which are not independently tagged and/or packaged. Such items include, but are not limited to, sleeping bags, luggage racks, luggage carriers and umbrellas.

j) UA shall not be liable for damage caused by improperly packed Checked Baggage or Carry-on Baggage.

k) UA shall not be liable for the loss of, damage to or delay in delivery of any Checked Baggage of a person traveling on a Ticket who is other than the Passenger to whom the Ticket was issued.

l) UA shall not be liable for the loss of, damage to or delay in delivery of any Checked Baggage of an employee of an airline other than UA or such employee's family or friends traveling on a non-revenue Ticket. EXCEPTION: If the other airline has a ZED agreement with UA, UA will comply with its terms regarding loss of, damage to or delay in delivery of any Checked Baggage of an employee of another airline or such employee's family or friends traveling on a non-revenue Ticket.

m) UA will not be liable for delivery or interim expenses incurred by the Passenger with delayed baggage if Passenger fails to meet the check-in time requirements set out in Rule 5 D.

n) UA is not liable for loss, damage, or delay of a Passenger's Checked Baggage, Carry-on Baggage, wheelchair or other assistive device, or any personal item that may result from a security search of such items conducted by an agent of any local, state, or federal agency, or from confiscation by an agent of any local, state, or federal agency.

6) Services of Other Carriers

a) UA's liability for damage, if any, shall be limited to occurrences on its own flights.

b) A carrier issuing a ticket or checking baggage for carriage over the lines of others (e.g., a carrier providing Interline Transportation) does so only as agent and is not liable for actions on the part of the operating carrier.

c) UA shall not be liable for the death or injury of a Passenger not occurring on its own operated flights.

## RULE 29   CUSTOMER SERVICE COMPLAINTS

Customer compliments and complaints may be made by email or mail to the following:

- Website address:
  https://www.united.com/en/us/customercare

- Mailing address:
  Customer Care – NHCCR
  United Airlines, Inc.
  900 Grand Plaza Dr.
  Houston, TX  77067-4323

If a third-party submits a complaint on behalf of a customer, the third party must provide evidence along with the complaint that it has the authority to act on the customer's behalf. Evidence of authorization shall include a signed letter from the customer or an executed power of attorney authorizing the third party to act on behalf of the customer. Third-parties must submit this evidence of authorization along with the complaint. United will not reply if evidence of third-party authorization is not provided or if United determines in its sole discretion that the evidence is incomplete or insufficient.

## RULE 30   CONSENT TO USE OF PERSONAL DATA

Upon booking a ticket for transportation, purchasing other services, or participating in any UA program or service such as MileagePlus or the United Club, you hereby authorize UA and its affiliates and authorized agents to (i) collect, process, retain and use, and (ii) transfer to third parties, including, but not limited to, subcontractors, agents, affiliates, marketing partners, other carriers, and government agencies, for their use, processing and retention, any and all personal data you provide when UA believes in good faith that it is in the interests of aviation security or that disclosure is otherwise necessary or advisable or as UA deems necessary to carry out any and all business purposes related to the program or services being requested and/or in the promotion of other information, goods, and services that may be of interest to you, including, but not limited to, the following purposes: making a reservation; purchasing a ticket; purchasing cargo services; participating in MileagePlus services; obtaining ancillary services, including accommodating special service requests; accounting, billing and auditing; checking credit or other payment mechanisms; operating frequent flyer programs; systems testing, maintenance and

46

development; customer relations; sales and marketing; promotions for UA and/ or its affiliates goods and services and third party goods and services; statistical analysis; developing and tailoring current and future services; facilitating travel, including obtaining immigration, security, and customs clearance; complying with applicable laws, regulations, government requests, law enforcement requests, and/or valid court orders; providing data to third parties or governmental or law enforcement agencies to comply with, or assist in the development of, security, safety, or health measures for passengers, baggage or cargo, or to provide for the prevention or detection of imminent criminal acts or the apprehension or prosecution of offenders; protecting the legal rights of UA and/or its affiliates.

If a passenger wants to learn more about UA's Privacy Policy, it may be viewed at www.united.com.  This policy is merely a statement of administrative protocol; it is not a contract, nor is it made, or intended to be made, a part of this Contract of Carriage, nor does it create any contractual or legal rights.

**RILEY SAFER HOLMES & CANCILA LLP**
SONDRA A. HEMERYCK (*pro hac vice*)
shemeryck@rshc-law.com
ELI LITOFF (*pro hac vice*)
elitoff@rshc-law.com
STEVEN E. VOGEL (*pro hac vice*)
svogel@rshc-law.com
1 S. Dearborn Street, Suite 2200
Chicago, IL 60603
Telephone:      (312) 471-8700
Facsimile:      (312) 471-8701
JEFFREY R. WILLIAMS (CSB No. 084156)
jwilliams@rshc-law.com
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Telephone:      (415) 275-8550
Facsimile:      (415) 275-8551

*Attorneys for Defendant*
UNITED AIRLINES, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC BRENMAN, AVIVA COPAKEN, SEAN MINYARD, ROBERT MONROE, and CINDY PAWLOWSKI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED AIRLINES, INC.,<br><br>Defendants. | Case No. 3:25-cv-06995-JD<br><br>**[PROPOSED] ORDER GRANTING DEFENDANT UNITED AIRLINES, INC.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DATE:  January 22, 2026**<br>**TIME:  10:00 a.m.**<br>**COURTROOM: 11**<br><br>Honorable James Donato<br>United States District Judge |

The Court, having reviewed the papers filed in support of and in opposition to Defendant United Airlines, Inc.'s Motion to Dismiss Plaintiffs' First Amended Class Action Complaint, and good cause appearing, hereby rules on Defendant's motion as follows:

IT IS HEREBY ORDERED that Defendant United Airlines, Inc.'s Motion to Dismiss Plaintiffs' First Amended Class Action Complaint is GRANTED.

Plaintiffs Marc Brenman, Aviva Copaken, Sean Minyard, Robert Monroe, and Cindy Pawlowski have failed to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

Therefore, Plaintiffs' First Amended Complaint against Defendant is dismissed in its entirety, with prejudice and without leave to amend.

IT IS SO ORDERED.

Dated: _____, 2026

_____
Honorable James Donato
United States District Judge